**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| NO LABELS, | |
| *Plaintiff*, | Case No. _____ |
| v. | |
| NOLABELS.COM INC., | |
| *Defendant*. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

*Of Counsel:*

Mark D. Lytle (*pro hac vice* forthcoming)
**NIXON PEABODY LLP**
799 9th Street NW
Suite 500
Washington, DC 20001
Tel:  (202) 585-8435
Fax:  (907) 331-4726
Email:  mlytle@nixonpeabody.com

Jason C. Kravitz (*pro hac vice* forthcoming)
Leslie E. Hartford (*pro hac vice* forthcoming)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel:  (617) 345-1031
Fax:  (617) 345-1300
Email: jkravitz@nixonpeabody.com
        lhartford@nixonpeabody.com

Dated:  December 4, 2023

**HALLORAN FARKAS + KITTILA LLP**

Theodore A. Kittila (Bar No. 3963)
5801 Kennett Pike, Suite C/D
Wilmington, Delaware 19807
Phone:  (302) 257-2025
Fax:  (302) 257-2019
Email:  tk@hfk.law

*Counsel  for Plaintiff*

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ...........................................................................................1

II.  ARGUMENT ................................................................................................3

    A.  Legal Standard ....................................................................................4

    B.  Application of the Legal Standard for Injunctive Relief to ACPA Claim................5

        1.  No Labels Has Shown a Reasonable Likelihood of Success  on the Merits that Defendant's Conduct Violates the ACPA ..................5

            a.  The NO LABELS Mark Was Distinctive When Defendant Registered the Infringing Domain ..................6

            b.  The Defendant's Domain Is Identical or Confusingly Similar to the Plaintiff's Mark .........................7

            c.  Defendant Registered the Infringing Domain with a Bad Faith Intent to Profit from the Mark.......................7

        2.  Defendant's Conduct Has Caused and, if Not Stopped, Will Continue to Cause Irreparable Harm to No Labels and the No Labels Registered Trademark ..................11

        3.  The Balance of Harms Weighs Heavily in Favor of Injunctive Relief ......11

        4.  Injunctive Relief Would Further the Public Interest .................................12

    C.  Application of the Legal Standard for Injunctive Relief to Infringement Claims .........................13

        1.  No Labels Has Shown a Reasonable Likelihood of Success on Its Claims that Defendant's Conduct Constitutes Trademark Infringement and False Designation of Origin .................13

            a.  Degree of Similarity Between the Owner's Mark and the Alleged Infringing Mark ..................15

            b.  The Strength of the Owner's Mark ...............................................15

            c.  The Price of the Services and Other Factors Indicative of the Care and Attention Expected of Consumers When Making a Purchase ..................16

            d.  The Length of Time the Defendant Has Used the Mark Without Evidence of Actual Confusion Arising ..........................17

e.      The Intent of the Defendant in Adopting the Mark.......................17

f.      Evidence of Actual Confusion .........................................................17

g.      Whether the Services, Competing or Not Competing, are
        Marketed Through the Same Channels of Trade and
        Advertised through the Same Media.................................................18

h.      Extent to Which the Targets of the Parties' Sales Efforts Are the
        Same..................................................................................................18

i.      Relationship of the Goods and Services in the Minds of
        Consumers, Whether Because of the Near-Identity of the
        Products, the Similarity of Function, or other Factors..................19

III.    CONCLUSION...............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000)............................................................14, 15, 18

*A.J. Canfield Co. v. Honickman*,
    808 F.2d 291 (3d Cir. 1986).......................................................................6

*AAMCO Transmissions, Inc. v. Dunlap*,
    646 F. App'x 182 (3d Cir. 2016) ...........................................................12

*Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*,
    No. 19-149 (MN), 2019 U.S. Dist. LEXIS 150395 (D. Del. Mar. 5, 2019) .............................5

*Am. Bridal & Prom Indus. Ass'n v. jollyprom.com*,
    No. 17-2454, 2018 U.S. Dist. LEXIS 38898 (D.N.J. Mar. 9, 2018)................................12, 19

*Carnivale v. Staub Design, LLC*,
    700 F. Supp. 2d 660 (D. Del. 2010)..................................................5, 6, 7

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001)........................................................15, 17, 18

*Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc*,
    214 F.3d 432 (3d Cir. 2000)......................................................................6

*Constructors Ass'n of Western Pa. v. Kreps*,
    573 F.2d 811 (3d Cir. 1978)..................................................................4, 5

*E.T. Browne Drug Co. v. Cococare Prods., Inc.*,
    538 F.3d 185 (3d Cir. 2008).......................................................................6

*Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*,
    213 F. Supp. 2d 612 (E.D. Va. 2002) ....................................................10

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
    30 F.3d 466 (3d Cir. 1994)................................................................15, 18

*Green v. Fornario*,
    486 F.3d 100 (3d Cir. 2007)..............................................................9, 10, 11

*Interpace Corp. v. Lapp, Inc.*,
    721 F.2d 460 (3d Cir. 1983)....................................................................14

*Jews for Jesus v. Brodsky*,
    993 F. Supp. 282 (D.N.J.) ......................................................................16

iii

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)......................................................................................15, 18

*Malibu Media, LLC v. Toshi Yamada*,
    No. CV171183, 2019 U.S. Dist. LEXIS 63290 (D.N.J. Apr. 12, 2019)...................................12

*New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd. LLC*,
    424 F. Supp. 3d 334 (D. Del. 2019)............................................................................13

*Ownum, LLC v. Ownum, Inc.*,
    No. 19-1043-MN, 2020 U.S. Dist. LEXIS 67728 (D. Del. Apr. 17, 2020)..............................7

*Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*,
    143 F. 3d 800 (3d Cir. 1998)....................................................................................19

*Shields v. Zuccarini*,
    254 F.3d 476 (3d Cir. 2001)...................................................................................6, 12

*Tootsie Roll Indus., Inc. v. Sathers, Inc.*,
    666 F. Supp. 655 (D. Del. 1987)................................................................................4

*United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc.*,
    128 F.3d 86 (2d Cir. 1997)......................................................................................13

*VeriFone, Inc. v. Poynt Co.*,
    199 F. Supp. 3d 898 (D. Del. 2016)...........................................................................17

*Versa Prods. Co. v. Bifold Co. (Mfg.)*,
    50 F.3d 189 (3d Cir. 1995)......................................................................................16

*Yah Kai World Wide Enterprises, Inc. v. Napper*,
    195 F. Supp. 3d 287 (D.D.C. 2016)...........................................................................16

**Federal Statutes**

15 U.S.C. § 1052(f).....................................................................................................6

15 U.S.C. § 1057(b)....................................................................................................7

15 U.S.C. § 1065......................................................................................................11

15 U.S.C. § 1114(1)................................................................................................4, 13

15 U.S.C. §§ 1114(1) and 1125(a)..................................................................................13

15 U.S.C. § 1114(1)(a)...............................................................................................13

15 U.S.C. § 1116(a)..................................................................................................11

15 U.S.C. § 1125(a) .................................................................................................................4, 13

15 U.S.C. § 1125(a)(1)(A) .............................................................................................................13

15 U.S.C. § 1125(d)(1)(B)(ii) ..........................................................................................................8

15 U.S.C. § 1125(d)(1)(c) ................................................................................................................3

15 U.S.C. § 1125(d)(2)(A) ...............................................................................................................4

15 U.S.C. § 1125(d)(2)(A)(ii) ..........................................................................................................4

ACPA ........................................................................................................................................4, 5, 11

Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ...........................................4, 5

Lanham Act Section 7(b) ..................................................................................................................7

Lanham Act Section 43(d)(1)(B)(i), 15 U.S.C. § 1125(d)(1)(B)(I) .................................................7

2020 Trademark Modernization Act .................................................................................................11

**Other Authorities**

FRCP 65 ............................................................................................................................................4

## I.     INTRODUCTION

Plaintiff No Labels ("Plaintiff" or "No Labels") is a social welfare organization whose stated mission is to support political centrism and bipartisanship through what it calls the "commonsense majority."  *See* Declaration of Jerald S. Howe, Jr. (the "Howe Decl."), filed herewith, at ¶ 4.  No Labels was founded in or about 2009.  *Id.* at ¶ 5.  No Labels has spent more than a decade nurturing and developing its unique brand of centrist politics that eschews the views of the extreme political left and right in favor of the middle and common sense.  *Id.* at ¶ 6.

No Labels owns a federal trademark registration for NO LABELS, U.S. Trademark Reg. No. 3,946,066 (the "No Labels Registered Trademark").  The No Labels Registered Trademark, which issued on April 12, 2011 in Class 35, covers:  "Issue advocacy; Public advocacy to promote awareness of public policy options and political issues."  *Id.* at ¶ 7.  No Labels' independence, and its ability to exclusively control its reputation and the political leaders with whom it is associated, is paramount to its mission.  *Id.* at ¶ 9.

No Labels has been the subject of enormous media attention in recent months because the organization may support a "Unity Ticket" for the 2024 election for president and vice president that would give voters a viable third-party candidate option rather than effectively being compelled to support the nominees from one of the two parties that dominate American politics. *Id.* at ¶ 10.  While No Labels has not yet committed to running candidates for president and vice president in 2024, polling shows that most Americans do not want to see a rematch of Joe Biden vs. Donald Trump.  *Id.* at ¶ 11. No Labels does not presently support any candidate in the 2024 presidential election.  *Id.* at ¶ 12.

To promote its message, No Labels relies heavily on its website (the "No Labels Website"), located at the domain nolabels.org (the "No Labels Domain").  *Id.* at ¶ 20.  The No Labels Website landing page trumpets: "WELCOME TO THE HOME FOR THE

COMMONSENSE MAJORITY."  It further states, "We are a national movement of commonsense Americans pushing our leaders together to solve our country's biggest problems." Visitors are invited to "Download the Common Sense Policy Booklet—a clear blueprint, guided by the shared values and aspirations of Americans across the nation."  The site also offers visitors the opportunity to "[w]atch a replay of our first Common Sense Town Hall…."  *Id.* at ⁋ 21.

No Labels has never authorized another person or entity to create a politically oriented website using its NO LABELS trademark.  *Id.* at ⁋ 31.  No Labels was therefore surprised when it recently learned that someone had purchased the domain nolabels.com (the "Infringing Domain") and was using that Infringing Domain to host a website which, like the No Labels Website, promotes political ideas and public policy (the "Infringing Website").  The surprise turned to frustration and anger when it became clear that the Infringing Website is designed to falsely evoke an association with the No Labels Website (coopting not only the registered trademark NO LABELS but also key phrases associated with No Labels like "Commonsense Majority").  *Id.* at ⁋ 32.  Moreover, the Infringing Website promotes politicians who have no affiliation with No Labels (including former President Donald Trump) and with whom No Labels has no desire to be affiliated.  *Id.* at ⁋ 33.  Such promotion by the Infringing Website is clearly for the purpose of deceiving the public, including voters and donors, into believing that supporting No Labels is tantamount to supporting former President Trump.

This is a textbook case of cybersquatting.  After performing a diligent investigation, No Labels discovered that a recently formed Delaware corporation named NoLabels.com Inc.

("Defendant")[1] was actively promoting the Infringing Website through a Google advertising campaign designed to improve its search ranking on Google.  *Id.* at ⁋ 37.  Through its Infringing Website, Defendant is pirating and bastardizing the No Labels' brand, its goodwill, and its reputation.  *Id.* at ⁋ 38.  By using a domain identical to the NO LABELS registered mark (differentiated only by the top-level domain (.org versus .com)), Defendant is cybersquatting and engaging in willful trademark infringement and false designation of origin, seeking to deceive the public and damage No Labels' brand and reputation.  People interested in learning more about the real No Labels who type "no labels" into a search engine may find themselves taken to the Infringing Website, where they will be confronted with content not associated with or approved by No Labels, including *inter alia* images of politicians whom No Labels does not support and with whom No Labels desires no association.  *Id.* at ⁋ 39.  Or they will be steered to the Infringing Website through Defendant's misleading advertisements, designed to deceive the public into believing they are being sent to a website sponsored by No Labels.

## II.    ARGUMENT

In view of the compelling and irrefutable evidence, No Labels seeks emergency *ex parte* relief to stop Defendant's unlawful activity, including:  (1) an Order directing Defendant to take down the Infringing Website and, pursuant to 15 U.S.C. § 1125(d)(1)(c), directing the Registrar to transfer the Infringing Domain to Plaintiff; (2) an Order enjoining the Defendant's use of NO LABELS in any confusing manner, including in its corporate name or any other website or

---

[1] The Delaware Department of State: Division of Corporations (DOC)'s online database revealed that NoLabels.com Inc. was formed on November 7, 2023.  *Id.* at ⁋ 36.  The DOC site does not publicly reveal the identity of Defendant's employees, shareholders, officers, or directors. *See, e.g.*, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.

domain; and (3) an Order authorizing No Labels to conduct expedited discovery of Defendant to, *inter alia*, ascertain the identity of all participants in this cybersquatting scheme.

A.    **Legal Standard**

Defendant's conduct violates the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), a law enacted in 1999 that established a cause of action for registering, trafficking in, or using a domain name confusingly similar to, or dilutive of, a trademark.  Pursuant to 15 U.S.C. § 1125(d)(2)(A), a trademark owner may file an *in rem* action "against a domain name in the judicial district in which the … domain name registry … is located …" provided the mark owner "through due diligence was not able to find a person who would have been a defendant in a civil action under [Section 1]…."  15 U.S.C. § 1125(d)(2)(A)(ii).  Here, although the registrant of the Infringing Domain made efforts to conceal its identity from the public by registering the domain through a proxy, No Labels believes after diligent investigation that Defendant is the registrant of the Infringing Domain.  As such, No Labels is asserting a claim directly against Defendant for violation of the ACPA, as well as claims for infringing a registered mark (15 U.S.C. § 1114(1)) and false designation of origin (15 U.S.C. § 1125(a)).

A temporary restraining order ("TRO") under FRCP 65 is an emergency remedy issued "to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction."  *Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F. Supp. 655, 658 (D. Del. 1987).  In granting a TRO, the court "must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing."  *Constructors Ass'n of Western Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978).

"A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction." *Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*, No. 19-149 (MN), 2019 U.S. Dist. LEXIS 150395, at *3 (D. Del. Mar. 5, 2019) (internal quotation marks and citations omitted).  In determining whether the entry of a TRO is warranted, a court must first consider whether:  (1) the movant has shown … a reasonable likelihood that it will succeed on the merits; (2) the movant has demonstrated that it will suffer irreparable harm absent the relief sought; (3) other parties will not be substantially injured by the relief; and (4) where the public interest lies.  *See id.* at **3-4.

No one factor will determine whether the court will enter a TRO; all of the elements must be weighed.  *See Constructors Ass'n*, 573 F.2d at 815.  Under this sliding scale, the greater the moving party's likelihood of prevailing on the merits, the less strongly it must show that the balance of harms weighs in its favor.  *See id.*

**B.     Application of the Legal Standard for Injunctive Relief to ACPA Claim**

**1.     No Labels Has Shown a Reasonable Likelihood of Success on the Merits that Defendant's Conduct Violates the ACPA**

The ACPA, 15 U.S.C. § 1125(d), provides in pertinent part:

A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person:

(i)     has a **bad faith intent to profit from the mark** . . . *and*

(ii)     registers, traffics in, or **uses a domain name that** . . .

(I)     in the case of a mark that is distinctive at the time of registration of the domain name, **is identical or confusingly similar to the mark**….

*Carnivale v. Staub Design, LLC*, 700 F. Supp. 2d 660, 663 (D. Del. 2010) (emphasis added).

The Third Circuit distills the ACPA analysis down to a three-part inquiry.  To prevail, a plaintiff must prove that:  (1) its mark was distinctive or famous at the time defendant registered

5

its domain name; (2) defendant's domain name is identical or confusingly similar to (or, if the mark is famous, dilutive of) plaintiff's mark; and (3) defendant registered the domain name with the bad faith intent to profit from the mark. *See Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir. 2001).  No Labels easily satisfies this three-part test.

> a. **The NO LABELS Mark Was Distinctive When Defendant Registered the Infringing Domain**

The No Labels Trademark Registration (for NO LABELS) was issued in 2011 and has been used in commerce continuously since then. *Id.* at ¶ 8.  "'Distinctiveness' is a term of art in trademark law that describes terms or designations that are eligible for legal protection as 'marks.'" *Carnivale*, 700 F. Supp. 2d at 664-665 (citing 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 11:2 (4th ed. 2010)).  The scale of distinctiveness for trademarks, in turn, is generally grouped into four categories:  arbitrary or fanciful terms, suggestive terms, descriptive terms, and generic terms.  *See A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir. 1986) (identifying the four categories of terms).  The first two categories, arbitrary or fanciful terms and suggestive terms, are considered "inherently distinctive" and are automatically protectable.  *See E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008).  Descriptive terms, however, are not considered inherently distinctive.  *Id.*  But descriptive terms can "acquire distinctiveness" if the consuming public comes to associate the term with a specific producer, which is known as "secondary meaning."  *See Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc,* 214 F.3d 432, 438 (3d Cir. 2000).  When a term acquires secondary meaning, it is eligible for protection as a mark.  *See E.T. Browne,* 538 F.3d at 191; *see also* 15 U.S.C. § 1052(f) (allowing registration of marks that have acquired distinctiveness).  Generic terms are never distinctive and thus never protectable as marks.  *E.T. Browne*, 538 F.3d at 191.

NO LABELS is not a coined term, and thus its distinctiveness emanates either from it being a suggestive or descriptive mark.  Irrespective of which category NO LABELS falls within, the No Labels Registered Trademark (NO LABELS) establishes distinctiveness as a matter of law.  *See Ownum, LLC v. Ownum, Inc.*, No. 19-1043-MN, 2020 U.S. Dist. LEXIS 67728, *7 (D. Del. Apr. 17, 2020) (mark presumed distinctive upon notice of allowance by PTO).  Section 7(b) of the Lanham Act indicates that a certificate of registration is prima facie evidence of the registered mark's validity.  15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this Act shall be prima facie evidence of the validity of the registered mark.").

Because Defendant registered its domain name on October 16, 2023—just weeks ago—there can be no dispute that the NO LABELS mark was distinctive at the time Defendant registered its Infringing Domain.  Accordingly, No Labels meets this element.

### b.  The Defendant's Domain Is Identical or Confusingly Similar to the Plaintiff's Mark

This factor is plainly met.  The Infringing Domain (nolabels.com) is effectively identical to the No Labels Registered Trademark (NO LABELS).  Courts have routinely found that adding a top-level domain (like .com) to a mark does not serve to distinguish it from the original mark.  *See, e.g.*, *Ownum,* 2020 U.S. Dist. LEXIS 67728, at *6-7 (finding that defendant's use of ownum.com domain name was identical to OWNUM registered mark); *see also Carnivale*, 700 F. Supp. 2d at 668.  Accordingly, No Labels meets this element.

### c.  Defendant Registered the Infringing Domain with a Bad Faith Intent to Profit from the Mark

Finally, No Labels must establish that Defendant acted with a bad faith intent to profit from Plaintiff's mark.  Section 43(d)(1)(B)(i) of the Lanham Act, 15 U.S.C. § 1125(d)(1)(B)(I),

provides a non-exhaustive list of nine factors for determining if a plaintiff has shown the

requisite bad faith:

(I) the trademark or other intellectual property rights of the defendant, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the defendant or a name that is otherwise commonly used to identify the defendant;

(III) the defendant's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the defendant's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the defendant's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the defendant's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the defendant's prior conduct indicating a pattern of such conduct;

(VII) the defendant's provision of material and misleading false contact information when applying for the registration of the domain name, the defendant's intentional failure to maintain accurate contact information, or the defendant's prior conduct indicating a pattern of such conduct;

(VIII) the defendant's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the defendant's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.[2]

---

[2] The statute provides a safe harbor:  "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had *reasonable grounds* to believe that the use of the domain name was a fair use or otherwise lawful.  15 U.S.C. § 1125(d)(1)(B)(ii) (emphasis added).  Given the compelling evidence of Defendant's bad faith, it cannot possibly avail itself of the safe harbor.

The Third Circuit has stated that applying these factors "is a holistic, not mechanical, exercise." *Green v. Fornario*, 486 F.3d 100, 106 (3d Cir. 2007).

Factors I, II, and III clearly favor No Labels. First, Defendant has no trademark or other intellectual property rights that could possibly give it the right to associate NO LABELS, or any domain name incorporating the No Labels Registered Trademark, with its political website.[3] Second, while the Infringing Domain consists of the Defendant's legal name, this is only because Defendant registered the Infringing Domain and formed its legal entity for the purpose of hijacking the No Labels Registered Trademark to sow confusion among the public, harm No Labels, and deceive potential voters. Finally, given that Defendant only registered the Infringing Domain on October 16, 2023—just weeks ago—it cannot possibly establish any prior use of the Infringing Domain in connection with the bona fide offering of any goods or services. *Id.* at ¶ 34. Accordingly, these three factors strongly support a finding of bad faith.

Factor IV also favors No Labels because Defendant cannot possibly establish that it is engaging in *bona fide* noncommercial or fair use of the mark on its Infringing Website. Defendant is not offering political commentary or critique of the legitimate No Labels on the Infringing Website. *Id.* at ¶ 44. Rather, Defendant is *pretending to be* the legitimate No Labels organization. The Infringing Website is designed to mislead visitors into believing that the site is operated by, or affiliated with, No Labels. This is not fair use; it is deception.

Similarly, factor V favors No Labels because the Defendant is trying to divert consumers from the legitimate No Labels Website to the Infringing Website. Defendant is sponsoring a Google Ads campaign to boost the search engine ranking of its Infringing Website. *Id.* at ¶ 37.

---

[3] Insofar as Defendant attempts to argue that it has trademark rights stemming from its use of NO LABELS on its Infringing Website, that use constitutes infringement and cannot support a claim to legitimate trademark rights.

This is irreparably harming the goodwill of the No Labels Registered Trademark, with the clear intent to tarnish or disparage No Labels and/or the NO LABELS mark by creating a likelihood of confusion as to the source or sponsorship of the Infringing Website and by misleading the public with respect to the politicians and policies the legitimate No Labels supports. *Id.* at ⁋ 38. There is no plausible explanation for why Defendant would choose the Infringing Domain for a website designed to evoke an association with No Labels other than Defendant is trying to cause potential voters to form misguided views of the real No Labels.

Factors VI and VIII do not favor either party. Defendant has not (to Plaintiff's knowledge) offered to transfer or sell the Infringing Domain to No Labels or any third party for financial gain, and Plaintiff presently has no evidence that Defendant is in the business of trafficking infringing domains. However, the evidence suggests that the primary motivation behind Defendant's plot is to profit by deceiving voters and donors, deterring people from supporting No Labels, and hindering No Labels' ability to control its brand.

Factor VII supports No Labels. By choosing to cloak the identity of the Infringing Domain's registrant, Defendant intentionally failed to maintain accurate contact information – undoubtedly for the purpose of avoiding accountability.

Finally, as detailed *supra* in the discussion on Factor I, Factor IX—the extent to which No Label's mark is distinctive and famous—supports No Labels. Indeed, registration of a distinctive mark may itself satisfy this factor. *See Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 626 (E.D. Va. 2002) (ninth factor "clearly satisf[ied]" where mark is "registered, incontestable, and distinctive"). Because the NO LABELS mark was registered by the U.S. Patent & Trademark Office in 2011, the mark is both distinctive and

incontestable as a matter of law.[4]  NO LABELS is not a generic term when used for "Issue advocacy; Public advocacy to promote awareness of public policy options and political issues," as reflected in the No Labels Trademark Registration and as actually used by No Labels on the No Labels Website.  The recent wave of publicity No Labels has experienced serves to make its NO LABELS mark even more distinctive and famous.  *Id.* at ¶10.

Given that seven of nine factors support No Labels (with the others being neutral), there can be little doubt that No Labels is reasonably likely to meet its burden of showing that Defendant acted with bad faith intent to profit from its conduct.  This is particularly true when the factors are viewed holistically, as the Third Circuit requires.  *See Green*, 486 F.3d at 106.

### 2.     Defendant's Conduct Has Caused and, if Not Stopped, Will Continue to Cause Irreparable Harm to No Labels and the No Labels Registered Trademark

Under the 2020 Trademark Modernization Act, a plaintiff seeking a temporary restraining order on the basis of a cybersquatting claim "shall be entitled to a rebuttable presumption of irreparable harm upon . . . a finding of likelihood of success on the merits." 15 U.S.C. § 1116(a).  Because No Labels has shown a likelihood of success on the merits of its cybersquatting claim, it is entitled to the presumption of irreparable harm.  Indeed, Defendant's objective is to tarnish No Labels' brand by deceiving the public, including voters, about what No Labels' stands for as an organization.  The Court should presume that – absent injunctive relief – Defendant will continue to succeed in its efforts.

### 3.     The Balance of Harms Weighs Heavily in Favor of Injunctive Relief

Because No Labels has established not just a *reasonable* likelihood of success on the merits of its ACPA claim, but an *overwhelming* likelihood, the Court should conclude that the

---

[4] A mark is incontestable if it has been "in continuous use for five years subsequent to the date of ... registration and is still in use in commerce." 15 U.S.C. § 1065.

balance of harms weighs heavily in favor of injunctive relief.  Indeed, where, as here, "the only hardship imposed upon the Defendant [by an injunction] is that they obey the law," courts have not hesitated to grant injunctive relief.  *See, e.g.*, *Malibu Media, LLC v. Toshi Yamada*, No. CV171183, 2019 U.S. Dist. LEXIS 63290, at *3 (D.N.J. Apr. 12, 2019) (citation, alteration, and quotations omitted); *Am. Bridal & Prom Indus. Ass'n v. jollyprom.com*, No. 17-2454, 2018 U.S. Dist. LEXIS 38898, at *11-12 (D.N.J. Mar. 9, 2018) ("In infringement actions, there is no injury where an injunction 'requires [a] [d]efendant to abide by the law and to refrain from infringing [] federally protected marks,' because any subsequent violation would be 'self-inflicted.'"); *see also AAMCO Transmissions, Inc. v. Dunlap*, 646 F. App'x 182, 184 (3d Cir. 2016) ("[A] permanent injunction would merely prohibit [the defendants] from engaging in an activity to which [they] have no legal right.").  Moreover, courts have held that where an injunction merely causes a defendant to cease its infringing conduct and operation of websites enabling that infringement, "it is not a significant burden or harm given that these sites are being used to perpetuate wrongful conduct."  *Am. Bridal*, 2018 U.S. Dist. LEXIS 38898, at *12.

### 4.      Injunctive Relief Would Further the Public Interest

The public interest strongly favors protecting a trademark holder's property interests from erosion and avoiding public confusion.  *Am. Bridal*, 2018 U.S. Dist. LEXIS 38898, at *5 (citing *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (3d Cir. 1984)).  Moreover, the Third Circuit has made clear that in trademark cases, "public interest . . . is a synonym for the right of the public not to be deceived or confused."  *See Shields*, 254 F.3d at 486.  That wisdom applies here.  Shutting down the Infringing Website will deny Defendant the opportunity to continue misleading the public, and thus this factor strongly favors injunctive relief.

In summary, it is clear that No Labels more than satisfies the high burden for issuance of a temporary restraining order.

C.   **Application of the Legal Standard for Injunctive Relief to Infringement Claims**

    1.   **No Labels Has Shown a Reasonable Likelihood of Success on Its Claims that Defendant's Conduct Constitutes Trademark Infringement and False Designation of Origin, in Violation of 15 U.S.C. §§ 1114(1) and 1125(a)**

Section 1114(1) bars unauthorized use of a mark "in commerce … in connection with the sale, offering for sale, distribution, or advertising of any goods or services [if] … such is likely to cause confusion, or to cause mistake or to deceive…."  Similarly, § 1125(a) provides that a person who:

> in connection with any goods or services … uses in commerce any word, term, name, symbol, or device … or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which … is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person … or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person…."

The term "services" has been interpreted broadly under the Lanham Act.  Indeed, "[t]he right to enjoin infringement of a trade or service mark 'is as available to public service organizations as to merchants and manufacturers'" and the Lanham Act has been applied to organizations offering a "wide variety of non-commercial public and civil benefits," including political organizations—even if those organizations do not "place products into the stream of commerce." *See United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc.*, 128 F.3d 86, 89-90 (2d Cir. 1997) (further citations omitted).

"Federal trademark infringement, 15 U.S.C. § 1114(1)(a), and a false designation of origin claim, known more broadly as federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards."  *See New Balance Ath., Inc. v. USA New Bunren Int'l Co. Ltd.*

*LLC*, 424 F. Supp. 3d 334, 346 (D. Del. 2019) (further citation omitted).[5]  Under these standards, a plaintiff must prove that: (1) it owns the mark; (2) the mark is valid and legally protectable; and (3) defendant's use of the mark to identify goods or services is likely to create confusion.  *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

As indicated *supra*, it is clear that No Labels owns the mark at issue (NO LABELS) and, in fact, received a federal registration for that mark in 2011.  Nor can there be any doubt that the No Labels Registered Trademark is valid and legally protectable.  Accordingly, whether No Labels is reasonably likely to prevail on the Infringement Claims depends exclusively on whether Defendant's use of NO LABELS to identify its services is likely to create confusion.

The Third Circuit has adopted a non-exhaustive list of factors to consider in evaluating likelihood of confusion, commonly referred to as the "*Lapp* factors."  *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).  The *Lapp* factors include:

(1)     the degree of similarity between the owner's mark and the alleged infringing mark;

(2)     the strength of the owner's mark;

(3)     the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4)     the length of time the defendant has used the mark without evidence of actual confusion arising;

(5)     the intent of the defendant in adopting the mark;

(6)     the evidence of actual confusion;

(7)     whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8)     the extent to which the targets of the parties' sales efforts are the same;

---

[5] For convenience, the claims for infringement and false designation of origin will be referred to, collectively, as the "Infringement Claims."

(9)     the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and

(10)    other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708-709 (3d Cir. 2004).

"None of [the *Lapp*] factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."  *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).  Each factor is "weighed . . . separately," which "is not to say that all factors must be given equal weight."  *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 & n.11 (3d Cir. 1994).  "The different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation."  *A & H*, 237 F.3d at 215.  The *Lapp* factors are best understood as "tools to guide a qualitative decision."  *Id.* at 216.

### a.      Degree of Similarity Between the Owner's Mark and the Alleged Infringing Mark

The Defendant's mark (nolabels.com) is identical to the No Labels Registered Trademark.  This factor weighs strongly in favor of confusion.

### b.      Strength of the Owner's Mark

The stronger the mark, the more protection it is entitled to.  The Third Circuit has described the strength factor as follows:

The strength of the owner's mark directly affects the likelihood that consumers will be confused as to the sources of products bearing substantially similar marks. Strength includes both "distinctiveness on the scale of trademarks" and "commercial strength, or marketplace recognition." [Citation omitted.] A strong trademark is thus one that carries widespread, immediate recognition that one producer (even if unknown) is associated with the mark, and so with the product.

> If a second comer adopts a mark substantially identical to a strong mark, there is a correspondingly high likelihood that consumers will mistakenly associate the newcomer's product with the owner of the strong mark.

*Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 203 (3d Cir. 1995).

NO LABELS is best characterized as a "suggestive" mark on the distinctiveness scale (discussed in detail *supra*).  Suggestive marks are considered to be moderately strong.  *See, e.g., Yah Kai World Wide Enterprises, Inc. v. Napper*, 195 F. Supp. 3d 287, 314 (D.D.C. 2016) (describing how a suggestive mark falls in the middle of the distinctiveness scale).  However, NO LABELS has a high degree of commercial strength (marketplace recognition), particularly given the massive media attention it has received in the context of the 2024 presidential election. *Id.* at ¶ 10.  Indeed, Defendant's Infringing Website is a direct response to the strength of the NO LABELS mark and brand and the media attention it has been receiving.  Moreover, No Labels actively promotes its mark by, *inter alia*, posting videos on its popular YouTube channel, sponsoring grass-roots events, and allowing visitors to download policy books from the No Labels Website.  *Id.* at ¶¶ 22-30.  Accordingly, this factor weighs heavily in favor of confusion.

### c. Price of the Services and Other Factors Indicative of the Care and Attention Expected of Consumers When Making a Purchase

It is well established that people conducting research on the Internet do not necessarily exhibit great care in that process.  *See, e.g.*, *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 303 (D.N.J.), *aff'd,* 159 F.3d 1351 (3d Cir. 1998) ("many Internet users are not sophisticated enough to distinguish between the subtle difference in the domain names of the parties").  This is reinforced here by the experience of Dr. Pat Love, who found herself directed to Defendant's Infringing Website while attempting to research the real No Labels.  *See generally* Declaration of Pat Love ("Love Decl.") filed herewith.  This factor supports confusion.

16

### d. Length of Time the Defendant Has Used the Mark Without Evidence of Actual Confusion Arising

Defendant has only been using the Infringing Domain to host the Infringing Website for a few weeks.  Tellingly, within that short time, No Labels has heard from a person who was actually confused by the similarity of the marks at issue.  The woman, who holds a doctorate in education, set out to research No Labels on the Internet but found herself on Defendant's Infringing Website, believing it to be the legitimate No Labels Website.  She was surprised to see politicians like Donald Trump featured on a site she believed to be the legitimate No Labels' website.  *See generally id.*  This factor weighs strongly in favor of confusion.

### e. Intent of the Defendant in Adopting the Mark

"[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion."  *Checkpoint*, 269 F.3d at 286.  Here, there can be no reasonable dispute that Defendant registered the Infringing Domain and then launched the Infringing Website with knowledge of No Labels and the No Labels Registered Trademark and for the purpose of misleading and sowing confusion among the public, including voters.  The Infringing Website is not a "grip site" designed to criticize or disagree with No Labels or its positions.  *See* Howe Decl. at ¶ 44.  It is designed to mislead people into believing it is operated by or endorsed by No Labels.  Accordingly, this factor weighs heavily in favor of confusion.

### f. Evidence of Actual Confusion

Although "[e]vidence of actual confusion is not required to prove likelihood of confusion," such evidence strengthens plaintiff's case.  *VeriFone, Inc. v. Poynt Co.*, 199 F. Supp. 3d 898, 909 (D. Del. 2016) (citing *Checkpoint*, 269 F.3d at 291).  Here, again, No Labels has already identified one Texas resident who was confused by the similarity of the marks at issue

and unintentionally found herself on Defendant's Infringing Website.  *See generally* Love Decl.

This factor weighs strongly in favor of confusion.

> **g.      Whether the Services, Competing or Not Competing, are Marketed Through the Same Channels of Trade and Advertised through the Same Media**

The greater the similarity between the parties' advertising and marketing campaigns, the

greater the likelihood of confusion.  *Checkpoint*, 269 F.3d at 289; *Kos Pharms.*, 369 F.3d at

722.  "This is a 'fact-intensive inquiry' that requires a court to examine the 'media the parties use

in marketing their products as well as the manner in which the parties use their sales force to sell

their products to consumers.'"  *Kos Pharms.*, 369 F.3d at 722 (quoting *Checkpoint*, 269 F.3d at

289).  In the instant case, the dispute centers around the parties' respective websites—which

serve the purpose of providing the public, including voters, with information.  The parties'

respective websites are accessed through publicly available search engines like Google, Bing,

Yahoo!, etc.  *See* Howe Decl. at ¶ 45.  Defendant sponsored a Google Ads campaign to boost

public awareness of its Infringing Website, and both parties' websites compete for search

rankings on Google and other search engines.  Accordingly, this factor supports confusion.

> **h.      Extent to Which the Targets of the Parties' Sales Efforts Are the Same**

When the parties target their sales efforts to the same consumers, there is a stronger

likelihood of confusion.  *Checkpoint*, 269 F.3d at 289-90.  Here, the "consumers" are potential

voters.  As such, No Labels and Defendant are targeting the same consumers.  Accordingly, this

factor supports confusion.

> **i.  Relationship of the Goods and Services in the Minds of Consumers, Whether Because of the Near-Identity of the Products, the Similarity of Function, or other Factors**

The test for determining the relationship of services in the minds of consumers is whether the services are similar enough that a consumer could assume they were associated with or offered by the same source.  *Fisons*, 30 F.3d at 481; *Checkpoint*, 269 F.3d at 286-87.  "Near-identity" and "similarity of function" are key to assessing whether consumers may see services as related.  *A & H*, 237 F.3d at 215.  Here, both No Labels and Defendant offer identical services—political advocacy and discussion and positions on certain issues.  Accordingly, this factor supports confusion.

In summary, it is clear that No Labels is, at a minimum, reasonably likely to succeed on the merits of the Infringement Claims.  In a trademark infringement case, irreparable harm is presumed upon a showing of likely confusion.  *See Am. Bridal*, 2018 U.S. Dist. LEXIS 38898, at *4 (observing that Third Circuit recognizes "trademark infringement amounts to irreparable injury as a matter of law") (quoting *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 237 (3d Cir. 2003))*; Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F. 3d 800, 805 (3d Cir. 1998) ("This court has held that once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury.").  Moreover, as detailed *supra*, the relief requested by No Labels is consistent with the public interest, and the balancing of harms weighs heavily in favor of granting injunctive relief.  Consequently, the Court should enter an Order that precludes Defendant from continuing its unlawful conduct.

### III.     CONCLUSION

For the reasons set forth herein, No Labels respectfully requests that the Court exercise its equitable power by granting the relief requested in the accompanying motion and proposed order.

Date: December 4, 2023

*Of Counsel:*

Mark D. Lytle (*pro hac vice* forthcoming)
**NIXON PEABODY LLP**
799 9th Street NW
Suite 500
Washington, DC 20001
Tel:  (202) 585-8435
Fax:  (907) 331-4726
Email:  mlytle@nixonpeabody.com

Jason C. Kravitz (*pro hac vice* forthcoming)
Leslie E. Hartford (*pro hac vice* forthcoming)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel:  (617) 345-1031
Fax:  (617) 345-1300
Email:  jkravitz@nixonpeabody.com
              lhartford@nixonpeabody.com

**HALLORAN FARKAS + KITTILA LLP**

*/s/ Theodore A. Kittila*
Theodore A. Kittila (Bar No. 3963)
5801 Kennett Pike, Suite C/D
Wilmington, Delaware 19807
Phone:  (302) 257-2025
Fax:  (302) 257-2019
Email:  tk@hfk.law

*Counsel for Plaintiff*

20