**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NO LABELS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01384-GBW |
| | ) | |
| NOLABELS.COM INC., | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**DEFENDANT NOLABELS.COM INC.'S OPPOSITION TO PLAINTIFF NO LABELS'
MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Elizabeth S. Fenton (Bar No. 5563)
**BALLARD SPAHR LLP**
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Office:  302-252-4465
Email: fentone@ballardspahr.com

**BILLION LAW**
Mark M. Billion (Bar No. 5263)
1073 S. Governors Avenue
Dover, DE  19904
Office:  302-428-9400
Email:  mbillion@billionlawgroup.com

Dated: December 14, 2023

This case is about who gets to control a grassroots movement of everyday Americans frustrated with the increasingly partisan nature of politics.  This movement, which is called "No Labels" in a nod to voters' desire to affiliate with candidates rather than parties, has led thousands of citizens to identify as "No Labels" party members.  Still more have banded together to get at least a dozen different "No Labels" parties – none of which are the instant Plaintiff – on to ballots nationwide.  Multiple candidates have decided to run on these tickets.

Now that the movement has taken off, Plaintiff is trying to claw it away from the very voters who are responsible for its relevance.  Plaintiff's plan, it appears, is to appropriate the "No Labels" movement by using its rights in the now-generic "No Labels" mark to silence the voices of others.  In short, now that someone is listening, Plaintiff wants total control of the message.  However, as explained below, Plaintiff already gave up control.  It consciously released its hold on the mark to the movement, which spans at least a dozen separate and distinct state political parties, which serves as an affiliation for more than a thousand times as many voters, and which serves as a political banner for multiple candidates.  Even the issue here, that the Defendant operates a "No Labels" site at NoLabels.com, is a product of Plaintiff's own decision to release its hold on the mark: Plaintiff owned NoLabels.com and gave it up rather than pay the nominal amount to keep it.[1]

This cessation of control is fatal to the Plaintiff's ambitions because a trademark only remains enforceable for as long as it is tightly held.  Put otherwise, to be enforceable, the mark has to be tied to a single producer – Coke means Coca-Cola, a half-eaten apple affixed to any electronic device means it will sync with an iPhone, and a swoosh means it's a Nike.  Given the number of

---

[1] *See* https://web.archive.org/web/20150801191623/http://nolabels.com/ (Aug. 15, 2015) (redirecting to NoLabels.org) *and compare* https://web.archive.org/web/20210111010736/http://nolabels.com/ (Jan. 11, 2021) (reflecting the release of the domain) .

people and entities under the "No Labels" umbrella, though, there is no 1:1 "swoosh to Nike" correlation here. "No Labels" could tie to any number of actors, including political parties, candidates and supporters. "No Labels" assuredly does not mean this Plaintiff exclusively. That makes the mark generic, and accordingly it invalidates all the Plaintiff's claims. Beyond that, the claims themselves make little sense given that what is at issue is a non-commercial political website that does not fall within the ambit of the laws that were supposedly violated.

Rather abandon its ambitions, Plaintiff has chosen to harass Defendant on the thinnest of grounds – a declaration made by one lone Texan, a life-long friend of Plaintiff's Texas organizer, who says she was unnecessarily confused.[2]  Almost entirely based on her purported confusion, Plaintiff demands this Court deprive Defendant of its rights to speak, the voters of their right to hear its speech, and Defendant's rights to a web address it purchased after Plaintiff abandoned it.

Under these circumstances, Plaintiff is simply not entitled to the extraordinary remedy of a temporary restraining order ("TRO"). While Plaintiff may very well have registered the trademark "No Labels" in 2011, Plaintiff's attempt to prevent Defendant from utilizing the domain www.nolabels.com should be rejected. With respect to Plaintiff's cybersquatting and Lanham Act claims, Plaintiff fails to show that the www.nolabels.com site has any commercial purpose whatsoever. On the contrary, the website seeks to encourage political speech, speech that is protected under the First Amendment.

Beyond that, Plaintiff has unclean hands that disqualify it from seeking equitable relief. They are the ones trying to redirect a movement *sub silentio* by taking over websites that offend

---

2 Love Dec. at ¶ 2 ("I became aware of Plaintiff . . . through Dorsey Cartwright, a citizen leader for [Plaintiff] in Texas. Unrelated to No Labels, Dorsey and I had been friends and colleagues for over 30 years.").

their narrow sensibilities so that they can provide a false narrative of cohesion within the movement.  They are the ones trying to confuse the voters.

The TRO should also be denied because of the many factual questions which cast doubt on Plaintiff's likelihood of success. At the very least, if the Court determines that Defendant should take down www.nolabels.com until further development of the record, the Court should not direct the domain to be transferred to Plaintiff.

### Factual Background

Plaintiff holds itself out as a 501(c)(4) tax-exempt social welfare organization.  Compl. ¶ 1; Decl. of Jerald S. Howe, Jr., attached to Op. Br. of Plaintiff.  Mr. Howe is the volunteer Treasurer for the Board of No Labels, and states in his Declaration that No Label's "independence, and its ability to exclusively control its reputation and the political leaders with whom it is associated, is paramount to its mission."  Howe Decl., ¶ 9.  Plaintiff allegedly owns a registered trademark, No. 3,946,066.  *Id.*  at ¶ 7.  Plaintiff states on its web site, www.nolabels.org, that it is not a political party.

**Is No Labels a political party?**

No Labels, Inc. is a 501(c)(4) social welfare organization established in 2009 to give voice to America's commonsense majority, and we have a proven track record of bringing leaders from both parties together to solve problems.

Since our inception, No Labels has been trying to make the two-party system work by building a bipartisan governing coalition in Congress. We helped create the first-of-its-kind House Problem Solvers Caucus and an allied Senate group that were the force behind historic bipartisan achievements like the 2021 infrastructure bill.

In late 2021, No Labels launched an ambitious new project to secure nationwide ballot access to enable the potential nomination of an independent Unity ticket in 2024. Opponents of this project say that this makes No Labels a national political party committee like the Democratic National Committee or Republican National Committee. This is untrue. A political party's purpose is to campaign for its candidates up and down the ballot, year after year. But No Labels' project is something much narrower and more focused: We are simply clearing away the ballot access obstacles built by the major parties to create space for the potential nomination of an independent Unity ticket, if that's what the American public wants.

We are only doing ballot access work for one office and for one election. If No Labels does end up offering our ballot line to an independent Unity ticket, our organization will not help fund or run the campaign. Since No Labels' inception, most of our time and resources have been dedicated to pushing for public policy reforms rather than election-related activity, and this remains true today. The law and the courts have been clear that an entity like No Labels that is focused only on ballot access and not on advocating for any clearly identified candidate is not the equivalent of a national political party and therefore cannot be compelled to disclose its donors.

Image from https://www.nolabels.org/unity-ticket-faqs, viewed on Dec. 13, 2023.  Yet at least twelve similarly named, yet unaffiliated, political parties have been recognized by as many states;

multiple candidates have identified themselves as "No Labels" candidates, and secured ballot access via those parties.

As set forth in the Declaration of Kelvin McIntyre, the timeline for NoLabels.Com, Inc.'s acquisition of NoLabels.com is as follows:

a. On September 24, 2023, American Patriot Project ("APP"), a vendor to the Defendant initially leased NoLabels.com via Dan.com, a GoDaddy subsidiary;

b. On October 11, 2023, APP paid off the lease to take full possession of NoLabels.Com;

c. On October 17, 2023, a vendor for APP took possession of NoLabels.Com;

d. On November 7, 2023, the Defendant was incorporated as a 501(c)(4) organization in Delaware;

e. On November 16, 2023, the NoLabels.com website went live; and

f. On November 29, 2023, NoLabels.com purchased Google Adwords search advertising through a vendor.

"No Labels" has been characterized in the media as a "movement." Even in an article in the Sunflower State Journal in which Plaintiff's own Chief Strategist Ryan Clancy provided multiple comments, he did not correct the characterization of "No Labels" as a movement. A true and accurate copy of this article is attached to the McIntyre Decl. as Exhibit A.

Plaintiff, in its own words and in its own content, refers to "No Labels" as a movement, and asks people to "join the movement." Videos evidencing the same, which were posted on December 11, 2023, can be accessed through these links:

- https://www.facebook.com/NoLabels/videos/1560134108067977

- https://www.facebook.com/reel/683626407233930.

McIntyre Decl. at ¶ 6.  Likewise, on December 12, 2023, Plaintiff posted a video to its Facebook page in which one of its surrogates indicated that in the upcoming 2024 presidential election, the perception of Plaintiff will be about the idea that "the individuals that are the ticket," suggesting that candidates get to define what "No Labels" is. The Facebook video can be accessed here: https://www.facebook.com/NoLabels/videos/1838845839880277.  McIntyre Decl. at ¶ 7.

Individuals have created their own communities, not controlled by Plaintiff, supporting the "No Labels" movement. For example, one such group is on Facebook as the "No Labels Party 2024."  McIntrye Decl. at ¶ 8.  In addition, the Arizona Secretary of State's Voter Registration Statistics website lists NO LABELS as a political party and shows that 18,799 Arizonians have registered as voters affiliated with NO LABELS as of October 2023. McIntyre Decl. at ¶ 9.  Based on these facts, it is hard to see how No Labels can enforce its mark.

### Standard for Issuance of a TRO3

Under Fed. R. Civ. P. 65(b), "[a] party seeking a temporary restraining order must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales, LLC*, 2018 U.S. Dist. LEXIS 149520, *5 (D. Del. Aug, 31, 2018).  *See also Hope v. Warden York County Prison*, 956 F.3d 156 (3d Cir. 2020).  All four factors must weigh in favor of the TRO, and the Court may consider the parties' declarations in weighing those factors.

---

3 During a meet and confer call on December 13, 2023, the parties agreed that only the TRO portion of the Plaintiff's motion will be addressed by this brief and the associated hearing.  All rights are otherwise reserved.

A TRO is an extraordinary remedy fully within the Court's discretion. *See American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Entry of a TRO is appropriate "only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citations omitted); *Groupe SEB USA, Inc. v. Euro-Pro Operating*, *LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (*quoting Winter v. NRDC, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)).

Since a TRO is equitable, the defense of unclean hands applies. *Tafeen v. Homestore, Inc.*, 2004 Del. Ch. LEXIS 38, 2004 WL 556733, at *6 (Del. Ch. Mar. 22, 2004). "To prevail on an unclean hands defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff." *Malibu Media, LLC v. Lee*, 2013 U.S. Dist. LEXIS 72218, 2013 WL 2252650, at *8 (D.N.J. May 22, 2013) (internal citations omitted). "The conduct must: (1) bear direct relation to the matter in litigation/before the Court, (2) injure the other party, and (3) affect the balance of equities. Id. The relatedness factor is strictly construed." *See Ace Am. Ins. Co. v. Wachovia Ins. Agency, Inc.*, 2008 U.S. Dist. LEXIS 83076, 2008 WL 4630486, at *11 (D.N.J. Oct. 17, 2008).

## Argument

### A.    The Plaintiff Fails to Show It Will Succeed on the Merits

Likelihood of success on the merits means that a movant has a substantial case, or a strong case on appeal. *E.g.*, *Morgan v. Polaroid Corp.*, 2004 U.S. Dist. LEXIS 1917, *1 (D. Del. Feb. 9, 2004). For the reasons set forth below, Plaintiff cannot make such a showing.

1.    Incontestable or Not, the Mark In Question is Not Entitled to Protection

Plaintiff's conduct has rendered this trademark unenforceable. Since all of Plaintiff's claims rely on the enforceability of the trademark, none of the claims has a likelihood of success

on the merits.  *E.g.*, *DaimlerChrysler v. Net Inc.*, 388 F.3d 201, 203 (6th Cir. 2004) ("A trademark owner asserting a claim under the Anti-Cybersquatting Consumer Protection Act must establish the following: (1) that it has a valid trademark entitled to protection . . . ."); *Int'l Labels LLC v. Sportlife Brands LLC*, 2021 U.S. Dist. LEXIS 60912, *1 (S.D.N.Y. Mar. 30, 2021) ("Claims for Trademark Infringement, False Designation of Origin, Unfair Competition, and Dilution under the Lanham Act all require that a plaintiff first demonstrate that it owns a valid trademark.").

The modern trademark is essentially the equivalent of the medieval seal: it is a representation that identifies the origin of the product or service bearing the mark.  "[E]very trademark's primary function [is] to identify the origin or ownership of the article to which it is affixed."  *Jack Daniel's Props. v. VIP Prods. LLC*, 143 S. Ct. 1578, 1583 (2023) (internal alterations omitted).  The mark must "identif[y] a product's source (this is a Nike) and distinguish[] that source from others (not any other sneaker brand)."  *Jack Daniel's Props. v. VIP Prods. LLC*, 143 S. Ct. 1578, 1583 (2023) (internal alterations omitted).  If the mark fails to "tell[] the public who is responsible for a product[, it] is not a trademark" worthy of protection.

Therefore, "No Labels" has to identify Plaintiff, and Plaintiff only, as the source of the work which has the mark.  The current state of play, however, renders such a 1:1 identification impossible; there is no reason to assume that everything (or, for that matter, anything) marked "No Labels" originated with Plaintiff, a self-styled social welfare organization.  The lack of identity arises primarily from the significance of "No Labels" itself.  Its own website proclaims that it is not a business, a PAC or a party. [4]  "No Labels" is nothing tangible – neither a good nor a service. The Plaintiff itself defines "No Labels" as a set of ideas driving a political movement, much like

---

[4] https://www.nolabels.org/unity-ticket-faqs.

the diametrically opposed *Keep America Great* or *Black Lives Matter* movements, both of which were deemed untrademarkable.

In fact, responding to a supposedly frequently asked question ("What does No Labels stand for?") on its website, the Plaintiff says, "We are a ***growing national movement of commonsense Americans*** pushing our leaders together to solve our country's biggest problems. Our movement includes conservatives, liberals, and everyone in between—but we are all united by certain fundamental beliefs."  Accordingly, being "No Labels" signifies a commitment to the cause, ideas and ideals of the movement.  It does not signify a commitment to Plaintiff.

A simple Google search makes abundantly clear that, in fact, "No Labels" can, and does, reference any number of other entities having the same mission and scope – "eschewing the views of the extreme left and right" (Howe Decl., ¶ 6) and using "public advocacy to promote awareness of public policy options and political issues." (*Id.* at ¶ 7).  For example, although the Plaintiff has elected against becoming a political party so that its donor rolls can remain anonymous and so that it can avoid registering with the Federal Election Commission (as a federal hybrid super PAC, for instance) or with state regulator, "No Labels" parties have formed nationwide.[5]  As a result, something marked "No Labels" could be from the "No Labels Party of Arizona."[6]  It could also be from the "No Labels Colorado Party," "No Labels Nevada" or the "No Labels Party of

---

[5] https://www.nolabels.org/unity-ticket-faqs (last accessed Dec. 12, 2023) ("Is No Labels a political party? No Labels, Inc. is a 501(c)(4) social welfare organization . . . . The law and the courts have been clear that an entity like No Labels that is focused only on ballot access and not on advocating for any clearly identified candidate is not the equivalent of a national political party and therefore cannot be compelled to disclose its donors.").
[6] *E.g., No Labels Party of Arizona, an Arizona political party v. Fontes*, Case No. 23-cv-02172-JJT (D. Az. 2023).

Florida."[7]  Alternatively, the mark may be referring to the South Dakota, Alaska, North Carolina, Utah or Arkansas "No Labels Party."[8]

Yet, Plaintiff asserts that it has "never authorized another person or entity to create a politically oriented website using its NO LABELS trademark."  Pls. Mem. in Supp, ECF No. 4, at 2.  The aforementioned Google search results in websites from each of these state parties which prominently feature the words "No Labels" in the context of political thought.[9]  The absence of authorization combined with a lack of enforcement efforts against these other websites evidence an understanding by Plaintiff that the phrase "No Labels" has a greater political meaning which cannot be trademarked.

Beyond that, there are candidates using the No Labels mark in a way that does not demonstrate any connection with Plaintiff.  For example, Tyson Draper announced his U.S. Senate bid, writing on an official state form, "I, the undersigned, hereby declare my interest to run as a candidate for the office of U.S. Senator, seeking the nomination of the No Labels Party."[10]  The

---

[7] Nevada Secretary of State, Organized Political Parties at https://www.nvsos.gov/sos/organized-political-parties (last accessed Dec. 12, 2023); Colorado Secretary of State, Political Party Directory available at sos.state.co.us/pubs/elections/Candidates/PoliticalPartyDirectory.html (last accessed Dec. 12, 2023); Florida Division of Elections, Political Parties at https://dos.fl.gov/elections/candidates-committees/political-parties/ (last accessed Dec. 12, 2023).

[8] South Dakota Secretary of State, Recognized Political Parties at https://sdsos.gov/elections-voting/upcoming-elections/general-information/recognized-political-parties.aspx (last accessed Dec. 12, 2023); State of Alaska Division of Elections, Political Parties and Groups in Alaska at https://www.elections.alaska.gov/political-parties/#recognizedpoliticalparties (last accessed Dec. 12, 2023); North Carolina State Board of Elections, Choosing Your Party Affiliation, at ncsbe.gov/registering/choosing-your-party-affiliation (last accessed Dec. 12, 2023); Oregon Secretary of State, Political Parties at https://sos.oregon.gov/blue-book/Pages/national-political-parties.aspx (last accessed Dec. 12, 2023); https://www.nolabels.org/unity-ticket-faqs; https://www.nolabels.org/unity-ticket-faqs (last accessed Dec. 12, 2023) ("Is No Labels a political party? No Labels, Inc. is a 501(c)(4) social welfare organization . . . . The law and the courts have been clear that an entity like No Labels that is focused only on ballot access and not on advocating for any clearly identified candidate is not the equivalent of a national political party and therefore cannot be compelled to disclose its donors.").

[9] *See, e.g.,* NO LABELS FLORIDA, https://nolabelsflorida.org/ (last visited Dec. 13, 2023).

[10] https://apps.arizona.vote/electioninfo/assets/46/0/StatementsOfInterest/draper-tyson-20955-23089.pdf.

same goes for Omar Chaudhry, Richard Grayson Michael Bishop, Sam Huang, and Lloyd Wiggins.[11]

There is also the Facebook group, "No Labels Party 2024."[12]  Indeed, "No Labels" could just be referring to any of the estimated twenty thousand Arizonans alone who joined the No Labels Party.[13]  Given Plaintiff's logic, each and every one of those voters infringes on its mark.  That cannot be so, and that is why phrases that notate political movements or thought are routinely refused registration.  U.S. Patent and Trademark Office, *Trademark Manual of Examining Procedure* [hereinafter, T.E.M.P.] at 1202.04(b) & 1202.03(f)(i).

For example, *In re Am. In Harms Way*, 2023 TTAB LEXIS 514, *20 (Trademark Trial & App. Bd. Nov. 30, 2023), saw the Trademark Trial and Appeal Board affirm the U.S. Patent and Trademark Office's refusal to register "Keep America Great!" as a trademark despite its prominent affiliation with the 2020 Trump campaign, the Board declared, "[T]he phrase is not capable of functioning as a source identifier. Indeed, political campaigns and movements are exercises in bringing people and groups together for a common, typically non-commercial purpose, sometimes advanced through slogans and other advocacy."

The Board noted — just as is the case here — that "a wide variety of Trump supporters use the proposed mark in a wide variety of ways," and explained that because "consumers are exposed to so many different sources of KEEP AMERICA GREAT!, the phrase cannot identify any

---

[11] https://apps.arizona.vote/electioninfo/assets/46/0/StatementsOfInterest/chaudhry-omar-21144-23397.pdfRi;     https://apps.arizona.vote/electioninfo/assets/46/0/StatementsOfInterest/grayson-richard-20947-23130.pdf; https://apps.arizona.vote/electioninfo/assets/46/0/StatementsOfInterest/bishop-michael-21156-23423.pdf;     https://apps.arizona.vote/electioninfo/assets/46/0/StatementsOfInterest/huang-sam-21170-23449.pdf; https://dos.elections.myflorida.com/candidates/CanDetail.asp?account=84236,
[12] https://www.facebook.com/groups/760239761266984/
[13] https://azsos.gov/elections/results-data/voter-registration-statistics)

particular source of these goods. The phrase is instead a political and cultural message, used by people who share political and cultural views to affiliate themselves with, and promote, former President Trump and his beliefs." *Id.* (cleaned up); *accord In re Wal-Mart*, 129 U.S.P.Q.2d at 1153 (widespread third party use of a phrase "makes it less likely that the public will perceive it as identifying a single commercial source and less likely that it will be recognized by purchasers as a trademark.").

This inability to tie a movement to one particular source also led the USPTO to reject an attempt to trademark "Black Lives Matter" filed by Covington & Burling LLP.  As the Office Action stated, "The definition of 'BLACK LIVES MATTER' is "a political and social movement originating among African Americans, emphasizing basic human rights and racial equality for black people and campaigning against various forms of racism."  Office Action Letter, U.S. Patent & Trademark Office, *In re Application No. 87659312*, Docket No. 990999.09952 (Feb. 2, 2018).  The USPTO explained, this definition "is commonly used by third parties to raise awareness of civil rights, protest violence, and convey the message of support for the same." *Id.*

The USPTO explained that the fact that this phrase emanated from "many different sources," it would not be perceived "as a mark that identifies the source of applicant's goods and services but rather only as conveying an informational message." *Id.*  Accordingly, registration was denied because, "[t]o be a mark, the phrase must be used in a manner calculated to project to purchasers or potential purchasers a single source or origin for the goods/services." *Id.*  The decision was not appealed.

This situation falls within the framework of "Keep America Great" and "Black Lives Matter."  "No Labels" is a political statement used in myriad ways and flows from any number of

sources. It does not link to "any particular source," so it cannot act as a source identifier. Instead, it is a generic term for certain political ideals, just like the foregoing examples.

Generic terms like these are, as recounted above, not entitled to trademark protection. *E.g.*, *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir 1983) (cleaned up); *accord In re Hulting*, 107 USPQ2d 1175, 1181 (TTAB 2013), at 807.14(e)(ii) (2023); *Carcione v. The Greengrocer, Inc.*, 1979 U.S. Dist. LEXIS 9188, 205 U.S.P.Q. 1075, 1077 (ED. Cal. 1979); T.E.M.P. at 1202.04(b) & 1202.03(f)(i); *see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005) (cleaned up); *accord Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979).

Accordingly, the "No Labels" mark cannot sustain claims under the ACPA or Lanham act. 15 U.S.C. § 1064(3). ***The allegedly indisputable nature does not change this analysis because "a registered mark may be canceled at any time on the grounds that it has become generic."*** *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985) (cleaned up). Indisputable or not, the Plaintiff's claims fail.[14]

### 2.   The ACPA Claims Fail for Lack of any Bad Faith Intent to Profit

Beyond being barred by Plaintiff's inability to assert its mark, the ACPA claim fails on its own merits as well, and accordingly affords no measure of success on the merits.

---

14 Although they never claim as much, if the Plaintiff's theory is that all the marks do flow to it, it is apparently "misrepresent[ing] the source of the materials" because "a bare license is a fraud upon the public and unlawful." *Societe Comptoir de l' Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc.*, 299 F.2d 33, 35 (2d Cir. 1962); 15 U.S.C. § 1064(3). As Judge Posner wrote, "the owner of a trademark is allowed to license its use, provided that it takes effective steps" to maintain some modicum of control. *Id.* "If the licensor does not maintain adequate . . . control, the mark may be deemed abandoned, or, equivalently, the licensor may be estopped to complain about infringements of it." *AmCan Enters. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994). There is no evidence that the Plaintiff took such steps, and were they not taken, that too would invalidate the mark. *Id.*

To establish an ACPA cybersquatting violation, a plaintiff must prove: (1) the *plaintiff's* ownership of a valid and protectable mark; (2) the registrant's use of a domain name that is "identical or confusingly similar" to a "distinctive" mark; and (3) the registrant's bad faith intent to profit from the mark. *Getir U.S., Inc. v. Domain Name*, 2023 U.S. Dist. LEXIS 74537, *13 (E.D. Va. Mar. 14, 2023).  Because, as discussed above, the mark is not protected, the Plaintiff fails on prongs (1) and (2). *Id.*  For the reasons stated below, the Plaintiff also fails on the third prong.

The "paradigmatic harm that the ACPA was enacted to eradicate [is] the practice of cyber squatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Acad. of Motion Picture Arts v. GoDaddy.Com, Inc.*, Case No. CV 10-03738 AB (CWx) (C.D. Cal. Sep 10, 2015).  That did not happen here.  Plaintiff voluntarily gave up the domain name at issue.  Defendant never was asked to sell it back and never offered.

Beyond that, Plaintiff has no basis for alleging bad faith by referencing the factors enumerated in 15 USCS § 1125, which are taken in turn:

- **The trademark or other intellectual property rights of the person, if any, in the domain name.**  As noted above, the mark is generic and thus Defendant has equal right to use the term "No Labels."

- **The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person.**  This factor does not apply.

- **The person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services.**  Defendant is not operating a commercial

site.  www.nolabels.com is dedicated to political involvement and the exercise of First Amendment rights to engage in noncommercial, political speech.

- **The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name**.  As demonstrated above, Defendant has as much right to use this generic mark as Plaintiff does.  Moreover, Defendant's use is wholly non-commercial political speech.

- **The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site**.  There is absolutely no allegation of commercial gain, and there is no disparagement of the mark.  Any likelihood of confusion associated with the mark is a product of the proliferation of "No Labels" marks across multiple unrelated organizations.

- **The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct**.  No such offer was alleged.

- **The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's**

**prior conduct indicating a pattern of such conduct.**  Nothing of the sort ever occurred.  Defendants used the standard GoDaddy proxy registration feature something that is absolutely commonplace in web registration.[15]  *In fact, the Plaintiff itself used the same proxy registration feature to shield its details from the WHOIS server as well.[16]*  There is no allegation that the information supplied to Godaddy was inaccurate.  Moreover, the Defendant formed itself as "NoLabels.com Inc." in the most widely recognized venue for corporate formation in the nation.  Any notion that the Defendant was hiding is simply nonsensical.

- **The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties**.  There is no evidence (or even an allegation) that Defendant registered more than the one domain at issue here.

- **The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous.**  There is no evidence of distinctiveness, as noted previously.  There is also no evidence of fame.  Plaintiff has presented no evidence as to the amount of traffic, visitors, views or mentions of "No Labels" linked solely to it.  There is no basis to conclude that the mark is,

---

[15] https://www.godaddy.com/help/turn-my-domain-privacy-on-or-off-32283
[16] https://www.whois.com/whois/nolabels.org

in fact, famous. *Fancaster, Inc. v. Comcast Corp.*, No. 08-2922 (DRD), 2012 U.S. Dist. LEXIS 32287, at *28-29 (D.N.J. Mar. 9, 2012).

Not one of the Section 1125 factors favors Plaintiff. As mentioned above, the "ACPA was designed to target," situations where "persons [] commandeer a domain name for no reason other than to profit by extortion, yet bypass persons with legitimate interests in the domain name." *Ford Motor Co. v. Great Domains.com, Inc.*, 177 F. Supp. 2d 635, 642 (E.D. Mich. 2001). That is not this case. To the contrary, this is a case about speech — highly protected noncommercial political speech, as discussed below. Given the factors and the undisputed fact that "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office," there is no basis for finding bad faith. *Citizens United v. FEC*, 558 U.S. 310, 310 (2009).

Beyond that, Defendant has no profit motive. "[I]ntent to profit means simply the intent to get money or other valuable consideration." *Shingle Springs Band of Miwok Indians v. Caballero*, 630 Fed. Appx. 708, 709 (9th Cir. 2015). It could be selling infringing goods on the site. *Nationwide Payment Solutions, LLC v. Plunkett*, 697 F. Supp. 2d 165, 172 (D. Me. 2010) ("[T]he record shows that Defendants began routing viewers of its www.getmunicipay.com site to a site that sold a competing product."). It could be trying to extort the mark's owner. *E.g.*, *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 675 (S.D.N.Y. 2018). But there has to be some way to make money within Defendant's contemplation. Despite the expansiveness of the phrase, there is no discernable intent by Defendant to profit from its noncommercial political speech. In short, neither the bad faith nor intent to profit prongs support a conclusion that the Defendant violated the ACPA.

3.      Plaintiff's Claims Under the Lanham Act Are Not Cognizable Because They Pertain to Conduct Lacking Any Relationship to Goods and Services.

Again, the Plaintiff's cannot demonstrate success on the merits when it comes to their Lanham Act claims.  Although the Plaintiff asserts twin violations of the act under §§ 1114(1) and 1125(a)(1)(A), they are analyzed in tandem because "Claims for federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards." *Mount Nittany Med. Ctr. v. Nittany Urgent Care, P.C.*, 2011 U.S. Dist. LEXIS 134585, *4 (M.D. Pa. Nov. 22. 2011).  "To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

Under either species of Lanham Act claim, Plaintiff seeks to use the Lanham Act to restrict Defendant's constitutionally protected political speech, courts have long recognized this is an inappropriate use of the act.  *See Cornette v. Graver*, 473 F. Supp. 3d 437, 459 (W.D. Pa. 2020); *accord Valley Forge Military Acad. v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 455 (E.D. Pa. 2014).

Not a general prohibition on speech, the Lanham Act applies only to commercial speech associated with the palming off of goods and services.  *See Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003); *Cent. Hudson Gas & Flee. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980).  This means that "the Lanham Act cannot be properly invoked" unless there was commercial speech made "on or in connection with any goods or services." *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003); 15 U.S.C. § 1125(a)(1).  In other words, a *sine qua non* for the claim is a good or service, and corresponding

commercial communication (*e.g.*, advertising).  *United States v. United Foods, Inc.*, 533 U.S. 405, 409, 121 S. Ct. 2334, 150 L. Ed. 2d 438 (2001).  *See also Cornette*, 473 F. Supp. 3d at 460 (Speech is commercial if it "(1) is an advertisement; (2) refers to a specific product or service; and (3) has an economic motivation, then there is strong support for the conclusion that the speech is commercial.").

The Act does not encompass political, religious, or other kinds of speech.  As one Court observed, "The Lanham Act protects only against confusion with respect to a transaction and not against 'confusion generally.' [It] do[es] not prohibit unauthorized use of a protected mark when the user is not trying to gain any advantage through confusion in offering its own goods or services."  *Howard Johnson Int'l, Inc. v. Vraj Brig, LLC*, 2010 U.S. Dist. LEXIS 3189, *22-23 (D. N.J. 2010).

Illustrating this point, the District of New Jersey confronted a hotelier which had prevented the franchisor, Howard Johnson, from removing the sign above the hotel.  *Id.*  The Court observed that the evidence established nothing more than that the hotelier let "a preexisting billboard containing [Howard Johnson's] marks remain standing on his property."  *Id.*  Because the hotelier "never offered or provided any goods or services at the lodging facility in question . . . his display of the marks d[id] not satisfy the 'in connection with goods or services' requirement" of the Lanham Act.  *Id.*

In arriving at this conclusion, the Court considered Howard Johnson's argument that "any individual traveling down the highway who sees the Howard Johnson sign over the lodging facility, exits the freeway looking for a Howard Johnson hotel, and then fails to find such a hotel will experience feelings of frustration that will tarnish his or her impression of [the Howard Johnson brand], thereby hurting Plaintiff's future commercial prospects."  *Id*.  The Court explained

19

that this was not enough because "the Lanham Act speaks of the defendant's offer of goods or services, not the plaintiff's offer of goods or services." *Id.* (cleaned up). In other words, unless the Defendant was offering something, the Act did not apply.

Here, "there are no allegations that Defendant has ever offered, distributed, possessed, sold, or advertised any goods or services of any kind bearing or imitating Plaintiff's marks." *Wakefern Food Corp. v. Marchese*, 2021 U.S. Dist. LEXIS 161661, *9 (D. N.J. Aug. 26, 2021). In fact, there is not a single good or service identified by Plaintiff in the entirety of its briefing. The reason is simple: Defendant is not offering any goods or services *at all*. It does not endorse candidates. If offers no merchandise. It does not even accept donations. It just describes the movement and offers updates to viewers who are interested. There is not a shred of evidence offered by Plaintiff to support the implausible allegation that: "[T]he primary motivation behind [No Labels.com's] plot is to **profit** by deceiving voters and donors, deterring people from supporting [Plaintiff], and hindering [its] ability to control its brand." Pls. Mem. in Supp, ECF No. 4, at 10 (emphasis supplied). How could Defendant be motivated to deceive donors when it is neither asking for, nor accepting, money? Plaintiff cannot say.

The better answer is what was alluded to previously. This is an informational site associated with a movement that has many participants, some sanctioned by Plaintiff and some that are not. In short, it is just like the Facebook group and websites referenced above. Plaintiff wants it removed because it does not like the news on it. That is most assuredly not a basis for removing the site from the internet or asserting a claim under the Lanham Act. *E.g.*, *Citizens United v. FEC*, 558 U.S. 310, 340 (2009).

4.     There Is No Possibility of Confusion Under the Circumstances

Finally, even if the claims are appropriately analyzed under the Lanham Act, success on the merits still does not follow. Any confusion here is caused by Plaintiff's own conduct in letting

the mark be used far and wide by statewide parties, other groups, and individuals.  The U.S. Court of Appeals for the Third Circuit adopted a multi-factor analysis for determining whether confusion may occur between non-competing marks. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3rd Cir. 1983). Individual factors weigh differently in the Court's analysis depending on the situation before it. *Fisons v. Horticulture, Inc. v. Vigoro Indus., Inc.* 30 F.3d 466, 476 (3d Cir. 1994). The *Lapp* factors are:

1. **The degree of similarity between the owner's mark and the alleged infringing mark.** Here, the marks are similar, but that is only because the political idea behind the term "No Labels" is so common as to be generic. Generic marks simply cannot cause confusion about the source of anything because generic marks do not point to a singular source.

2. **The strength of the owner's mark.** Plaintiff's mark is not enforceable. Countless organizations, politicians, and websites have used the term "No Labels" in the generic political context it has taken in the last decade, as discussed previously.

3. **The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.** Consumers — here, voters and potential donors — take their role in the political process seriously. Any confusion suffered by them results not from Defendant maintaining a website for political commentary, but is simply a byproduct of the heterogeneity of any populist movement.  Moreover, Plaintiff's argument amounts to base speculation about voter behavior which has been rejected repeatedly by courts. *See, e.g., Washington State Grange v.*

*Washington State Republican Party*, 552 U.S. 442, 457-58 (2008) (rejecting speculative arguments regarding voter confusion).   Further undermining their claim, the only instance of potential confusion that Plaintiff could find actually showed that voters could (and did) discern the difference and investigate.   (Love Decl.)

4.      **The length of time the defendant has used the mark without evidence of actual confusion arising.** Again, plaintiff claims a single person with a doctorate became confused by Defendant's website, where the individual ultimately figured it out.   They have shown no web traffic, donations, contacts, online commentary or other data suggesting in any way that confusion actually occurred.   They do not have the record.

5.      **The intent of the defendant in adopting the mark.** As discussed, there is a political movement — which Plaintiff acknowledges on *its* website — surrounding the term "No Labels" and it resonates with Defendant.   Plaintiff asserts nothing more than base speculation regarding Defendant's intent in adopting the phrase No Labels. This issue will also be developed in discovery but speculation alone cannot support the drastic remedy Plaintiff seeks. *Bullock v. Carney*, 463 F.Supp.3d 519,523 (D. Del.), *aff'd*, 806 Fed. Appx. 157 (3d Cir. 2020). and *aff'd*, C. A. No. 20-2096. 2020 WL 7038527 (3d Cir. June 4, 2020) ("Like a preliminary injunction, a temporary restraining order is 'an extraordinary and drastic remedy…that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'").

6.      **The evidence of actual confusion.** Again, a single self-serving Affidavit from someone who is a life-long friend of one of the Plaintiff's organizers is far from overwhelming evidence that Defendant's website is causing actual confusion among voters and potential donors. This is especially the case when real data (donations, web traffic, and alike) are in Plaintiff's sole control.  Given the ubiquity of the No Labels movement and its popularity — repeatedly asserted by Plaintiff in the context of its mark's fame — there should be far more examples if actual confusion were occurring as Plaintiff claims. This factor weighs against confusion.

7.      **Whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media.** Defendant sells no goods (Plaintiff's website prominently features branded items).  Defendant's website offers political commentary, not a good within the meaning of the Lanham Act. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) (defining "goods" under the Lanham Act as: "[w]ares; merchandise."). This factor weighs against confusion.

8.      **The extent to which the targets of the parties' sales efforts are the same.** Defendant sells nothing, cannot collect donations, and offers no services. Plaintiff's website offers all of these things. They can hardly be more different in this respect.  This factor weighs against confusion.

9.      **The relationship of the goods in the minds of consumers because of the similarity of function.** No goods are sold through Defendant's website

within the meaning of the Lanham Act as defined by the Supreme Court of the United States.

**B.      The Plaintiff Has Not Demonstrated Any Irreparable Harm.**

Turning to the second element of the TRO standard, Plaintiff fails to show that Defendant caused it any unique harm.  Any harm to Plaintiff could just as well have been caused by one of the multitude of other entities also using the "No Labels" mark.  Irreparable harm is an injury of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole. *See Anderson v. Davila*, 125 F.3d 148, 163, 37 V.I. 496 (3d Cir. 1997); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  Mere risk of injury is not sufficient to meet this standard. Rather, the moving party must establish that the harm is imminent and probable. *Anderson*, 125 F.3d at 164.  Availability of money damages will typically "preclude a finding of irreparable harm." *Id*. at 164.

As a threshold matter, Plaintiff makes much of the presumption of irreparable harm granted by the 2020 Trademark Modernization Act, 15 U.S.C. 1116. That presumption is only triggered by a finding that Plaintiff is likely to succeed on the merits. *Id*. at (a). As discussed herein, Plaintiff seeks to enforce its generic mark against Defendant who is engaged in purely noncommercial political speech. Its two claims under the Lanham Act fall flat because no goods or services are being offered by Defendant. Similarly, its cybersquatting claim bends the Anti-Cyberpoaching Protection Act to its limits by attempting to commandeer a website engaged in political commentary with no profit motive whatsoever.  In short, the presumption doesn't help the Plaintiff.

In its Brief in Support, Plaintiff offers no evidence of irreparable harm whatsoever beyond that presumption.  Pl's Mem. in Supp., ECF No. 4, at 11. This flies in the face of binding precedent stating that proving irreparable harm is a required element for prevailing on a motion for injunctive relief. *See, e.g., Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205 (3rd Cir. 2014)

24

("Absent a showing of irreparable harm, a plaintiff is not entitled to injunctive relief, even if the other three elements are found."). The only reasonable conclusion is that there is no evidence to support a finding of irreparable harm.

Assuming, *arguendo,* that Plaintiff is entitled to such a presumption, it is easily rebutted. Here, there is no evidence of harm beyond the fact that Defendant's content, which is entirely true and accurate, is not the message that Plaintiff wants to send.  This harm is speculative**,** as discussed below; one Texan was confused, investigated and ultimately wound up at Plaintiff's site. *See* Love Decl.  There is no evidence that Plaintiff lost donations, traffic, engagement or even a single volunteer.  There is no evidence that anyone has actually interpreted Defendant's site as being Plaintiff's site.  There is simply no evidence of any harm that must be remedied without a record and within a fortnight of the suit's initiation.

### C.   A Temporary Restraining Order Is Contrary to the Public Interest and Unduly Harmful to the Defendant.

With respect to the final two TRO considerations, both parties agree that "No Labels," the mark at issue, represents an amorphous movement, not an entity.[17]  This case is about who gets to speak on its behalf.  Defendant wish to do so.  Its website highlights milestones in the movement. It recounts the speakers that have participated with it, including current and former political figures.  It also highlights some of the grassroots participants in the movement, like Arizona's

---

[17] https://www.nolabels.org/unity-ticket-faqs (last accessed Dec. 12, 2023) ("Is No Labels a political party? No Labels, Inc. is a 501(c)(4) social welfare organization . . . . The law and the courts have been clear that an entity like No Labels that is focused only on ballot access and not on advocating for any clearly identified candidate is not the equivalent of a national political party and therefore cannot be compelled to disclose its donors.").

Tyson Draper, a current U.S. Senate candidate running on the No Labels Party of Arizona's ticket.18  In short, it covers the goings on in the movement.

Defendant is not speaking on Plaintiff's behalf.  Defendant's website says it is NoLabels.com in the url, in its logo, on the site where it indicates who paid for it, and in its privacy policy.  It also expressly disclaims any relationship with nolabels.org on every page of the site. That should be enough — had Plaintiff really believed it would not be, they should never have surrendered the domain.

That said, differentiation is not what Plaintiff is after. Plaintiff is primarily unhappy with Defendant's messaging about the movement, messaging that Plaintiff improperly seeks to control. For example, Plaintiff complains that Defendant has somehow published "deceptive and false photographs" of Donald Trump associating him with the No Labels movement.  (Compl. ¶ 28.)  In fact, Plaintiff claims that the photograph "run[s] directly contrary to No Labels' position." *Id.*

The problem is that Plaintiff's claim, like so many others, is false.  The photograph is real— Trump did speak at the "No Labels Problem Solver Convention."  The Plaintiff invited him to do it.[19]  The problem is that Plaintiff changed its tune about Trump; Plaintiff no longer wants to be linked with Trump, and, therefore, needs to bring the entire movement along to reflect that view. [20]  Plaintiff cannot do that through the mechanism of this litigation, at least.

In a similar vein, Plaintiff (which, by its own proclamation, is not a political party) wants to control the messaging about who is running for office on No Labels parties that Plaintiff does

---

18 Incidentally, Mr. Draper has a an estimated twenty thousand social media followers that he has informed of his candidacy, using the phrase "No Labels," which further cuts against the notion that this phrase ties to a single source.

[19]  https://www.nolabels.org/unity-ticket-faqs%20 (When No Labels hosted our Problem Solvers Convention in New Hampshire in 2015, we invited all the candidates on both sides. Eight of them, including Trump, accepted.)

[20] https://www.nolabels.org/no-labels-donald-trump-president

not control.  For example, Plaintiff bemoans the Defendant's decision to feature Arizona Senate candidate Tyson Draper on the website.  (Compl. ¶ 27.). Why Plaintiff wants to hide Mr. Draper is not clear.  That said, there is no reason to take his information down — he is running; it's the truth.[21]

No matter, Plaintiff is litigating to control a message associated with an undefined movement, so that Plaintiff can downplay inconvenient facts.  Plaintiff's motivation remains unknown.  As is the question of who is calling the shots because Plaintiff assiduously protects its anonymity, going so far as to structured itself so that it cannot be "compelled to disclose its donors."[22]  (Whether properly or not is a different question).

Yet, in what is surely an effort to intimidate Defendant, Plaintiff had already demanded that this Court strip away the same protections for Defendant's contributors.  (*E.g.*, D.N. 18.) Plaintiff cannot use this Court to assume control over "No Labels" any more than Plaintiff can assume control over Occupy Wall Street or become the only Me voice in #MeToo movement. From a trademark perspective, that is not how things work.

From a First Amendment perspective, their aims are equally problematic.  Cutting off Defendant's access to its site, the vehicle by which it disseminates its views on the movement, is detrimental to both its private interests and the public interest.  It is by now axiomatic that the "First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office."  *Citizens United v. FEC*, 558 U.S. 310, 310 (2009).  "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by the United States Constitution."  Defendant has the right to speak on such topics, and voters have a right to access that speech.  *Id.*

---

[21] https://apps.arizona.vote/electioninfo/assets/46/0/StatementsOfInterest/draper-tyson-20955-23089.pdf
[22] https://www.nolabels.org/unity-ticket-faqs

"By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Id.* If Plaintiff were to obtain the relief sought in its motion, it would deprive the public of true and accurate election information, and Defendant of its right to speak. Plaintiff's Brief in Support is silent as to Defendant's ability to engage in noncommercial political speech for consumption by the general public regarding the No Labels movement. Pl's Mem. in Supp., ECF No. 4, at 12. The sole argument made in favor of a required element for their claim amounts to, "Property rights are important." This is not surprising because of how important one's ability to speak on matters of political important are in the United States. *See, e.g., Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95 (3rd Cir. 2022) ("There is a strong public interest in upholding the requirements of the First Amendment."). While Plaintiff's property rights in its trademark are weak due to its generic nature and its broader meaning adopted by the general public as discussed herein, Defendant's First Amendment right to engage in political speech has not — and cannot be — diminished, nor can the public's right to be exposed to its political speech by visiting its website.

## <u>Security</u>

Under Fed. R. Civ. P. 65(b), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Often this is a measure of lost profits, but here that analysis makes no sense because Defendant seeks no profits. However, to the extent the Court determines a TRO should issue,

Defendant requests a bond in the amount of $500,000.00 in light of the significance of the legal issues raised herein.

## Conclusion

For the reasons stated herein, Defendant respectfully requests that the Court deny the TRO Motion.

Dated: December 14, 2023

/s/ Elizabeth S. Fenton
Elizabeth S. Fenton (Bar No. 5563)
**BALLARD SPAHR LLP**
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Office:  302-252-4465
Email: fentone@ballardspahr.com

**BILLION LAW**
Mark M. Billion (Bar No. 5263)
1073 S. Governors Avenue
Dover, DE  19904
Office:  302-428-9400
Email:  mbillion@billionlawgroup.com