# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NO LABELS,

        *Plaintiff,*

    v.

~~NOLABELS.COM INC.,~~

~~*Defendant*~~DELCO0222024, INC. (f/k/a NOLABELS.COM INC.), AMERICAN PATRIOT PROJECT, INC., RT GROUP LLC, JOSHUA SILVER, CHARLES SILER, and LUCY CALDWELL,

        *Defendants*.

Case No. ~~——————~~1:23-CV-01384-GBW

## AMENDED COMPLAINT

    Plaintiff No Labels ("No Labels" or "Plaintiff"), by and through its attorneys, brings this Amended Complaint[1] against DELCO0222024, Inc. (f/k/a NoLabels.com Inc. ~~("Defendant~~) ("NoLabels.com Inc."), American Patriot Project, Inc. ("APP"), RT Group LLC ("RT Group"), Joshua Silver, Lucy Caldwell, and Charles Siler (together, "Defendants") for claims arising ~~from Defendant's unlawful and unauthorized use of Plaintiff's NO LABELS trademark. Specifically, Defendant has created and is actively promoting a website   hosted at the URL <nolabels.com> designed~~out of the coordinated conspiracy to ~~mimic No Labels' legitimate website for the purpose of deceiving the public, including voters, and sowing confusion about what~~destroy No Labels ~~stands for and which political leaders No Labels supports. Moreover, Defendant has apparently purchased advertisements on Google in certain states with the goal of steering individuals who are seeking~~and its brand through deceptive and unlawful trade practices, including but not limited to

---

[1] A copy of a redline showing the changes to the prior complaint is attached hereto as Exhibit A.

the publication of a copycat "No Labels" website full of false information about No Labels.  In support of this Amended Complaint, Plaintiff alleges as follows:

## INTRODUCTION

1.      In the spring of 2023, a group of political operatives joined forces to destroy No Labels and undermine its work to secure ballot access in states across America.  No Labels' ballot access effort was launched to offer voters another choice in the 2024 presidential race.  Among the political operatives' stated aims was "brand destruction."  In their own words, they sought to "Make No Labels Brand socially, professionally toxic."  To accomplish this shared objective, Defendants knowingly published false and misleading information about No Labels ~~on the Internet to Defendant's infringing website.  Defendant's actions are a blatant attempt to trade on~~ to scare off donors and potential candidates.  Their conduct violated state laws against deceptive trade practices, infringed No Labels' ~~goodwill and deceive individuals about the candidates, platform, and advocacy of No Labels.  Not only does the fraudulent website mislead voters, but it also will likely discourage individuals from supporting~~ federally registered trademark, and damaged No Labels' ~~mission, including dissuading individuals from providing No Labels financial support.  In addition to being deceptive and undemocratic, Defendant's actions constitute a clear violation of established trademark law~~ brand.  Defendants should all be held to account for the damages.

2.      Defendants collectively worked on a website at the domain name <nolabels.com> (the "Infringing Domain") in October and ~~absent emergency relief from this Court, these actions will continue to irreparably harm No Labels.~~ November 2023 that was made to look like No Labels' real website, registered at <nolabels.org>.  In fact, although No Labels' longstanding focus is to bring together Democrats, Republicans, and independents to forge commonsense, bipartisan solutions, the political operatives' fake website contained language and statements that

intentionally made No Labels look like a shadowy right-wing group.  A pitch deck circulated by the Defendants reflected the full plans for the scheme:

## NL VISION PAGE

This is a real opportunity for us to mirror the NL.ORG language while saying what a NL world will look like.

This is such an easy chance to describe pre-Civil Rights America as the utopia, throwing in lots of references to Western Civilization and culture, and the degradation of society as we've gotten more divided by radical elements (and we all know who those elements are!).

## POTUS NOMINEES PAGE

This will be a really fun page. Here we can do profiles on any candidates we think would be off-putting NL POTUS nominees and VPOTUS nominees, along with bios made to look as problematic as possible for NL.

We could potentially even include a running poll on the site to see who people want to see become the NL POTUS nominee/ticket, and then we can just rig our own poll to make it look as shit as possible.

Ex. 1 at pp. 5 & 9.

3.     Defendants sought to destroy No Labels' brand, not by criticizing its actual positions, but by making false misleading statements about No Labels to deceive and confuse potential donors and candidates.   In short, the Defendants' collective efforts to destroy No Labels through the use of the copycat website were intentional, deceptive, and unlawful.

4.     While No Labels welcomes dissenting political opinions and policy debates and, indeed, encourages ~~intellectual and political discourse, Defendant~~free speech and expression, the Defendants may not, under the guise of free speech or fair use, ~~misleadingly invoke and disseminate false and misleading information about No Labels,~~ infringe on No Labels' trademark rights, or use the copycat website to create a false association ~~with No Labels, and then use the resulting misrepresentation to interfere with the electoral process.  No Labels therefore brings this action to protect not only itself and its rights, but also the registered voters and potential donors who are being deceived by Defendant's unlawful actions~~between No Labels, other political groups, and far-right platforms.

**PARTIES**

~~1.~~5.    No Labels is a non-profit corporation organized under the laws of the District of Columbia with a principal place of business at ~~1130 Connecticut Avenue NW #325,~~1150 18th Street NW, Suite 450 Washington, DC 20036.

6.     Upon information and belief, ~~Defendant~~defendant NoLabels.com Inc. was a corporation organized under Delaware law.  NoLabels.com Inc. changed its name to DELCO0222024, Inc. following the entry of preliminary injunctive relief by the Court.

7.     Upon information and belief, defendant American Patriot Project, Inc. ("APP") is a corporation organized under ~~Delaware law.~~the laws of the District of Columbia.  Upon

information and belief, APP was formed on or about September 26, 2023, and was dissolved on March 14, 2024.

8.    Upon information and belief, defendant RT Group is a Delaware limited liability company.  Upon information and belief, defendant Joshua Silver is the principal of RT Group, and Mr. Silver uses RT Group as a company for his political consulting services.

9.    Upon information and belief, defendant Joshua Silver is a resident of the Commonwealth of Massachusetts.  Silver is also the principal of defendant APP.

10.    Upon information and belief, defendant Charles Siler is a resident of the State of Arizona.  Siler is a political consultant that, upon information and belief, was hired by defendant APP for work related to No Labels.

2.11.    Upon information and belief, defendant Lucy Caldwell is a resident of the State of Arizona.  Caldwell is a political consultant that, upon information and belief, was hired by defendant APP and others for work related to No Labels.

**JURISDICTION AND VENUE**

3.12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this case arises under the Anti-cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and the Lanham Act, 15 U.S.C. §§ 1114(1), 1116, 1117 and 1125(a), and 1125(a).  Additionally, this Court has subject matter jurisdiction over the additional state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

4.13.    This Court has personal jurisdiction over the DefendantNoLabels.com Inc. because Defendantit is a citizen of Delaware, having been incorporated in the District of Delaware.

14.     This Court has personal jurisdiction over APP because, upon information and belief, it sold or otherwise transferred the infringing domain to Delaware resident Nolabels.com Inc. and thus intentionally transacted business within the State of Delaware.

15.     This Court has personal jurisdiction over RT Group because it is a Delaware limited liability company.  Upon information and belief, RT Group sold or otherwise transferred the infringing domain to Delaware resident Nolabels.com Inc., maintaining a reverting interest in the domain, and thus intentionally transacted business within the State of Delaware.

16.     This Court has personal jurisdiction over Silver because he served as a manager of a Delaware limited liability company and because he served as an agent for, and provided services to, NoLabels.com Inc., a Delaware corporation and citizen, in connection with the Infringing Website.  Additionally, Silver directed such services to this jurisdiction, and intended for such services to be used by NoLabels.com Inc. in its operation of the copycat website.  Silver, as an agent of APP, worked with Charles Siler to cause Nolabels.com Inc. to be incorporated in Delaware for the purpose of owning and operating the copycat website.

17.     This Court has personal jurisdiction over Siler because he served as an officer of NoLabels.com Inc., a Delaware corporation and citizen.  Siler, as an agent of APP, worked with Joshua Silver to cause Nolabels.com Inc. to be incorporated in Delaware for the purpose of owning and operating the copycat website.  Additionally, Siler served as an agent for, and provided services to, NoLabels.com Inc., a Delaware citizen, in connection with the Infringing Website, directed such services to this jurisdiction, and intended for such services to be used by NoLabels.com Inc. in its operation of the copycat website.

18.     This Court has personal jurisdiction over Caldwell because she served as an agent for, and provided services to, NoLabels.com Inc., a Delaware corporation and citizen, in

connection with the Infringing Website, directed such services to this jurisdiction, and intended for such services to be used by NoLabels.com Inc. in its operation of the copycat website.

19.    Further, this Court has personal jurisdiction over each of the Defendants based on their participation in the conspiracy to spread false and misleading information about No Labels, through use of the copycat website and violations of state and federal law.  First, a substantial act in furtherance of the conspiracy occurred in Delaware, namely the incorporation of Nolabels.com Inc. which went on to register the infringing domain (nolabels.com) and publish the copycat website at that domain.  Upon information and belief, each conspirator knew or had reason to know of the copycat website or that acts outside of Delaware, including the numerous meetings and communications about spreading false information related to No Labels would have an effect or effects inside Delaware.  Further, publication of the copycat website by Nolabels.com Inc., and the spreading of misinformation about No Labels inside Delaware, was a direct and foreseeable result of conduct that furthered the conspiracy.

5.20.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because DefendantNoLabels.com Inc. resides in the District of Delaware, and the other Defendants provided services to Nolabels.com Inc. in connection with the Infringing Website, directed such services to this judicial district, and a substantial part of the events or omissions giving rise to the claim at issue in this litigation occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.     NO LABELS' MISSION, REGISTERED TRADEMARK, AND WEBSITE.**

6.21.   No Labels, a 501(c)(4) nonprofit corporation headquartered in Washington, DC,D.C., was established in 2009 to bridge the partisan divide in Washington by advancing commonsense reforms and convening officeholders from both major parties in an effort to find bipartisan solutions to the nation's problems.

7.22.   No Labels has spent more than a decadealmost 15 years working with centrist leaders from both sides of the political spectrum to effectuate change in public policy.

8.23.   As reflected in its registration with the United States Patent and Trademark Office, No Labels has used the mark NO LABELS since at least 2010, and was granted registration for the mark, No. 3,946,066, on April 12, 2011, for use with "issue advocacy; public advocacy to promote awareness of public policy options and political issues" in Class 35 (the "No Labels Registered Trademark").

9.24.   No Labels uses its NO LABELS mark on its website (the "No Labels Website") hosted at the URL <nolabels.org> (the "No Labels Domain"), which No Labels registered on December 15, 2009.  No Labels relies on the No Labels Website to promote its platform, provide information about its ideas, and publicize future events.

10.25.  No Labels also uses its NO LABELS mark on the No Labels Website to increase awareness of the organization and grow support for its mission.

11.26.  The No Labels Website includes an option for individuals to become involved in the organization, including by volunteering, donating, or signing up for communications.

12.27.   The No Labels Website makes clear that it is a centristan organization dedicated to providing the "commonsense majority" with options to encourage policy leaders to solve many of the biggest problems facing America.

13.28.  Prior to Defendants' infringing and unlawful conduct, No Labels is alsohad been working to gain ballot access in every state for states nationwide to offer voters a potential "Unity Ticket for the 2024 presidential electionticket" that would offer an independent feature another option for presidential and vice-presidential candidate optioncandidates for voters unsatisfied with the choices available to them from the major political parties (particularly the Democratic and Republican Parties).

14.29.  Prior to Defendants' infringing and unlawful conduct, No Labels hashad not named candidates for thea 2024 presidential andor vice- presidential election and hascandidate to appear on its ballot line.  Ultimately, No Labels did not to date endorsedendorse or offeredoffer support to any presidential candidate.

15.30.  No Labels statesPrior to Defendants' infringing and unlawful conduct, No Labels had stated unequivocally on the No Labels Website that it iswas only contemplating offering its ballot line onfor the presidential and vice-presidential election, not for any congressional or other down-ballot races.[2]

**DEFENDANT'S UNAUTHORIZED USE OF THE NO LABELS REGISTERED TRADEMARK AND DEFENDANT'S INTENT TO DECEIVE**

**B.    A CONSPIRACY FORMS TO DESTROY THE NO LABELS BRAND THROUGH FALSE AND DECEPTIVE MISREPRESENTATIONS OF FACT.**

31.    Plaintiff filed this action in December 2023 after learning a fraudulent copycat website—Nolabels.com—that was published by a Delaware corporation.

---

[2] https://www.nolabels.org/unity-ticket-faqs. https://www.nolabels.org/unity-ticket-faqs.

32.    Plaintiff has since discovered a web of seasoned political operatives that were meeting in private throughout 2023 and into 2024, sharing strategies on how to destroy No Labels' brand and undermine its ballot access effort, circulating slideshows and talking points memos with false and misleading information about No Labels. They also conspired to acquire, build and publish the very same copycat website, which, in the words of one conspirator, was designed to "*mirror the NL.ORG language* while also framing the entire NL project as a right-wing shadow effort by *crafting language that looks like it's coming from NL as a right-wing shadow group*." Ex. 1 at p. 4 (emphasis added).

33.    The goal was as simple as it was unlawful:  destroy the No Labels brand by making it politically and socially toxic through a campaign of targeted disinformation in hopes of scaring off potential donors, candidates, and citizen supporters. The agreed-upon objective and actions taken to achieve that objective cannot be denied.

34.    The copycat website was only one part of the coordinated effort to make No Labels "toxic" through coordinated efforts to misrepresent what it stood for.

35.    Founded fifteen years ago as a social welfare organization whose mission is to promote bipartisanship and advocate for America's "commonsense majority," No Labels has owned and operated a website at nolabels.org since 2009.  The landing page for that website reads: "WELCOME TO THE HOME FOR THE COMMONSENSE MAJORITY."

36.    In 2010, No Labels posted a video (still available on its YouTube Channel) called "Join the Movement:  No Labels."

37.    No Labels has continued to promote its consistent message of bipartisan advocacy and commonsense solutions by hosting town halls, publishing books and booklets, posting videos

to its YouTube Channel, conducting interviews and issuing press releases, among myriad other activities.

38.     There can be no dispute what No Labels was trying to achieve, or that No Labels made this clear to the public at large and to political operators in particular.  Nor can there be any dispute that the defendants and their conspirators were lying about No Labels in a coordinated attempt to confuse people about its mission.  Key to their shared activities was an intentional effort to mislead the public by connecting No Labels and its leadership to Donald Trump, a connection that was patently untrue and which the conspirators knew would scare off potential donors and potential candidates that supported centrist and bipartisan solutions—the very audience that No Labels was seeking.

39.     Those lies, and the effort to destroy No Labels' brand, began in early 2023 in response to No Labels' stated intentions to offer a ballot line to a Unity Ticket for President and Vice President, which entrenched operatives viewed as a threat to their political interests.  In response, political operatives and funders began to complain privately and then hold secret meetings at D.C. think tanks and advocacy groups to discuss various ways they could destroy No Labels and undermine its ballot access effort.

40.     What began as a vocal desire to take down No Labels gathered steam as more political operators and funders connected with each other, coordinated their thoughts about No Labels, shared plans on how to scare off donors, candidates, and citizens by making the No Labels brand "devastatingly toxic," met in small and large groups to further this shared objective and, ultimately, published false and misleading statements about No Labels to accomplish their goals.

41.     In the summer of 2023, Defendants Silver and Caldwell communicated with potential funders to discuss their respective work on No Labels.  Silver would later use companies

he set up to funnel money to Caldwell and another consultant, defendant Charles Siler, who spearheaded the acquisition and development of the copycat website.

42.    By early fall 2023, various Defendants—including Siler, Caldwell, and Silver—began their work on the copycat website that was later posted at nolabels.com.  It was clear from the start how the copycat website would be used to destroy No Labels through deception and misrepresentation.  In Siler's own words, the website would:

> mirror the NL.ORG language while also framing the entire NL project as a right-wing shadow effort by crafting language that looks like it's coming from NL as a right-wing shadow group.

Ex. 1 at p. 4.

43.    On November 7, 2023, defendant NoLabels.com Inc. was incorporated in Delaware. Nolabels.com Inc. would go on purchase and register the domain nolabels.com. To hide the identify of those responsible, Nolabels.com Inc. used a proxy entity to register the domain. The identity of Nolabels.com Inc.'s employees, shareholders, officers and directors remains a secret.

44.    Thereafter, the copycat website at Nolabels.com was published.  Not only did the copycat website infringe upon No Labels' federally registered trademark, but it was also used (as planned) to falsely present No Labels as a right-wing shadow group.

**C.    CONSPIRATORS ACQUIRE NOLABELS.COM INC. AS PART OF COORDINATED ATTEMPT TO DECEPTIVELY MISREPRESENT PLAINTIFF AND INFRINGE UPON ITS FEDERALLY REGISTERED TRADEMARK.**

45.    Defendant ~~is a newly-created organization[2] that seeks to usurp~~RT Group was established in the State of Delaware by defendant Silver to be used for his consulting services.  RT

---

[2] ~~Defendant NoLabels.com Inc. was incorporated in Delaware on November 7, 2023.  Further, the website for the Delaware Department of State: Division of Corporations does not publicly reveal the identity of employees, shareholders, officers, or directors of the Defendant. *See, e.g.,* https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.~~

Group has no employees, but Silver is the principal and the only member of the LLC.  Defendants Caldwell and Siler have performed consulting work for RT Group.

46.     Defendant APP was incorporated on September 23, 2023, as a 501(c)(4) corporation.  APP was formed to receive and distribute funds to be used to advance different political strategies and tactics. Silver is the principal of APP and he supervises the political consulting work performed by its consultants. Silver has complete discretion on how to allocate funds that APP distributes for various political work.

47.     Defendants Siler and Caldwell are political consultants who, at all relevant times, were consultants for defendants APP and RT Group.  Upon information and belief, Siler and Caldwell received at least $10,000 per month for this consulting work.

48.     Silver considered Siler and Caldwell to be valuable consultants because they are former conservative political operatives, who understood how to communicate with people with a conservative background.

49.     Caldwell and Siler have a long history of collaborating.

50.     Siler is a self-described "political animal" who regularly looks for unclaimed domain names that might have some value as part of his political consulting work.  Silver described him as a "hard-nosed operative" who is creative and aggressive.

51.     In early October 2023, Siler saw that the domain name "nolabels.com" was available for purchase for approximately $11,000. Siler knew that plaintiff No Labels had previously used this domain name for its activities and saw value in acquiring this domain.

52.     Siler contacted defendant Caldwell and they discussed acquiring the domain.  Siler then reached out to Silver for funding necessary to purchase the domain.

53.     Silver approved the acquisition, and APP provided funding to purchase the domain name "nolabels.com."  On October 11, 2023, APP purchased the domain and took full possession of NoLabels.com.  Upon information and belief, RT Group also owned the domain for a period of time, at least until defendant Nolabels.com, Inc. could be set up and take over ownership of the domain.

54.     Around the same time that APP purchased the NoLabels.com domain name, Siler was designing the "copycat" website that would mimic No Labels' actual website, at nolabels.org.  This was done to mislead and deceive the public about No Labels.  Caldwell and Siler collaborated on the language for proposed use on the NoLabels.com website.  As part of the planning process, Siler prepared a pitch deck to outline the vision for the copycat website, including the following objectives:

- On a page captioned "NL VISION PAGE," the pitch deck stated:

    This is a real opportunity for us to mirror the NL.ORG language while also framing the entire NL project as a right-wing shadow effort by crafting language that looks like it's coming from NL as a right-wing shadow group.

    Examples would be by fixating on red meat issues that can be fixed with the unity of "real" Americans, such as Immigration, welfare waste, war spending in Ukraine, and possibly anti-abortion messaging.

    Ex. 1 at p. 5.

- On a page captioned "POTUS NOMINEES PAGE," the pitch deck stated:

    This will be a really fun page.  Here we can do profiles on any candidates we think would be off-putting NL POTUS nominees and VPOTUS nominees, along with bios made to look as problematic as possible for NL.

    We could potentially even include a running poll on the site to see who people want to see become the NL POTUS nominee/ticket, and *then we can just rig our own poll to make it look as sh[*]t as possible.*

    Id. at p. 9 (emphasis added).

- On a page captioned "AN NL SCOTUS PAGE," the pitch deck stated:

  … Here we can really put the most f[***]ed up SCOTUS decisisons [*sic*] from the 1950's and earlier and herald them as a time of bipartisanship and unity, and talk about how great a future we could with the nominees picked by the sh[*]tbags at NL.

  *Id.* at p. 11.

55.    The pitch deck also stated that the website should include white nationalist dog-whistles that would mislead the public about No Labels' actual position on political issues and tarnish No Labels' image:  "The language will reflect NL.ORG while including christo-nationalist dog whistles (eg. NL now has ballot access in **14** states with support in **88** counties)."  *Id.* at p. 3.

56.    Siler provided art direction and copy writing for the Infringing Website.  Siler then gave directions to a D.C.-based vendor hired by APP to build the website, on the aesthetics, language, and imagery of the website.

57.    Caldwell and Silver both made edits to the copycat website that Siler designed.

58.    The copycat website would come to be owned and run by NoLabels.com Inc., a corporation set up by Siler expressly to support the website.

16.59.  NoLabels.com Inc. was formed for the purpose of usurping No Labels' goodwill and tarnish tarnishing its reputation through its piracy of the No Labels Registered Trademark.

17.60.  Specifically,  Defendant defendant Nolabels.com Inc. registered and utilizes a website (utilized the "Infringing Website") at the domain name <nolabels.com> (the "Infringing Domain"), a domain name which was identical to the No Labels Domain (<nolabels.org>) save for the top-level domain (.org versus .com).

18.61.  Upon information and belief, Defendant— Nolabels.com Inc.—whose very corporation name contains the Infringing Domain— has hiddenhid behind a proxy entity in registering the Infringing Domain, cloaking its true identity from public view.

19.62.  It is not surprising that Defendant seeksdefendant Nolabels.com Inc. sought to conceal its identity given that the Infringing Website iswas intentionally designed to mimic the look and layout of the No Labels Website, including the use of a black banner with "NO LABELS" in thick white block text at the top, an oval shaped button at the top right where users may donate or sign up for mailing list, and a similar color scheme of black, white, and yellow, as seen in the images below.

<hr />

**Infringing Website:**

<hr />





**<u>Actual</u> No Labels Website:**





20.63.  Even beyond the visual similarities, the Infringing Website explicitly ~~states~~stated that it "is a hub for No Labels Party supporters to foster discussions and solutions," thereby directly and misleadingly linking the Infringing Website with No Labels.

21.64.  Defendant ~~imitates~~Nolables.com Inc. imitated the No Labels ~~Websites~~Website by repeating other key phrases too, such as the phrase "commonsense majority."

**Infringing Website:**



**Actual No Labels Website:**



~~22.~~65.  Furthermore, the Infringing Website ~~makes~~made deceptive use of photographs of

candidates who appeared at the No Labels Problem Solver Convention, held in 2015, including

20

under the heading "NoLabels.com Leaders," to suggest (falsely) that No Labels endorses or supports those candidates, as seen in the examples below. As the host and organizer of the 2015 Problem Solver Convention, No Labels invited many presidential candidates from across the political spectrum, many such candidates did in fact appear, and a candidate's attendance at the Convention did not and does not imply or suggest No Labels' endorsement of such candidate.

**Infringing Website:**









Former U.S. Rep. Tulsi Gabbard, Hawaii, who ran for President in 2020



23.66.  To be clear, No Labels does not object to third parties referencing No Labels when commenting on No Labels' positions or candidates.  Nor does No Labels seek to stifle free political discussion or competing points of view.  Indeed, No Labels' own website ~~encourages~~encouraged "robust debate on the many issues confronting our country" and the organization "understand[s] that politics is often rough and tumble."[4]

24.67.  What Defendant ~~cannot~~Nolabels.com Inc. could not do, however, is use the No Labels Registered Trademark, and language and imagery evocative of the legitimate No Labels Website, to attract Internet traffic to an Infringing Website ~~that is~~designed to mislead and confuse the public, including voters and donors, in order to harm No Labels.

25.68.  Indeed, the content of the Infringing Website cannot reasonably be characterized as fair use or critique of No Labels.  Rather, the Infringing Website ~~hijacks~~hijacked the No Labels Registered Trademark and No Labels' identity, thereby denying No Labels the exclusive ability to control and define its own brand—the fundamental purpose of trademark law.

69.    Adhering to defendant Siler's plan to use dog-whistles to mislead the public about No Labels, the Infringing Website "asked" the public to join No Labels' community of "[t]housands of patriotic citizens who want to reclaim our American way of life":



**JOIN OUR COMMUNITY**

Thousands of patriotic citizens who want to reclaim our American way of life just like you do have already joined our movement. Join us and find out what you can do to make the success of this movement a reality in your own backyard.

---

[4] ~~https://www.nolabels.org/unity-ticket-faqs.~~  https://www.nolabels.org/unity-ticket-faqs [former site].

70.    Furthering this intent to deceptively link No Labels with jingoistic terminology, the defendants used the Infringing Website to associate No Labels with "a growing network of Americans looking for a return to American supremacy, working-class excellence, honorable values founded on the building blocks of Western Civilization, and a functioning Democracy like the one once enjoyed by our parents and grandparents."  This jingoistic language was combined with a Trump 2020 flag in further efforts to mislead the public about No Labels:

**Infringing Website:**



26.71.  Although No Labels' objection to Defendant'sthe Infringing Website is not based on the specific candidates currently displayed on the Infringing Website—indeed, No Labels would object to candidates from either end of the political spectrum being falsely associated with No Labels——the Infringing Website includes candidates that No Labels iswas explicitly not supporting.

27.72.  Specifically, the Infringing Website prominently features a large photograph of former President Donald Trump on its landing page.  The Infringing Website also includes a photograph of Tyson Draper, with a caption falsely describing Mr. Draper as a "No Labels U.S. Senate Candidate."

**Infringing Website:**





No Labels U.S. Senate Candidate, Tyson Draper, Arizona



No Labels U.S. Senate Candidate, Tyson Draper, Arizona

28.73.  These photographs and captions are deceptive and false.  They run directly contrary to No Labels' position, which makes clear that it only ~~intends~~intended to offer its ballot line to presidential and vice-presidential candidates, *not* Congressional candidates.  Furthermore, No Labels' website unequivocally ~~states~~stated that it ~~is~~was not supporting ~~Mr. Trump, including by means of an article entitled, "Donald Trump Should Never Again Be~~ President.~~"[5]~~ Trump.

29.74.  Equally problematic is the Infringing Website's inclusion of various principles under the heading, "What We Stand For," which do not align with the principles and guiding beliefs of No Labels.  Indeed, it is clear that ~~Defendant,~~Nolabels.com Inc., through the Infringing Website, ~~is~~was attempting to rebrand No Labels and confuse the public about what the organization actually stands for.

30.75.  The inclusion of these photographs and text thus appears to have two potential purposes:  (1) ~~Defendant intends~~Nolabels.com Inc. intended to improperly benefit from No Labels' goodwill and reputation to further ~~Defendant's~~its own cause, as displayed on the Infringing

---

[5] ~~https://www.nolabels.org/no-labels-donald-trump-president~~

28

Website; and/or, more sinisterly, (2) ~~Defendant intends~~Defendants intended to tarnish No Labels' ~~centrist and~~ non-partisan reputation by falsely associating No Labels with the candidates and positions on the Infringing Website in the hopes of undercutting  an organization that ~~may decide~~was investing significant, time, energy and financial resources in an effort to ~~support~~offer its ballot line to a ~~third-party ticket~~potential candidate for the upcoming 2024 presidential election.

~~31.~~76.  Regardless of ~~Defendant's~~the intent, both purposes are unlawful and these fraudulent activities may deter those individuals and organizations who would likely support No Labels away from volunteering or contributing financial support to No Label's cause.  ~~Defendant's continued control and use of the Infringing Website therefore must not be permitted.~~

~~32.~~77.  Furthermore, ~~Defendant~~Nolabels.com Inc. funded a Google Ads campaign, evidenced below, to improve the search result ranking of the Infringing Domain, encouraging viewers to "Join NoLabels.com Today."

Sponsored

Paid for by **NoLabels.Com Inc**

 nolabels.com
https://www.nolabels.com

NoLabels.com: Unity & Reason - Join NoLabels.com Today

We are Problem Solvers, embodying resilience and courage, advocating for the right causes.
Supporting **NoLabels.com** candidates and Americans disillusioned with current politics.

~~Defendant~~

Sponsored

Paid for by **NoLabels.Com Inc**

 nolabels.com
https://www.nolabels.com

NoLabels.com: Unity & Reason - Join NoLabels.com Today

We are Problem Solvers, embodying resilience and courage, advocating for the right causes.
Supporting **NoLabels.com** candidates and Americans disillusioned with current politics.

~~33.~~78.  Nolabels.com Inc. directed these ads across state lines to Internet users ~~in California,~~throughout the ~~District of Columbia, Georgia, Maryland, Missouri, North Carolina, Texas and Washington.~~United States.  The ads, which in and of themselves constitute trademark infringement, ~~are~~were clearly designed to misdirect individuals seeking information about No Labels to the Infringing Website and its misleading content.

**D.    ~~DEFENDANT HAS~~NOLABELS.COM INC. REFUSED TO ENGAGE WITH PLAINTIFF CONCERNING INFRINGING WEBSITE DESPITE ACTUAL CONFUSION.**

~~34.~~79.  No Labels discovered the Infringing Website after one of its potential supporters was deceived by the Infringing Website.  In response, No Labels investigated the site and attempted to contact both the registrar (GoDaddy LLC) as well as the listed registrant (Domains by Proxy LLC) to resolve this dispute without the need for litigation.  Counsel for No Labels also sent a request to the registrant seeking further contact information so as to allow the parties to discuss the issue.  Finally, counsel sent a request to the registered agent for ~~Defendant,~~NoLabels.com Inc., The Corporation Trust Company.  There ~~have been~~was no ~~responses~~response to any of these requests.

~~35.~~80.  Despite letters, emails, and phone calls to these entities, no one responded to No Labels' outreach, which ~~is~~was consistent with ~~Defendant's~~NoLabels.com Inc.'s attempt to deceive as to its own identity while misappropriating No Labels' identity.

~~36.~~81.  No Labels' concern that individuals ~~will be~~were confused or deceived by the Infringing Website ~~is~~was not merely hypothetical.  As indicated, one individual, a Texas resident located where ~~Defendant~~Nolabels.com Inc. had purchased Google ads supporting the Infringing Website, has already contacted No Labels because she was misled by ~~the Defendant~~Nolabels.com Inc. and its Infringing Website, causing harm not only to her but also to No Labels, whose goodwill and reputation were harmed by this individual's experience.

37.82.  Defendant'sNolabels.com Inc. unlawful, deceptive, and undemocratic actions have left No Labels no option other than to seek relief from this Court.  No Labels sees no other way to prevent further public and voter confusion and to prevent further irreparable damage to its brand.

### COUNT I – CYBERSQUATTING
#### (Defendants APP, RT Group, Siler, and NoLabels.com Inc.)
*Violation of 15 U.S.C. 1125(d)*

38.83.  No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

39.84.  No Labels' NO LABELS mark is distinctive and has been registered with the United States Patent and Trademark Office since 2010, and thus is presumptively valid and protectable under the Lanham Act.

40.85.  Defendant,Defendants APP, RT Group, Siler, and NoLabels.com Inc., without authorization and with a bad faith intent to profit from the No Labels Registered Trademark, registered, traffiestrafficked in, and usesor used the <nolabels.com> domain name for itsthe Infringing Website, which domain is identical to the No Labels Registered Trademark and the No Labels Domain.

41.86.  Defendant'sThe bad faith intent of defendants APP, RT Group, Siler, and NoLabels.com Inc. is evident in Defendant'stheir use of similar colors, fonts, and visual layout on the Infringing Website intentionally designed to mimic the No Labels Website, which evinces Defendant'stheir intent to divert consumers from the No Labels Website to the Infringing Website.

87.    Defendant Siler knew that Plaintiff used the No Labels name and had previously used the nolabels.com domain name in connection with its business.  When Siler saw that the nolabels.com domain name was available for purchase, he believed it had political value and, as a paid consultant for APP, secured funding from APP and then caused a subordinate to purchase the domain for the benefit of APP and RT Group.

88.    The bad faith intent of defendants APP, RT Group, Siler and NoLabels.com Inc. is further evident in the pitch deck prepared by APP and RT Group's consultant, Siler, which expressly stated that building a copycat website was "a real opportunity for us to ***mirror the NL.ORG language*** while also ***framing the entire NL project as a right-wing shadow effort*** by crafting language that ***looks like it's coming from NL*** as a right-wing shadow group." Ex. 1 at p. 4 (emphasis added).

~~42.~~89. Whether this diversion was intended to benefit ~~Defendant~~defendants APP, RT Group, Siler and NoLabels.com Inc. commercially or to harm No Labels' goodwill and tarnish its mark, or both, Defendant's actions demonstrate bad faith in creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Infringing Website and the candidates, positions, and principles included therein.

~~43.~~90.  ~~Defendant's~~The bad faith of defendants APP, RT Group, Siler, and NoLabels.com Inc. is further evident in its failure to provide usable and accurate contact information associated with the Infringing Domain and Infringing Website.

~~44.~~91.  ~~Defendant has~~Defendants APP, RT Group, Siler, and NoLabels.com Inc. have no legitimate rights in NO LABELS and, indeed, only began (intentionally misleadingly) using the mark in the ~~last several months.~~fall 2023.

~~45.~~92.  Furthermore, ~~Defendant~~defendants APP, RT Group, Siler and NoLabels.com Inc. had no reasonable basis to believe that ~~its~~their infringing use of NO LABELS was fair use or otherwise lawful.  In fact, the pitch deck created by defendant Siler, the "hard-nosed operative," confirmed the intended use of the Infringing Website was to deceive the public.

~~46.~~93.  ~~Defendant's~~The registration and continued use of the Infringing Website was intended to cause harm and has actually caused harm to No Labels, whose supporters have been

and—should the Infringing Website be resurrected—will continue to be confused by the Infringing Website.

47.94. Defendant'sThe acquisition and registration of the Infringing Domain and continued use of the Infringing Website wrestswrested control of the NO LABELS mark and associated brand from No Labels, the rightful owner of the No Labels Registered Trademark, in violation of No Labels' exclusive rights under federal trademark law.

48.95. Unless and until Defendant isNolabels.com Inc. is permanently enjoined from holding the registration for or using the Infringing Domain, No Labels will continue to be irreparably harmed.

**COUNT II – TRADEMARK INFRINGEMENT/ / FALSE DESIGNATION OF ORIGIN FALSE DESIGNATION OF ORIGIN**

(All Defendants)
*Violation of 15 U.S.C. §1125(a)*

49.96. No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

50.97. No Labels' Registered Trademark is entitled to protection under Section 43(a) of the Lanham Act.

51.98. Despite knowing of the No Labels Registered Trademark, DefendantDefendants intentionally used the NO LABELS mark not only in Defendant'sdefendant Nolabels.com Inc.'s domain name, but dozens of times on the Infringing Website itself. *See, e.g*., images, *supra*, at ¶¶ 19, 2262 & 65.

99. Defendants also referred to the "No Labels Party" and "NoLabels.com community" throughout the Infringing Website.

100. No Labels is a 501(c)(4) non-profit organization. Although certain state chapters of No Labels have registered as political parties within their respective state, No Labels is not

nationally organized as a political party.  The Infringing Website's reference to the "No Labels Party" therefore is a mischaracterization of the organization.

52.101.    Defendant, NoLabels.com Inc., which improperly usesused the No Labels Registered Trademark in its very corporate entity name, also refersand Defendants APP, Siler, Caldwell, and Silver contributed to the "No Labels Party"⁶ and "NoLabels.com community" throughoutcontent of the Infringing Website.

102.    Siler, a political consultant for APP, noted nolabels.com was available for purchase and secured the funding from APP and Silver to acquire the domain name, and then later provided art direction and copy writing for the Infringing Website.

103.    Siler also gave directions to a vendor who built the Infringing Website, on the appropriate aesthetics, language and imagery.

104.    Caldwell made edits to the copycat website that Siler designed.

105.    Silver, as a representative of APP, made edits to the copycat website that Siler designed.

106.    APP was financially responsible to the company that built the website, and provided consulting services to defendant Nolabels.com Inc.

107.    RT Group owned the nolabels.com domain for a period of time, until Nolabels.com Inc. was set up.  Upon information and belief, RT Group also compensated Siler and Caldwell for their consulting work on the Infringing Website.

---

⁶ As noted in Paragraph 6 of this Complaint, No Labels is a 501(c)(4) non-profit organization. Although certain state chapters of No Labels have registered as political parties within their respective state, No Labels is not nationally organized as a political party.  The Infringing Website's reference to the "No Labels Party" therefore is a mischaracterization of the organization.

53.108.        Furthermore, Defendant NoLabels.com Inc. funded a Google Ads campaign to improve the search result ranking of the Infringing Domain and attract more individuals to the Infringing Website's misleading information.

54.109.        Defendant hasDefendants knowingly and intentionally used the No Labels Registered Trademark in a manner that is deceptive and likely to cause confusion—and indeed *already has* caused confusion—as to the affiliation, sponsorship, connection, or association between the Infringing Website, its supporters, and candidates and No Labels.

55.110.        Defendant'sThe use on the Infringing Website of similar color schemes, visual layout, and phrasing ("commonsense," "problem solver," etc.) further demonstrates its intent to cause confusion or deceive consumers concerning an affiliation or sponsorship between No Labels and the ideas, platforms, and candidates contained on Defendant'sthe Infringing Website.

56.111.        No Labels is aware of at least one individual who was confused or deceived by Defendant'sthe infringement, and both No Labels and this individual suffered harm as a result of that confusion and/or deception.  It is certain that additional individuals willwere similarly be misled and confused by Defendant'sthe attempts to falsely suggest sponsorship or affiliation between No Labels and the ideas, platforms, and candidates on the Infringing Website.

57.112.        Defendant'sThe continued infringement of the No Labels Registered Trademark—in the Infringing Domain, on the Infringing Website, and as part of the Google Ads campaign—will cause No Labels irreparable injury, which cannot be adequately compensated by money damages.

58.113.        No Labels therefore requests that the Court permanently enjoin DefendantDefendants from any further use of the No Labels Registered Trademark, whether in the

Infringing Domain, on the Infringing Website, as part of the Google advertisements, in ~~its~~any

corporate entity name, or otherwise.

**COUNT III – TRADEMARK INFRINGEMENT**
(All Defendants)
*Violation of 15 U.S.C. § 1114(1)*
~~COUNT III – TRADEMARK INFRINGEMENT~~
*~~Violation of 15 U.S.C. § 1114(1)~~*

~~59.~~114.        No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

~~60.~~115.        No Labels' Registered Trademark is entitled to protection.

~~61.~~116.        ~~Defendant~~ As a group, with input and/or financial support from all, Defendants intentionally and without No Labels' consent created and/or used a reproduction, counterfeit, copy or colorable imitation of the NO LABELS mark not only in ~~Defendant's~~the domain name nolabels.com, but dozens of times on the Infringing Website itself. *See, e.g*., images, *supra,* at ¶¶ ~~19, 22~~62 & 65.

~~62.~~117.        ~~Defendant, which improperly uses the No Labels Registered Trademark in its very corporate entity name, also refers~~Defendants referred to the "No Labels Party"[7] and "NoLabels.com community" throughout the Infringing Website~~.~~, which mischaracterizes No Labels.

118.    Defendant NoLabels.com Inc. also improperly used the No Labels Registered Trademark in its very corporate entity name.

~~63.~~119.        Furthermore, Defendant NoLabels.com Inc. funded a Google Ads campaign to improve the search result ranking of the Infringing Domain and attract more individuals to the Infringing Website's misleading information.

---

[7] ~~*See* fn. 5 *supra*.~~

64.120.        ~~Defendant has~~Defendants knowingly and intentionally used the No Labels Registered Trademark in connection with ~~its~~the services of NoLabels.com Inc. in a manner that is deceptive and likely to cause confusion——and indeed already has caused confusion.

65.121.        ~~Defendant's~~Defendants' use on the Infringing Website of similar color schemes, visual layout, and phrasing ("commonsense," "problem solver," etc.) further demonstrates its intent to cause confusion or deceive consumers concerning an affiliation or sponsorship between No Labels and the ideas, platforms, and candidates contained on ~~Defendant's~~the Infringing Website.

66.122.        No Labels is aware of at least one individual who was confused or deceived by ~~Defendant's~~the infringement, and both No Labels and this individual suffered harm as a result of that confusion and/or deception.  It is certain that additional individuals will similarly be misled and confused by ~~Defendant's~~Defendants' attempts to falsely suggest sponsorship or affiliation between No Labels and the ideas, platforms, and candidates on the Infringing Website.

67.123.        ~~Defendant's~~Defendant NoLabels.com Inc.'s continued infringement of the No Labels Registered Trademark——in the Infringing Domain, on the Infringing Website, and as part of the Google Ads campaign——will cause No Labels irreparable injury, which cannot be adequately compensated by money damages.

68.124.        No Labels therefore requests that the Court permanently enjoin ~~Defendant~~NoLabels.com Inc., and the other Trademark Defendants, from any further use of the No Labels Registered Trademark, whether in the Infringing Domain, on the Infringing Website, as part of the Google advertisements, in its corporate entity name, or otherwise.

## COUNT IV – TRADEMARK DILUTION
### (All Defendants)
### *Violation of 15 U.S.C. § 1125(c)*

125.    No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

126.    Defendants' use of NO LABELS caused dilution by blurring, in violation of Section 43(c) of the Trademark Act of 1946, 15 U.S.C. § 1125(c).

127.    Plaintiff's NO LABELS mark is famous.  It is widely recognized by the general consuming public of the United States as a designation of source of No Labels' services.

128.    Plaintiff's NO LABELS mark has been used exclusively and has been extensively used and promoted through the United States since at least 2010.

129.    A substantial volume of publications, events and services have been sold or delivered under Plaintiff's NO LABELS mark throughout the United States.

130.    Plaintiff's NO LABELS mark enjoys a high degree of actual recognition.

131.    Defendants used NO LABELS in connection with issue advocacy and public advocacy to promote awareness of public policy options in commerce without authorization from Plaintiff.

132.    Defendants' unauthorized use of NO LABELS began long after Plaintiff's NO LABELS mark became famous.

133.    Defendants' unauthorized use of NO LABELS caused an association from the similarity between that and Plaintiff's NO LABELS mark that impaired the distinctiveness of Plaintiff's NO LABELS mark.

134.    Defendants' use of the NO LABELS in the domain name Nolabels.com, and on the website located at that domain, is identical or highly similar to Plaintiff's use of its NO LABELS mark.

135.    Plaintiff's NO LABELS mark is highly distinctive.

136.    Defendants intended to create an association between its use of NO LABELS in the domain name Nolabels.com and on the website located at that domain.

137.    Defendants' use of NO LABELS in the domain name Nolabels.com and on the website located at that domain created a likelihood of dilution by blurring within the meaning of 15 U.S.C. § 1125(c).

138.    Defendants were aware of Plaintiff's NO LABELS mark before they began to use NO LABELS in the domain name Nolabels.com and on the website located at that domain. Defendants' violation of Plaintiff's exclusive rights to the NO LABELS were willful.

139.    Defendants' conduct alleged herein caused and is likely to cause injury to the public and caused and is likely to cause Plaintiffs to suffer damages.

### COUNT V – CONTRIBUTORY TRADEMARK INFRINGEMENT / FALSE DESIGNATION OF ORIGIN
(Defendants APP, RT Group, Siler, Silver, and Caldwell)
*Violation of 15 U.S.C. § 1125(a)*

140.    No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

141.    In the alternative to liability for direct infringement under Count II, above, defendants APP, RT Group, Siler, Silver, and Caldwell are liable for contributing to defendant NoLabels.com Inc.'s infringement of Plaintiff's registered trademark.

142.    APP, RT Group, Siler, Silver, and Caldwell knew, or should have known, that Plaintiff No Labels previously used the Nolabels.com website in connection with its services.

143.    APP, RT Group, Siler, Silver, and Caldwell knew, or should have known, that Nolabels.com Inc. was planning to, and in fact carried through with plans to, infringe the Plaintiff's trademark by use of the copycat website that each of them played a part in creating.

144.     APP, RT Group, Siler, Silver, and Caldwell knew, or should have known, NoLabels.com Inc. was planning to, and in fact did, infringe Plaintiff's trademark and yet continued to provide NoLabels.com Inc. with their services, and/or provide payment for such services.

145.     APP, RT Group, Siler, Silver, and Caldwell intended for their contributions to the Infringing Website to be used to mislead the public about the source of the information, services or goods mentioned thereon, and as to any affiliation, connection or association with Plaintiff.

146.     APP, RT Group, Siler, Silver, and Caldwell contributed to the Infringing Website knowing that it would infringe on Plaintiff's registered trademark and should be held responsible for their participation and liable for the damages caused by the infringement.

### COUNT VI – CONTRIBUTORY TRADEMARK INFRINGEMENT
(Defendants APP, RT Group, Siler, Silver, and Caldwell)
*Violation of 15 U.S.C. § 1114(1)*

147.     No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

148.     In the alternative to liability for direct infringement under Count III, above, defendants APP, RT Group, Siler, Silver, and Caldwell are liable for contributing to defendant NoLabels.com Inc.'s infringement of Plaintiff's registered trademark.

149.     APP, RT Group, Siler, Silver, and Caldwell were each aware that Plaintiff No Labels previously used the Nolabels.com website in connection with its services.

150.     APP, RT Group, Siler, Silver, and Caldwell were each aware that Nolabels.com Inc. was planning to, and in fact carried through with plans to, infringe the Plaintiff's trademark by use of the copycat website that each of them played a part in creating.

151.     APP, RT Group, Siler, Silver, and Caldwell knew, or should have known, NoLabels.com Inc. was planning to, and in fact did, infringe Plaintiff's trademark and yet

continued to provide NoLabels.com Inc. with their services, and/or provide payment for such services.

152.     APP, RT Group, Siler, Silver, and Caldwell intended for their contributions to the Infringing Website to be used to cause confusion and deceive the public about the source of the information, services, imagery, and messaging contained on the Infringing Website.

153.     APP, RT Group, Siler, Silver, and Caldwell contributed to the Infringing Website knowing that it would infringe on Plaintiff's registered trademark and should be held responsible for their participation and liable for the damages caused by the infringement.

## COUNT VII – CONTRIBUTORY TRADEMARK DILUTION
### (Defendants APP, RT Group, Siler, Silver, and Caldwell)
### *Violation of 15 U.S.C. § 1125(c)*

154.     No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

155.     In the alternative to liability for direct infringement under Count IV, above, defendants APP, RT Group, Siler, Silver, and Caldwell are liable for contributing to defendant NoLabels.com Inc.'s dilution of Plaintiff's registered trademark.

156.     APP, RT Group, Siler, Silver, and Caldwell were each aware of Plaintiff's NO LABELS mark and that Plaintiff previously used the Nolabels.com website in connection with its services.

157.     APP, RT Group, Siler, Silver, and Caldwell were each aware that Nolabels.com Inc. was planning to, and in fact carried through with plans to, dilute the Plaintiff's trademark by use of the copycat website that each of them played a part in creating.

158.     APP, RT Group, Siler, Silver, and Caldwell knew, or should have known, NoLabels.com Inc. was planning to, and in fact did, dilute Plaintiff's trademark and yet they

continued to provide NoLabels.com Inc. with their services, and/or provide payment for such services.

159.    APP, RT Group, Siler, Silver, and Caldwell intended for their contributions to the Infringing Website to be used to dilute Plaintiffs NO LABELS mark and deceive the public about the source of the information, services, imagery, and messaging contained on the Infringing Website.

160.    APP, RT Group, Siler, Silver, and Caldwell contributed to the Infringing Website knowing that it would dilute Plaintiff's NO LABELS mark and should be held responsible for their participation and liable for the damages caused by the infringement.

### COUNT VIII – DECEPTIVE TRADE PRACTICES
(All Defendants)
*Violation of Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. § 2531,* et seq.

161.    No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

162.    In 2023, a growing number of political operatives were sharing plans for destroying No Labels' brand by making is so devastatingly toxic that no donor or candidate would want to be associated with it.  These efforts persisted through December 2023, at least.

163.    The Infringing Website likewise pushed out false and misleading information about No Labels and was, in fact, designed to frame the "the entire NL project as a right-wing shadow effort by crafting language that looks like it's coming from NL as a right-wing shadow group."

164.    Defendants used false and misleading information to activities to disparage No Labels.

165.    Plaintiff suffered damages as a result of Defendants' deceptive trade practices in an amount to be determined at trial.

### COUNT IX – UNFAIR OR DECEPTIVE TRADE PRACTICES

(All Defendants)
*Violation of District of Columbia Code § 28-3904(g)*

166.    No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

167.    In 2023, a growing number of political operatives were sharing plans for destroying No Labels brand by making is so devastatingly toxic that no donor or candidate would want to be associated with it.

168.    Much of this work was done within the District of Columbia and/or organized by individuals or entities located or working in the District of Columbia

169.    These efforts persisted through December 2023, at least.

170.    The Infringing Website likewise pushed out false and misleading information about No Labels and was, in fact, designed to frame the "the entire NL project as a right-wing shadow effort by crafting language that looks like it's coming from NL as a right-wing shadow group."

171.    Defendants used false and misleading information to activities to disparage No Labels.

172.    Plaintiff suffered damages as a result of Defendants' deceptive trade practices in an amount to be determined at trial.

## COUNT X – CIVIL CONSPIRACY
(All Defendants)

173.    No Labels realleges and incorporates by reference all preceding allegations set forth above as though fully set forth herein.

174.    There was a meeting of the minds between each of the defendants that false and misleading statements about No Labels should be disseminated in violation of U.S. trademark law and state/district unfair trade practice laws.  These meetings were for the objective of making the

No Labels so devastatingly toxic that it would scare off potential donors and candidates in violation of these state/district and federal laws.

175.    To achieve this objective, Defendants, and each of them, engaged in the dissemination of false and misleading information about No Labels and violated U.S. trademark law and state/district unfair trade practice laws.  Each and every one of the Defendants were directly involved in the acts alleged herein.

176.    No Labels was damaged as a result, including the loss of millions of dollars invested in efforts to gain ballot access in states across the country.

## PRAYER FOR RELIEF

WHEREFORE, No Labels respectfully requests that the Court enter judgment in its favor and against Defendant, providing the following relief:

- Entering judgment in favor of No Labels on its ACPA claim;

- Entering judgment in favor of No Labels on its Lanham Act claims for trademark infringement and false designation of origin;

- Ordering the~~final and complete~~ transfer of <nolabels.com> to the Plaintiff, pursuant to 15 U.S.C. §~ 1125(d)(1)(C);

- Enjoining ~~Defendant's~~Defendants' use of the No Labels Registered Trademark in any manner, including but not limited to on the Infringing Domain, the Infringing Website, and in its corporate entity name, pursuant to 15 U.S.C. § 1116(a);

- Awarding No Labels a monetary judgment for ~~Defendant's~~Defendants' profits, No Labels' damages, and the costs of this action, pursuant to 15 U.S.C. § 1117(a);

- Trebling No Labels' damages based on the circumstances of the case, including ~~Defendant's~~Defendants' willful and knowing infringement and intent to deceive, pursuant to 15 U.S.C. § 1117(a);

- Awarding No Labels statutory damages of no less than $100,000 for ~~Defendant's~~Defendants' violation of 15 U.S.C. § 1125(d)(1);

- Finding this action to be exceptional and thus awarding No Labels its reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a);

    - ~~Granting leave for No Labels to conduct expedited discovery, as appropriate; and~~

- Treble damages and attorney fees pursuant to the Delaware Uniform Deceptive Trade Practices Act, 6 *Del. C.* §§ 2531, *et seq.*; and

- Awarding No Labels such other and further relief as the Court deems just and appropriate.

Date:  February 3, 2025

~~Date: December 4, 2023~~

*Of Counsel:*

Mark D. Lytle (*pro hac vice* ~~forthcoming~~)
**NIXON PEABODY LLP**
799 9ᵗʰ Street NW
Suite 500
Washington, DC 20001
Tel:  (202) 585-8435
Fax:  (907) 331-4726
Email:  mlytle@nixonpeabody.com

Jason C. Kravitz (*pro hac vice* ~~forthcoming~~)
Leslie E. Hartford (*pro hac vice* ~~forthcoming~~)
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel:  (617) 345-1318
Fax:  (617) 345-1300

**HALLORAN FARKAS + KITTILA LLP**

*/s/ Theodore A. Kittila*
Theodore A. Kittila (Bar No. 3963)
~~5801~~William E. Green, Jr. (Bar No. 4864)
5722 Kennett Pike~~, Suite C/D~~
Wilmington, Delaware 19807
Phone:  (302) 257-2025
Fax:  (302) 257-2019
Email:  tk@hfk.law / wg@hfk.law

*Counsel for Plaintiff*

Email:  jkravitz@nixonpeabody.com
         lhartford@nixonpeabody.com

Aaron M. Brian (*pro hac vice*)
300 S. Grand Ave., Suite 4100
Los Angeles, CA 90071
Tel:  (213) 629-6000
Fax:  855-515-9456
Email:  abrian@nixonpeabody.com