**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NO LABELS,

        *Plaintiff,*

    v.

DELCO0222024, INC. (f/k/a NOLABELS.COM INC.), AMERICAN PATRIOT PROJECT, INC., RT GROUP LLC, JOSHUA SILVER, CHARLES SILER, and LUCY CALDWELL,

        *Defendants.*

Case No. 1:23-CV-01384-GBW

## PLAINTIFF'S OMNIBUS ANSWERING <u>BRIEF IN OPPOSITION TO MOTIONS TO DISMISS</u>

*Of Counsel:*

Mark D. Lytle (*pro hac vice*)
**NIXON PEABODY LLP**
799 9ᵗʰ Street NW, Suite 500
Washington, DC 20001
Tel: (202) 585-8435
Email: mlytle@nixonpeabody.com

Jason C. Kravitz (*pro hac vice*)
Leslie E. Hartford (*pro hac vice*)
**NIXON PEABODY LLP**
Exchange Place, 53 State Street
Boston, Massachusetts 02109
Tel: (617) 345-1318
Email:  jkravitz@nixonpeabody.com /
      lhartford@nixonpeabody.com

Dated:  June 20, 2025

**HALLORAN FARKAS + KITTILA LLP**

Theodore A. Kittila (Bar No. 3963)
James G. McMillan, III (Bar No. 3979)
William E. Green, Jr. (Bar No. 4864)
5722 Kennett Pike
Wilmington, Delaware 19807
Tel:  (302) 257-2103
Fax:  (302) 257-2019
Email:  tk@hfk.law / jm@hfk.law /
      wg@hfk.law

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.     NATURE AND STAGE OF THE PROCEEDINGS .................................................1

II.    SUMMARY OF ARGUMENTS ...............................................................................3

III.   STATEMENT OF FACTS ........................................................................................5

IV.    ARGUMENT ..........................................................................................................10

  A.   Standards of Review ..............................................................................................10

    1. Rule 12(b)(1) Standard: Lack of Subject Matter Jurisdiction ...............................10

    2. Rule 12(b)(2) Standard: Lack of Personal Jurisdiction .........................................11

    3. Rule 12(b)(6) Standard: Failure to State a Claim .................................................13

  B.   Defendants' Motions to Dismiss for Lack of Personal Jurisdiction Should Be Denied ....14

    1.   APP's Motion to Dismiss for Lack of Personal Jurisdiction Should Be Denied ...14

      a.   APP is subject to long-arm jurisdiction in Delaware .................................14

      b.   The requirements of due process are met as to APP .................................17

      c.   APP is subject to personal jurisdiction under the conspiracy theory of jurisdiction ................................................................................................19

    2.   The Individual Defendants' Motions to Dismiss for Lack of Personal Jurisdiction Should Be Denied ...............................................................................21

      a.   Silver and Siler are subject to this court's jurisdiction .............................22

      b.   Caldwell is subject to this court's jurisdiction ..........................................23

  C.   Siler's Motion to Dismiss Count I for Cybersquatting Should Be Denied .......................26

  D.   Siler's Motion to Dismiss Plaintiff's Trademark Claims Should Be Denied ...................30

  E.   Siler's Motion to Dismiss Count VIII for Violation of the Delaware Deceptive Trade Practices Act Should Be Denied ...................................................................31

  F.   Defendants' Motions to Dismiss Count IX for Violation of the D.C. Consumer Protection Procedures Act Should Be Denied ........................................................32

    1. No Labels Has Standing Under CPPA Subsection 28-3904(g) .............................32

    2. Count IX States a Claim for Violation of CPPA Subsection 28-3904(g) ....................................................................................................................36

  G.   Siler's Motion to Dismiss Count X for Civil Conspiracy Should Be Denied ...................37

V.     CONCLUSION .......................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                 **Page(s)**

*Allied Cap. Corp. v. GC-Sun Holdings, L.P.*,
    910 A.2d 1020 (Del. Ch. 2006)................................................................37

*Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*,
    2005 Del. Ch. 35 (Del. Ch. Mar. 3, 2005)...........................................20

*Applied Biosystems, Inc. v. Cruachem, Ltd.*,
    772 F. Supp. 1458 (D. Del. 1991).........................................................12

*Archie v. U.S. Bank, N.A.*,
    255 A.3d 1005 (D.C. App. 2021)...........................................................35

*Argos v. Orthotec LLC*,
    304 F. Supp. 2d 591 (D. Del. 2004)................................................26, 27

*In re Asbestos Litig.*,
    509 A.2d 1116 (Del. Super. 1986).........................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................13

*Bell v. Hood*,
    327 U.S. 678 (1946).................................................................................11

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
    2005 WL 583828 (Del. Ch. 2005) ...........................................15, 17, 21

*Bosley Med. Inst., Inc. v. Kremer*,
    403 F.3d 672 (9th Cir. 2005) ................................................................26

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
    582 U.S. 255 (2017).................................................................................19

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985).................................................................................16

*In re Burlington Coat Factory Secs. Litig.*,
    114 F.3d 1410 (3d Cir. 1997).................................................................13

*Cardio-Medical Assocs., Ltd. v. Crozer-Chester Med. Ctr.*,
    721 F.2d 68 (3d Cir. 1983)......................................................................11

*Chandler v. Ciccoricco*,
    2003 WL 21040185 (Del. Ch. 2003) ...................................15, 17, 18, 19, 22

*Clark v. Davenport,*
    2019 WL 3230928 (Del. Ch. July 18, 2019)....................................................24

*Constitution Party of Pa. v. Aichele,*
    757 F.3d 347 (3d Cir. 2014)....................................................................11

*Cornell Glasgow, LLC v. La Grange Props., LLC,*
    2012 Del. Super. LEXIS 266 (Del. Super. Ct. June 6, 2012)...........................20

*Credit Union Liquidity Servs., LLC v. Coastal Fed. Credit Union,*
    2010 WL 3606033 (N.D. Tex. Sept. 14, 2010)............................................16

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014)...........................................................................12

*DaimlerChrysler v. The Net Inc.,*
    388 F.3d 201 (6th Cir. 2004) .................................................................26

*District Cablevision L.P. v. Bassin,*
    828 A.2d 714 (D.C. App. 2003).............................................................36

*Eurofins Pharma US Hldgs. v. BioAlliance Pharma SA,*
    623 F.3d 147 (3d Cir. 2010)...................................................................12

*Ford Motor Co. v. Montana Eighth Judicial District Court,*
    592 U.S. 351 (2021)......................................................................17, 22

*Ford v. ChartOne, Inc.,*
    908 A.2d 72 (D.C. Ct. App. 2006)......................................................33, 35

*Fortis Advisors LLC v. Johnson & Johnson,*
    2021 Del. Ch. LEXIS 290 (Del. Ch. Dec. 13, 2021) ...................................20

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009)...................................................................13

*In re General Motors (Hughes) S'holder Litig.,*
    2005 WL 1089021 (Del. Ch. 2005) .........................................................15

*Gibralt Capital Corp. v. Smith,*
    2001 WL 647837 (Del. Ch. 2001) ...........................................................15

*Goodyear Dunlop Tires Ops., S.A. v. Brown,*
    564 U.S. 915 (2011)...........................................................................12

*Gould Elecs. Inc. v. United States,*
    220 F.3d 169 (3d Cir. 2000)...................................................................11

*Harris v. Harris*,
   289 A.3d 310 (Del. Ch. 2023)............................................................................24

*Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*,
   611 A.2d 476 (Del. 1992) ........................................................................14, 24

*Howard v. Riggs Nat'l Bank*,
   432 A.2d 701 (D.C. 1981) ..............................................................................33

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)........................................................................................12

*Istituto Bancario Italiano SpA v. Hunter Engineering Co.*,
   449 A.2d 210 (Del. 1982) ........................................................21, 23, 24, 25

*JPMorgan Chase Bank, N.A. v. Argus Information & Advisory Services Inc.*,
   765 F. Supp. 3d 367 (D. Del. Feb. 2, 2025)....................................................31

*Kahn v. Lynch Commc'n Sys., Inc.*,
   1989 WL 99800 (Del. Ch. 1989) ....................................................................15

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
   926 F.2d 1406 (3d Cir. 1991)..........................................................................11

*Libertarian Nat'l Comm., Inc. v. Saliba*,
   116 F.4th 530 (6th Cir. 2024) .........................................................................30

*Lincoln Ben. Life Col. v. AEI Life, LLC*,
   800 F.3d 99 (3d Cir. 2015)..............................................................................11

*Marino v. Cross Country Bank*,
   2003 WL 503257 (D. Del. Feb. 14, 2003) ......................................................38

*Mayer v. Belichick*,
   605 F.3d 223 (3d Cir. 2010)............................................................................14

*Merck & Co. v. Barr Labs., Inc.*,
   179 F. Supp. 2d 368 (D. Del. 2002)................................................................13

*Nespresso USA, Inc. v. Ethical Coffee Co. SA*,
   263 F. Supp. 3d 498 (D. Del. 2017)................................................................13

*Pacira Biosciences, Inc. v. Ventis Pharma, Inc.*,
   2024 WL 3925117 (D. Del. Aug. 23, 2024) ....................................................31

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
   794 A.2d 1211 (Del. Ch. 2001).................................................................15, 21

*Pennsylvania Med. Soc. v. Snider*,
    29 F.3d 886 (3d Cir. 1994)........................................................................34

*Perry v. Neupert*,
    2017 WL 6033498  (Del. Ch. Dec. 6, 2017)...................................24, 25

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
    261 F.3d 1188 (11th Cir. 2001) ....................................................26, 30

*Puff Corp. v. KandyPens, Inc.*,
    2020 WL 6318708 (D. Del. Oct. 28, 2020) .............................................32

*Reach & Assoc. P.C. v. Dencer*,
    269 F. Supp. 2d 497 (D. Del. 2003).........................................................12

*Sample v. Morgan*,
    935 A.2d 1046 (Del. Ch. 2007)......................................................15, 22

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974)...................................................................................13

*SDF Funding LLC v. Fry*,
    2022 WL 1521309 (Del. Ch. May 13, 2022) ...............................15, 22

*Shaw v. Marriott Int'l, Inc.*,
    605 F.3d 1039 (D.C. Cir. 2010)....................................................33, 35

*StrikeForce Techs., Inc. v. WhiteSky, Inc.*,
    2013 WL 3508835 (D.N.J. July 11, 2013).............................................16

*In re Transamerica Airlines, Inc.*,
    2006 WL 587846 (Del. Ch. Feb. 28, 2006) ..........................................20

*Traynor v. Liu*,
    495 F. Supp. 2d 444 (D. Del. 2007)........................................................12

*Treasury Mgmt. Servs., Inc. v. Wall St. Sys. Delaware, Inc.*,
    2017 WL 1821114 (D. Del. May 5, 2017)...............................................31

*Underwood v. Bank of Am. Corp.*,
    996 F.3d 1038 (10th Cir. 2021) ...............................................................30

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966)...................................................................................10

*United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*,
    128 F.3d 86 (2d Cir. 1997).............................................................27, 30

*In re USACafes, L.P. Litig.*,
    600 A.2d 43 (Del. Ch.1991).......................................................................18

*Virtus Capital L.P. v. Eastman Chemical Co.*,
    2015 WL 580553 (Del. Ch. Feb. 11, 2105).........................................18, 24, 25

*Whirlpool Corp. v. Cabri*,
    2022 WL 1421126 (D. Del. May 5, 2022).........................................................10

*Wolfe v. Intermeccanica Int'l, Inc.*,
    2024 WL 1300198 (D. Del. Mar. 27, 2024) ......................................................12

*Zipee Corp. v. United States Postal Service*,
    140 F. Supp. 2d 1084 (D. Ore. 2000)................................................................27

**Statutes and Rules**

15 U.S.C. § 1114 ......................................................................................................30

15 U.S.C. § 1116 ......................................................................................................30

15 U.S.C. § 1117 ......................................................................................................30

15 U.S.C. § 1125 ...............................................................................................*passim*

6 *Del. C.* § 2531, *et seq.* ..........................................................................................31

10 *Del. C.* 3104 ................................................................................................*passim*

D.C. Code § 28-3904 .........................................................................................*passim*

Fed. R. Civ. Proc. 12(b)(1) .....................................................................................11

Fed. R. Civ. Proc. 12(b)(2) .........................................................................3, 4, 10, 12

Fed. R. Civ. Proc. 12(b)(6) ...........................................................................4, 10, 13

**Other Authorities**

2 James W. Moore, Moore's Federal Practice § 12.30[4] (2025)..................................11

Plaintiff No Labels ("No Labels" or "Plaintiff") submits this Omnibus Answering Brief in Opposition to the Motions to Dismiss submitted by defendants American Patriot Project, Inc. ("APP") (D.I. 131), RT Group LLC ("RT Group") (D.I. 134), Joshua Silver ("Silver") (D.I. 139), Charles Siler ("Siler") (D.I. 143), and Lucy Caldwell ("Caldwell") (D.I. 133) (collectively, "Defendants").

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This cases arises from Defendants' knowing and intentional incorporation of a Delaware entity originally named "Nolabels.com Inc." for the purpose of creating and operating the website <nolabels.com>.  That website was created for the express purpose of destroying the No Labels brand.  In their own words, they sought to "Make No Labels Brand socially, professional toxic." To accomplish this objective, Defendants knowingly published false and misleading information about No Labels to scare off donors and potential candidates.  Defendants' website was intended to mimic the look and feel of the genuine No Labels website.  Defendants opted for the domain name <nolabels.**com**> in the hopes that the voting public would confuse it with the genuine website for No Labels:  <nolabels.**org**>.

Five of the six Defendants have moved to dismiss, but as demonstrated below those motions are without merit.  Defendants' conduct is exactly the type of cybersquatting conduct that gives rise to claims under the Lanham Act.   Indeed, Congress described this conduct— "intent[ionally] divert[ing] consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site."   15 U.S.C. § 1125(d)(2)(V).

1

The decision to use the name "nolabels.com Inc." demonstrates the intent to infringe on No Labels' trademark, particularly given Defendants' own documents that show the reason for that name choice was to attract politically interested consumers searching for information about No Labels and provide false and misleading information in its place.

Further, the various state consumer protection laws, including those of Delaware and the District of Columbia, are intended to protect both businesses and consumers from the type of misleading behavior that Defendants intentionally engaged in. Those statutes impose liability where, as here, a party intentionally disseminates false and disparaging information about another's business.

Defendants conspired to attack No Labels and interfere with its work. The Amended Complaint is replete with allegations that Defendants agreed to work in concert for the express purpose of accomplishing illegal goals. That is all that needs to be alleged to establish a conspiracy claim.

Finally, Defendants are subject to personal jurisdiction. They intentionally incorporated a Delaware entity for the express purpose of having that entity engage in illegal conduct. Moreover, those actions were conducted on the internet and was directed at the voting public in Delaware (among other places).

All defendants except DELCO0222024, INC. (f/k/a NoLabels.com Inc.) ("NoLabels.com") have moved to dismiss the Amended Complaint (D.I. 126) against them. This is Plaintiff's Omnibus Answering Brief in Opposition to Motions to Dismiss. NoLabels.com has answered the Amended Complaint and filed a counterclaim for declaratory judgment. D.I. 145. No Labels has filed a reply to NoLabels.com's counterclaim. D.I. 147.

## II.   **SUMMARY OF ARGUMENTS**

1.    The Court must deny the motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2) filed by four of the Defendants because each of those defendants is subject to the district court's specific jurisdiction under Section 3104(c)(1) of the Delaware long-arm statute, 10 *Del. C.* § 3104, and because subjecting them to jurisdiction is consistent with the due process clause of the Fourteenth Amendment to the United States Constitution.  Three of the four, APP, Silver, and Siler, participated in the filing of NoLabels.com's certificate of incorporation in Delaware for the purpose of engaging in the challenged misconduct, a substantial act in Delaware under Section 3104(c)(1).  The claims in this action are related to that substantial act as required by the statute.  Requiring these defendants to appear in this district court does not offend traditional notions of fair play and substantial justice.  APP is also subject to jurisdiction under the conspiracy theory of jurisdiction because it conspired with Defendants NoLabels.com and RT Group to engage in the challenged illegal conduct.  As is Caldwell for conspiring with Silver and Siler.

2.    The Court must deny Siler's motion to dismiss Count I for violation of the Cybersquatting Statute, 15 U.S.C. § 1125(d), because Siler's argument that the statute requires that the defendant profit financially from the violation is wrong.  The statute provides that a defendant's intent to divert consumers from the mark owner's website to a copycat site with the intent to tarnish or disparage the mark satisfies the statute's requirement that the defendant act with a bad-faith intent to profit.

3.    The Court must deny Siler's motion to dismiss Counts II through VII for violations of the Lanham Act because the No Labels trademark was used by Defendants in commerce.  The requirement that a trademark be used "in commerce" encompasses trademark infringement by or against political or nonprofit organizations like NoLabels.com and No Labels.

4.      The Court must deny Siler's motion to dismiss Count VIII for violations of the Delaware Deceptive Trade Practices Act because Siler's argument that the statute does not have extraterritorial effect misses the point that trademark infringement that has a nationwide effect constitutes a violation of the statute in Delaware.  NoLabels.com's copycat website had effects in Delaware that meet the statute's requirements.

5.      The Court must deny Siler's and RT Group's motions to dismiss Count IX for violation of the District of Columbia Consumer Protection Procedures Act (the "CPPA") because Subsection (g) of Section 28-3904 of the CPPA governs relations between businesses and is not limited solely to interactions between consumers and merchants.  The subsection refers to disparagement of the business of another by false or misleading representations of material facts.  Here, NoLabels.com disparaged the business of No Labels—conduct between businesses that is prohibited by the statute's express language.

6.      The Court must deny Siler's motion to dismiss Count X for civil conspiracy because the conspiracy here arose from underlying causes of action:  violations of U.S. trademark law and state/district unfair trade practice laws.

7.      The Court must also deny Caldwell's motion to dismiss pursuant to Rule 12(b)(2) and (b)(6).  First, Caldwell is subject to personal jurisdiction both because of her direct actions in the formation of Nolabels.com Inc. and because of her active role in the conspiracy to form an entity that would operate a website that was designed to harm No Labels.  She played an active role in all aspect of that conspiracy that to the publication of the <nolabels.com> website and the harm that caused to No Labels.  Her contacts with Delaware are sufficient to meet the *Instituto Bancario* test.  Second, the Amended Complaint states claims against Caldwell for cybersquatting

and other violations of the Lanham act because of her role in the design, creation and publication of the infringing website.

### III.    <u>STATEMENT OF FACTS</u>

Defendants sought to destroy No Labels' brand, not by criticizing its actual positions, but by making false misleading statements about No Labels to deceive and confuse potential donors and candidates.   This case arises from one aspect of those efforts:  the creation of a website that was intended to "make the No Labels Brand socially, professionally toxic."  D.I. 126 (Amended Complaint) ¶ 1.   As an early step in that effort, Defendants registered the domain name <nolabels.**com**> to create confusion with the real No Labels website <nolabels.**org**>.  *Id.* ¶ 2.

Long before Defendants embarked on their illegal campaign, No Labels registered its name and the mark "NO LABELS".   The mark is registered as No. 3,946,066 for use with "issue advocacy; public advocacy to promote awareness of public policy options and political issues" in Class 35.   *Id.* ¶ 23.   Despite No Labels holding a duly registered trademark, Defendants intentionally sought to use its name and registered mark without permission and with the intent of destroying the good will and value existing in that mark.

No Labels, a 501(c)(4) nonprofit corporation headquartered in Washington, D.C., was established in 2009 to bridge the partisan divide in Washington by advancing commonsense reforms and convening officeholders from both major parties in an effort to find bipartisan solutions to the nation's problems.  *Id.* ¶ 21.  No Labels has spent almost 15 years working with leaders from both sides of the political spectrum to effectuate change in public policy.  *Id.* ¶ 22. *See also id.* ¶¶ 2, 35, 37, 75.  Soon after its formation No Labels acquired the rights to the internet domain <nolabels.org> which it uses to promote its ideas, provide information about future events and as a mechanism for people to become involved through donations and volunteer efforts.  *Id.* ¶¶ 24-26.

Fundamental to the No Labels mission is that it is an organization dedicated to providing the "commonsense majority" with options to encourage policy leaders to solve many of the biggest problems facing America. *Id.* ¶ 27. Prior to Defendants' conduct, No Labels had been working to gain ballot access in states nationwide to offer voters a "Unity ticket" that would feature another option for presidential and vice-presidential candidates for voters unsatisfied with the choices available to them from the major political parties (particularly the Democratic and Republican Parties).. *Id.* ¶ 28. No Labels relied on its website to disseminate its message.

In an effort to derail No Labels' growing success, Defendants undertook a conspiracy to make false and misleading statements, to infringe on the No Labels trademark, and through deliberate cybersquatting.

As an initial step in their scheme, Defendants formed a Delaware corporation with the name "NoLabels.com Inc." *Id.* ¶ 59. There was no accident in choosing this name, Defendants intentionally selected this name for the Delaware entity as part of their effort to wrongfully impersonate the genuine No Labels. *Id.* ¶¶ 6, 16. Defendants undertook this task by establishing a website with the domain <nolabels.**com**> because they expected that the general public would mistakenly go to their website rather than the genuine No Labels website with the domain <nolabels.**org**>. Having obtained a website with a confusingly similar name, the Defendants embarked on their efforts to destroy No Labels. *Id.* ¶ 33. The conspiracy included the intent to create a website that was to be designed to "mirror the NL.Org language while also framing the entire NL project as a right-wing shadow effort by drafting language that looks like it's coming from [No Labels] as a right-wing shadow group." *Id.* ¶ 32 and Ex. 1. Defendants conspired in "an intentional effort to mislead the public by connecting No Labels and its leadership to Donald Trump." *Id.* ¶ 38. Defendants knew that there was no link to Trump and hoped that the effort to

create that appearance would "scare off potential donors and potential candidates"—particularly those "that supported centrist and bipartisan solutions." *Id.* ¶ 38.

Defendants Silver and Caldwell began the process of trying to destroy No Labels during the summer of 2023. *Id.* ¶¶ 39-41. Defendant Siler joined those efforts in early fall 2023, with the start of work on the copycat website that was to become <nolabels.com>. *Id.* ¶ 42. Siler described the website efforts as creating a site that would: "mirror the NL.ORG language while also framing the entire NL project as a right-wing shadow effort by crafting language that looks like it's coming from NL as a right-wing shadow group." *Id.* ¶ 42. In furtherance of their scheme, the individual defendants incorporated NoLabels.com Inc. on November 7, 2023. *Id.* ¶ 43. Aware that their course of action was wrongful, Defendants took their actions in secret: they used a proxy to register the domain <nolabels.com> and have not disclosed the employees, shareholders, officers and directors of Nolabels.com Inc. *Id.* ¶ 43.

Siler prepared a pitch deck to share with his co-conspirators to help focus the thought process and move the planned destruction of No Labels into reality. As part of the effort to paint No Labels as a right-wing entity, Siler suggested that the website focus "on red meat issues that can be fixed with the unity of 'real' Americans, such as Immigration, welfare waste, war spending in Ukraine, and possibly anti-abortion messaging." *Id.* Ex. 1 at 5. Siler went further suggesting a page to discuss potential nominees for President and Vice-President with bios designed to make the potential candidates appear problematic to centrists. *Id.* Ex. 1 at 9. He also suggested running a poll, but faking the results with the intent to cause additional harm to No Labels. *Id.* Siler's proposal also suggested that it pick the worst Supreme Court decisions from the 1950s and extol their virtues. *Id.* at 11. He also suggested that the copycat website should include "Christo-nationalist dog whistles" so as to further harm No Labels. D.I. 126 ¶ 55.

Siler designed the <nolabels.com> website to have the same look and feel as the genuine <nolabels.org> website. *Id.* ¶ 56. Defendants paid careful attention to the details and intentionally designed the copycat website to mimic the look and layout of the genuine website. A comparison of the homepage images demonstrates the lengths to which Defendants went in attempting to copy the design. *See id.* ¶ 62. This included the same design for the "NO LABELS" banner and a similar color scheme, as well as providing links for donations and to sign-up as volunteers. *Id.* ¶ 62. The website included the explicit statement that it "is a hub for No Labels Party supporters to foster discussions and solutions." *Id.* ¶ 63.

Caldwell and Silver played significant roles in editing the copycat website with the intent of exacerbating the injury to No Labels that it would cause. *Id.* ¶ 57. These edits included using photos from the No Labels Problem Solver Convention of 2015 as a way of implying that No Labels endorsed or supported certain candidates, when that was not the case. *Id.* ¶ 65.

Defendants took the actions necessary to exacerbate the impact of their infringing website. They purchased advertising for the website and worked to improve its results in search engines. *Id.* ¶ 108. Their approach was effective. People found the infringing website and had negative reactions to its content. *See, e.g.*, *id.* ¶ 81.

Each of the Defendants played an instrumental role in the effort to harm No Labels.

Silver is the principal of Defendants RT Group and APP and conducts a political consulting business through those entities. *Id.* ¶¶ 8, 9. Silver is the mastermind of the entire scheme and made the decision to incorporate Nolabels.com Inc. for the purpose of owning and operating the infringing website. *Id.* ¶ 17. Silver managed the Delaware entities and participated in the incorporation of Nolabels.com Inc. for the purpose of creating and operating the infringing website. *Id.* ¶ 16. Silver was instrumental in obtaining and funneling the funding to participants

8

to enable Defendants' scheme to move forward. *Id.* ¶ 41. In addition, Silver supervised the work of the other defendants and had the final say in determining how and what to fund. *Id.* ¶ 46. Indeed, it was Silver who approved the acquisition of the domain <nolabels.com> (*id.* ¶ 53) and was intimately involved in designing and editing the infringing website. *Id.* ¶ 105.

Defendant Siler is a political consultant who was hired to work with Silver and Caldwell in designing and developing the infringing website <nolabels.com>. *Id.* ¶ 16. He was involved in the incorporation of Nolabels.com Inc. in Delaware and, as an officer of that entity, operating the infringing website. *Id.* ¶ 17. Siler spearheaded the acquisition and development of the infringing website with the intent of harming No Labels. *Id.* ¶ 41. As described above, Siler was instrumental in designing the website and organizing the approach. The slide deck he created goes to extraordinary lengths to detail the approach that would inflict the maximum harm on No Labels. *See* D.I. 126 Ex. 1, ¶¶ 42, 54. He was paid at least $10,000 per month for his efforts. *Id.* ¶ 47.

Defendant Caldwell was a leader in the effort to sabotage No Labels. She was active in the effort to design the copycat website used by nolabels.com as both an agent of nolabels.com and RT Group. *Id.* ¶ 18, 41, 54. With Siler, she spearheaded the acquisition and design of the website. *Id.* ¶ 41. She was also active in the process of raising funding to allow nolabels.com to operate the infringing website. *Id.* ¶ 41. Caldwell was compensated at least $10,000/month for her efforts to destroy No Labels. *Id.* ¶ 47. Caldwell played a key role in selecting the language for the website. *Id.* ¶¶ 101, 104. Caldwell was particularly valuable to the conspiracy because of her background as a conservative political consultant and her understanding of how to communicate with people who have a conservative lean. *Id.* ¶ 48. With her co-defendants, Caldwell plotted to use a Delaware entity to undermine the No Labels message and harm No Labels

through the infringing website, and directed that conduct at voters and contributors in Delaware among other places. *Id.* ¶ 54.

Defendant APP existed for less than six months before being dissolved. *Id.* ¶ 7. APP hired Siler and Caldwell to provide services with the express intent to damage No Labels through the infringing website. *Id.* ¶¶ 10, 11. APP participated in the formation of NoLabels.com Inc. in Delaware and sold the <nolabels.com> domain to that entity. *Id.* ¶¶ 15, 16. APP received and distributed funds in order to enable the conspirators to execute their plan by creating the infringing website and its content, including purchasing the infringing domain name. *Id.* ¶¶ 46, 53.

DELCO0222024, Inc. (f/k/a Nolabels.com Inc.) ("Nolabels.com Inc.") is a Delaware corporation through which Defendants executed their scheme to harm No Labels by cybersquatting and infringing on the No Labels trademark.

## IV.    ARGUMENT

### A.    Standards of Review.

#### 1.    Rule 12(b)(1) Standard: Lack of Subject Matter Jurisdiction.

Defendant Siler argues that Plaintiff's claims under the federal statute for cybersquatting, 15 U.S.C. § 1125(d), and under the Lanham Act for trademark infringement, 15 U.S.C. §§ 1125(a), 1114(1), and 1125(c), should be dismissed under Rule 12(b)(6) for failure to state a claim, and that if they are dismissed the district court will lack jurisdiction over the subject matter of this action. D.I. 144 at 5. He is wrong. The Amended Complaint states claims under those federal statutes and those claims provide subject matter jurisdiction in the district court, including over Plaintiffs' pendent state law claims, each of which is related to Plaintiff's claims under federal statutes. *See Whirlpool Corp. v. Cabri*, 2022 WL 1421126, at *16 (D. Del. May 5, 2022) (district court has pendent jurisdiction where state and federal claims "derive from a common nucleus of operative fact") (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits dismissal of an action for "lack of subject matter jurisdiction." A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014); *see also* 2 James W. Moore, Moore's Federal Practice § 12.30[4] (2025). A challenge is facial when a motion to dismiss is filed prior to an answer and asserts that the complaint is jurisdictionally deficient on its face. *Cardio-Medical Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983).

The Court is required to apply the standards relevant to Rule 12(b)(6) when reviewing a facial challenge under Rule 12(b)(1). *Lincoln Ben. Life Col. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)) ("[i]n reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff"). Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or... is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408–1409 (3d Cir. 1991) (ellipsis in original) (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)). Here, Plaintiff is asserting a variety of claims that arise under federal statutes. Indeed, Plaintiff's cybersquatting claim—Defendants intentional use of the "No Labels" mark when creating the <nolabels.com> domain—is exactly the type of conduct that is barred by federal law. Accordingly, the Court has subject matter jurisdiction and must exercise pendent and supplemental jurisdiction over Plaintiff's state law claims.

### 2.    Rule 12(b)(2) Standard:  Lack of Personal Jurisdiction.

Defendants APP, Caldwell, Silver, and Siler each argue that the district court lacks personal jurisdiction over them. They are wrong. This Court has personal jurisdiction over each of them

pursuant to Delaware's long-arm statute, 10 *Del. C.* § 3104(c)(1), and the requirements of due process are met.

On a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), "a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor." *Traynor v. Liu*, 495 F. Supp. 2d 444, 448 (D. Del. 2007). "[T]he plaintiff need only establish a prima facie case of personal jurisdiction." *Wolfe v. Intermeccanica Int'l, Inc.*, 2024 WL 1300198, at *2 (D. Del. Mar. 27, 2024) (quoting *Eurofins Pharma US Hldgs. v. BioAlliance Pharma SA*, 623 F.3d 147, 155 (3d Cir. 2010)).

To establish personal jurisdiction, a party need only allege facts sufficient to satisfy two requirements, one statutory and one constitutional. *Id.* (citing *Reach & Assoc. P.C. v. Dencer*, 269 F. Supp. 2d 497, 502 (D. Del. 2003)). Regarding the statutory requirement, "the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute." *Id.* "As for the constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

This Court has specific jurisdiction over Defendants. Under Delaware's long arm statue, "specific jurisdiction may be established if the cause of action arises from contacts with the forum." *Id.* at 449 (citing *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1466 (D. Del. 1991)). By contrast, general jurisdiction requires that the defendant's affiliations with the state are "so 'continuous and systematic' as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "The Delaware long-arm statute, however, has been construed 'broadly to confer jurisdiction to the maximum extent possible under the Due Process Clause,' so the focus

of the inquiry traditionally rests on the constitutional component." *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 502 (D. Del. 2017) (quoting *Merck & Co. v. Barr Labs., Inc.*, 179 F. Supp. 2d 368, 372 (D. Del. 2002)). Here, due process is met because APP, Caldwell, Siler and Silver each took acts in Delaware in connection with the formation of Nolabels.com Inc. and its infringing website. Moreover, Defendants intended that their action harm No Labels in Delaware.

### 3.    Rule 12(b)(6) Standard: Failure to State a Claim.

Defendant Siler moves to dismiss all ten counts of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. Defendant RT Group also joins Siler in moving to dismiss Count IX for violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904(g). Their motion is wholly without merit. As explained below, each of those counts states a claim.

When dismissal is sought under Rule 12(b)(6), the court conducts a two-part analysis. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show… a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The court may grant a motion to dismiss only if, after "accepting all well pleaded allegations in the complaint

13

as true, and viewing them in the light most favorable to plaintiff, [the] plaintiff is not entitled to relief." *Id.* "In deciding a Rule 12(b)(6) motion, a court must consider *only* the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (emphasis added).

**B.    Defendants' Motions to Dismiss for Lack of Personal Jurisdiction Should Be Denied.**

Defendants APP, Caldwell, Silver, and Siler move for dismissal of the Amended Complaint against them under Rule 12(b)(2) for alleged lack of personal jurisdiction. The Court should deny each of these motions for the following reasons:

**1.    APP's Motion to Dismiss for Lack of Personal Jurisdiction Should Be Denied.**

**a.    APP is subject to long-arm jurisdiction in Delaware.**

Defendant APP argues that it should be dismissed from this case because it "did not transact any business in Delaware," because it "has no contacts with Delaware," and because "the action *did not arise* from any of APP's alleged Delaware contacts." D.I. 132 at 1 (emphasis in original).

However, the Amended Complaint alleges that APP, through its agents Silver and Siler, "cause[d] Nolabels.com Inc. to be incorporated in Delaware for the purpose of owning and operating the copycat website." D.I. 126 ¶¶ 16-17.[1] It also alleges that APP "sold or otherwise transferred the infringing domain to Delaware resident Nolabels.com Inc. and thus intentionally transacted business within the State of Delaware." D.I. 126 ¶ 14. Thus, the Amended Complaint alleges sufficient jurisdictional facts regarding APP. The requirements of the Delaware long-arm statute and due process are met.

---

[1] Actions of an agent undertaken on behalf of their principal are imputed the principal. *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 481 (Del. 1992) ("conspirators are considered agents for jurisdictional purposes").

In *Sample v. Morgan*, 935 A.2d 1046, 1057 (Del. Ch. 2007), the Delaware Court of Chancery found that it had personal jurisdiction over an individual defendant and a law firm that "themselves prepared and sent the Certificate Amendment to CSC in Delaware for filing with the Secretary of State." The Court held: "[t]he involvement of a defendant in arranging, either directly or through an agent such as CSC, for the filing of a corporate instrument in Delaware that facilitated transactions under challenge in litigation in this court has been repeatedly recognized as sufficient to constitute the transaction of business under § 3104(c)(1)." *Id.* (citing *In re General Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *22 (Del. Ch. 2005) (certificate of merger); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *8 (Del. Ch. 2005) (certificate of designation); *Chandler v. Ciccoricco*, 2003 WL 21040185, at *11 (Del. Ch. 2003) (certificate of designation); *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1229 (Del. Ch. 2001) (charter amendments), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002); *Gibralt Capital Corp. v. Smith*, 2001 WL 647837, at *6 (Del. Ch. 2001) (charter amendment and certificate of designation); *Kahn v. Lynch Commc'n Sys., Inc.*, 1989 WL 99800, at *4 (Del. Ch. 1989) ("negotiating and consummating the merger at issue" constituted transaction of business under 10 *Del. C.* § 3104(c)(1) when the merger's consummation required a filing with the Secretary of State)).

Filing of a certificate of incorporation is a sufficient jurisdictional act under Section 3104(c)(1) where the corporation is formed for the purpose of engaging in the challenged actions. In *SDF Funding LLC v. Fry*, 2022 WL 1521309, at *2 (Del. Ch. May 13, 2022), the Court of Chancery found that "[t]o support the exercise of specific personal jurisdiction, however, the Delaware entity must have been formed for the purpose of engaging in the challenged transaction." Here, APP, Silver, and Siler formed NoLabels.com, Inc. for the purpose of engaging in the

challenged misconduct. They formed the Delaware corporation "for the purpose of owning and operating the copycat website," to use that website to knowingly publish false and misleading information about No Labels, and to, in their own words, "Make No Labels Brand socially, professionally toxic." *See* D.I. 126 ¶ 1.

The requirement that Plaintiff's claims arise from or relate to APP's contacts with Delaware is also met. APP argues that Plaintiff's claims did not arise "*specifically*" from its transfer of the infringing domain to Nolabels.com Inc. because that action "occurred well before the website went live." D.I. 132 at 6 (emphasis in original). That APP transferred the website to an entity that APP caused to be formed before the website was live as part of a conspiracy to harm No Labels, however, does not absolve APP of the jurisdictional contacts relating to the transfer; the Court must look to the entirety of the scheme, not each individual action in isolation. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) ("we have emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."); *Credit Union Liquidity Servs., LLC v. Coastal Fed. Credit Union*, 2010 WL 3606033, at *5 (N.D. Tex. Sept. 14, 2010) ("This case, however, is not about each of those contacts in isolation. The number and nature of contacts that Coastal has with the state of Texas, when considered together, are more than sufficient for specific jurisdiction."); *StrikeForce Techs., Inc. v. WhiteSky, Inc.*, 2013 WL 3508835, at *3 (D.N.J. July 11, 2013) ("Though WhiteSky argues that any one of these contacts, standing alone, is insufficient to establish specific jurisdiction, the Court

must not consider them in isolation.  Putting together the various contacts with New Jersey demonstrates that WhiteSky actively sought out, pursued and transacted upon a contract with a New Jersey company.").

APP ignores the allegation that it caused NoLabels.com Inc. to be incorporated in Delaware.  *See* D.I. 126 ¶¶ 16-17.  That allegation, standing alone, is sufficient to establish personal jurisdiction in Delaware.

APP quotes the United States Supreme Court in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359 (2021), as support for its argument that a defendant's contacts "must also *specifically* give rise to plaintiff's claims."  D.I. 132 at 6 (emphasis in original).  However, the Supreme Court in *Ford* stated that a plaintiff's claims "must arise out of *or relate to* the defendant's contacts with the forum."  U.S. 351 at 359 (emphasis added).  Here, Plaintiff's claims relate to APP's incorporation of NoLabels.com Inc. in Delaware and its transfer of the <nolabels.com> domain to NoLabels.com Inc. (whether directly or indirectly through defendant RT Group).  Those actions were necessary steps toward the infringement of Plaintiff's trademark and the resulting injuries alleged in the Amended Complaint.

b.    __The requirements of due process are met as to APP__.

As to due process, requiring APP to appear in this court does not offend traditional notions of fair play and substantial justice.  APP "is a sophisticated party that understands the effects of the 'Delaware-directed nature of their conduct.'"  *Benihana*, 2005 WL 583828, at *8 (quoting *Chandler*, 2003 WL 21040185, at *12).  The Amended Complaint alleges that APP caused a certificate of incorporation to be filed with the Delaware Secretary of State, forming an entity for the purpose of infringing No Labels' trademarks and damaging No Labels' reputation.  D.I. 126 ¶¶ 59, 75.

17

In *Virtus Capital L.P. v. Eastman Chemical Co.*, 2015 WL 580553, at *15 (Del. Ch. Feb. 11, 2105), the Delaware Court of Chancery found that its exercise of personal jurisdiction over an individual defendant comported with due process. The defendant, Sass, was "financially sophisticated." *Id.* He "engaged in conduct that involved the formation of Delaware entities, the use of Delaware law, and the filing of a certificate of merger with the Delaware Secretary of State to accomplish his purposes." *Id.* The Court concluded that "Sass should have 'reasonably anticipated... that his... actions might result in the forum state asserting personal jurisdiction over him in order to adjudicate disputes arising from those actions.'" *Id.* (quoting *In re USACafes, L.P. Litig.*, 600 A.2d 43, 50–51 (Del. Ch.1991)) (ellipses in original).

In *Chandler*, 2003 WL 21040185, at *12 n.52, the Court of Chancery found that the exercise of jurisdiction over non-resident defendants who filed a certificate of designations in Delaware "comports with the due process requirements of the United States Constitution because this case arises directly out of the transaction" being challenged by the plaintiff. "Moreover, that transaction required an act in Delaware." *Id.*

In *Chandler*, the plaintiffs asked the Court of Chancery to invalidate an issuance of preferred stock to three entity defendants that purportedly allowed the defendants to take control of plaintiff NuWeb Solutions, Inc. The Court denied the nonresident defendants' motion to dismiss under Rule 12(b)(2), finding that the filing of a certificate of designations of preferred stock with the Delaware Secretary of State was "an important act in Delaware necessary to the accomplishment of an alleged conspiracy to place a large block of NuWeb's voting power in the hands of [defendants] Frome and Wainstein." *Id.* at *1. The Court found that the filing of the certificate was "a transaction of business for the purposes of § 3104(c)(1)." Regarding due process, the Court concluded that the exercise of jurisdiction "comports with the due process

18

requirements of the United States Constitution because this case arises directly out of the transaction giving rise to their ownership of the shares." *Id.* at *12 n.52.

In *Ford Motor Co.*, the petitioner, Ford, argued—as APP does here—that jurisdiction attaches "only if the defendant's forum conduct *gave rise* to the plaintiff's claims." 592 U.S. at 361. The Supreme Court rejected that argument, finding that it would unduly "narrow the class of claims over which a state court may exercise specific jurisdiction." *Id.* at 361-62. The Supreme Court stressed that "our most common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum." *Id.* at 362 (quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 582 U.S. 255, 261 (2017)) (emphasis in original). Here, Plaintiff's claims *relate to* APP's contacts with Delaware.

This case arises out of and relates to the challenged actions of Nolabels.com Inc. As alleged in the Amended Complaint, "NoLabels.com Inc. was formed for the purpose of usurping No Labels' goodwill and tarnishing its reputation through its piracy of the No Labels Registered Trademark." D.I. 126 ¶ 59. NoLabels.com Inc. was "a corporation set up by Siler expressly to support the website." *Id.* ¶ 58. The requirements of due process are met.

### c.    APP is subject to personal jurisdiction under the conspiracy theory of jurisdiction.

APP also argues that it is not subject to personal jurisdiction under a conspiracy theory of jurisdiction because "APP cannot conspire with itself and its agents, no substantial act integral to the alleged conspiracy occurred in Delaware, and there is no allegation that alleged harm occurred inside Delaware (let alone that APP knew nor could have known that)." *Id.* at 1-2.

The Amended Complaint alleges that APP is subject to personal jurisdiction in Delaware because it participated in a conspiracy with the other defendants "to spread false and misleading information about No Labels" through the Infringing Website, including "inside Delaware." *Id.*

19

¶ 19.  APP argues that all of its alleged co-conspirators are either "itself" or its "agents" and that it could not conspire with itself or its agents.  D.I. 132 at 8.  APP argues that the Amended Complaint's "blurred lines suggest that all three entities were under common control and does not allege that the interests, economic or otherwise, of the three entities were any different." *Id.* at 8-9.

However, No Labels need not allege that the interests of the Defendants were different or that they were not "under common control."  The cases APP cites provide only that a corporation cannot conspire with its wholly owned subsidiary.  In *Fortis Advisors LLC v. Johnson & Johnson*, 2021 Del. Ch. LEXIS 290, at *18-19 (Del. Ch. Dec. 13, 2021) (cited by APP (D.I. 132 at 8)), the Court of Chancery found that "[a] corporation generally cannot be deemed to have conspired with its wholly owned subsidiary." (quoting *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006)); *see also Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 Del. Super. LEXIS 266, at *37–39 (Del. Super. Ct. June 6, 2012) (cited at D.I. 132 at 8) (same); *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 Del. Ch. 35, at *26–27 (Del. Ch. Mar. 3, 2005) (cited at D.I. 132 at 8) (same) (quoting *In re Asbestos Litig.*, 509 A.2d 1116, 1120 n.2 (Del. Super. 1986)).  The Amended Complaint does not allege that any of the defendant entities is a wholly owned subsidiary of any other defendant entity.  Even if the entities had common interests or were under common control (which is not alleged in the Amended Complaint), they are not alleged to have any parent-subsidiary relationships.

Accordingly, the Amended Complaint adequately alleges that APP conspired with NoLabels.com Inc. and RT Group.  That element of the conspiracy theory of jurisdiction is satisfied as to APP.

As to the other elements of the test articulated by *Istituto Bancario Italiano SpA v. Hunter Engineering Co.*, 449 A.2d 210, 225 (Del. 1982), the Amended Complaint alleges that APP was a member of the conspiracy, that substantial acts—the filing of the NoLabels.com Inc. certificate of incorporation with the Delaware Secretary of State and the transfer of the infringing domain to Delaware resident Nolabels.com Inc.—occurred in Delaware, that APP knew or had reason to know of the acts in Delaware, and that the acts in Delaware and their effects in Delaware were a direct and foreseeable result of its conduct in furtherance of the conspiracy.  *See* D.I. 126 ¶¶ 19, 174-75; *see also Benihana*, 2005 WL 583828, at *8 n.38 ("a conspiracy to commit such wrongful acts and effect such inequitable results should satisfy the first element of conspiracy theory jurisdiction"); *Parfi Holding*, 794 A.2d at 1229 (defendant's knowledge of acts in Delaware "can be inferred from its participation" in the challenged transactions).

Finally, the Amended Complaint alleges facts sufficient to make the exercise of jurisdiction over APP under the conspiracy theory of jurisdiction consistent with due process.  "Because it is so rigorous and focuses on the out-of-state defendant's Delaware-directed conduct, the *Istituto* test is a sound method by which to examine the constitutionality of an exercise of personal jurisdiction."  *Parfi Holding*, 794 A.2d at 1230.  In this case, the test indicates that APP may be sued in Delaware without unfairness.  *See id.*  Accordingly, APP is subject to personal jurisdiction in Delaware.

**2.    The Individual Defendants' Motions to Dismiss for Lack of Personal Jurisdiction Should Be Denied.**

Defendants Silver, Siler, and Caldwell also move for dismissal of the Amended Complaint against them based on an alleged lack of personal jurisdiction.  *See* D.I. 137 (Caldwell brief); D.I. 140 (Silver brief); D.I. 144 (Siler brief).

a.    <u>**Silver and Siler are subject to this court's jurisdiction**</u>.

The Amended Complaint alleges that Silver and Siler worked "to cause Nolabels.com Inc. to be incorporated in Delaware for the purpose of owning and operating the copycat website." D.I. 126 ¶¶ 16, 17. Siler admits that he incorporated NoLabels.com Inc. in Delaware. D.I. 133-3 (Siler Affidavit) ¶ 20 ("On November 7, 2023, I formed NoLabels.com Inc. n/k/a DELCO0222024, INC."). Silver does not deny the Amended Complaint's allegation that he worked with Siler to cause NoLabels.com Inc. to be incorporated in Delaware. *See* D.I. 140 at 9 (citing D.I. 133-3 ¶¶ 20-29).

As explained above, "[t]he involvement of a defendant in arranging, either directly or through an agent such as CSC, for the filing of a corporate instrument in Delaware that facilitated transactions under challenge in litigation in this court has been repeatedly recognized as sufficient to constitute the transaction of business under § 3104(c)(1)." *Sample*, 935 A.2d at 1057. Silver and Siler were involved in arranging, either directly or through agents, for the filing of a certificate that facilitated the wrongful conduct alleged in the Amended Complaint. *See* D.I. 126 ¶¶ 16, 17. Thus, they are subject to personal jurisdiction in this court under 10 *Del. C.* § 3104(c)(1).

The requirements of due process are also met as to Silver and Siler. The exercise of jurisdiction over Silver and Siler "comports with the due process requirements of the United States Constitution because this case arises directly out of the transaction" being challenged by Plaintiff. *Chandler*, 2003 WL 21040185, at *12 n.52. "Moreover, that transaction required an act in Delaware." *Id.*

Siler argues that "[t]he causes of action do not arise from the act of incorporation, but from use of a website." D.I. 144 at 12. However, as alleged in the Amended Complaint, Siler and Silver formed the Delaware corporation "for the purpose of owning and operating the copycat website." D.I. 126 ¶¶ 16, 17. Where a Delaware entity is formed for the purpose of carrying out the alleged

wrongful conduct, that allegation supports the exercise of specific personal jurisdiction under 10 *Del. C.* § 3104(c)(1). *See SDF Funding*, 2022 WL 1521309, at *2. Even if the causes of action here did not arise directly from the formation of NoLabels.com Inc., they *relate to* the act of incorporation and thus suffice to meet the requirements of due process. *See Ford Motor Co.*, 592 U.S. at 359.

#### b.    <u>Caldwell is subject to this court's jurisdiction</u>.

The Amended Complaint alleges that Defendant Caldwell is subject to personal jurisdiction in Delaware "because she served as an agent for, and provided services to, NoLabels.com Inc., a Delaware corporation and citizen, in connection with the Infringing Website, directed such services to this jurisdiction, and intended for such services to be used by NoLabels.com Inc. in its operation of the copycat website." D.I. 126 ¶ 18. It also alleges that she is subject to jurisdiction under the conspiracy theory of jurisdiction because of her "participation in the conspiracy to spread false and misleading information about No Labels, through use of the copycat website and violations of state and federal law." *Id.* ¶ 19. It alleges that Caldwell "contributed to the content of the Infringing Website" and "made edits to the copycat website." *Id.* ¶¶ 101, 104. She was handsomely compensated for so doing. *See* D.I. 126 ¶ 47 ([u]pon information and belief, Siler and Caldwell received at least $10,000 per month for this consulting work").

In the often-cited *Istituto Bancario* case, the Delaware Supreme Court stated:

> We therefore hold that a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

23

Thus, a defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws.

*Istituto Bancario*, 449 A.2d at 225.

Caldwell is subject to personal jurisdiction in this Court based on *Istituto Bancario* because she deliberately chose to participate in a conspiracy to form a Delaware corporation for the express purpose of operating the Infringing Website.

Satisfying the *Istituto Bancario* test meets the requirements of the Delaware long-arm statute and federal due process.

"The first and second *Istituto Bancario* elements provide grounds for imputing the jurisdiction-conferring act to the defendant under agency principles, because conspirators are considered agents for jurisdictional purposes." *Clark v. Davenport*, 2019 WL 3230928, at *18 (Del. Ch. July 18, 2019). The "plain language of the Long–Arm Statute recognizes that forum-directed activity can be accomplished 'through an agent.'" *Perry v. Neupert*, 2017 WL 6033498, at *15 (Del. Ch. Dec. 6, 2017); *see also Virtus*, 2015 WL 580553, at *12 (same). Here, the Complaint alleges both that a conspiracy existed and that Caldwell was a member of that conspiracy. D.I. 126 ¶¶ 174-75. That is sufficient to meet the first two elements of the *Istituto Bancario* standard.

"The third *Istituto Bancario* element corresponds to the statutory requirement that the defendant have transacted business or performed work in the State." *Clark*, 2019 WL 3230928, at *18; *see also Harris v. Harris*, 289 A.3d 310, 338–39 (Del. Ch. 2023) (same). Thus, because Caldwell was a member of the conspiracy, the jurisdictional contacts of other members of the conspiracy are properly imputed to her and the third *Istituto Bancario* factor is satisfied. *See Hercules*, 611 A.2d at 481 ("conspirators are considered agents for jurisdictional purposes").

24

The requirements of the Delaware long-arm statute are therefore met. *See Harris*, 289 A.3d at 338–39 ("the first, second, and third *Istituto Bancario* elements correspond sufficiently with the requirements of Section 3104 such that satisfying the former accomplishes the latter").

The requirements of due process are also met:

> The fourth and fifth *Istituto Bancario* elements—whether the defendant knew or had reason to know of the forum-directed activity and the degree to which the forum-directed activity was a direct and foreseeable result of the conduct in furtherance of the conspiracy—speak to due process and whether there are sufficient minimum contacts between the defendant and the forum such that the defendant could reasonably anticipate being sued there.

*Perry*, 2017 WL 6033498, at *15–16; *see also Virtus*, 2015 WL 580553, at *12 (same). Here, Caldwell knew that the goal of the conspiracy—damaging No Labels—would be accomplished by creating a Delaware corporation for the express purpose of having that entity operate the Infringing Website. A "defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws." *Perry*, 2017 WL 6033498, at *15–16.

Caldwell argues that engaging in a conspiracy with Silver and Siler cannot serve as a basis for jurisdiction because all three individuals were agents of Nolabels.com Inc. D.I. 137 at 22-23. That argument, however, requires ignoring the timeline, and the goals and actions of the conspirators. Here, the conspiracy came into existence *before* the conspirators formed Nolabels.com Inc. *See* D.I. 126 ¶ 41 ("[i]n the summer of 2023, Defendants Silver and Caldwell communicated with potential funders to discuss their respective work on No Labels"); *id.* ¶ 43 ("[o]n November 7, 2023, defendant NoLabels.com Inc. was incorporated in Delaware"). That the conspirators remained involved with NoLabels.com Inc. *after* they formed it does not allow

Caldwell to escape from consequences of her *pre*-formation decision to join and further the conspiracy's aims.

Accordingly, the Court has personal jurisdiction over Defendant Caldwell.

### C.    Siler's Motion to Dismiss Count I for Cybersquatting Should Be Denied.

Count I of the Amended Complaint alleges that "Defendants APP, RT Group, Siler, and NoLabels.com Inc., without authorization and with a bad faith intent to profit from the No Labels Registered Trademark, registered, trafficked in, and/or used the <nolabels.com> domain name for the Infringing Website, which domain is identical to the No Labels Registered Trademark and the No Labels Domain." D.I. 126 ¶ 85. Those allegations state a claim for cybersquatting in violation of 15 U.S.C. § 1125(d).

Cybersquatting occurs when a person registers the domain name of a well-known trademark and attempts to profit from it, including by "using the domain name to divert business from the trademark holder to the domain name holder." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004)).

One of the elements of a claim for cybersquatting is that the defendants had a "bad faith intent to profit" from their wrongful conduct. 15 U.S.C. § 1125(d)(1)(A)(i). Siler argues (without citation to authority) that Count I fails to state a claim because it does not allege that Defendants intended to "profit" in the sense of "benefit[ing] financially" from the Infringing Website. D.I. 144 at 5-6. The concept of profiting from cybersquatting is not limited "to a literal interpretation of the statutory words alone," but rather was intended to be viewed expansively as the statute includes a non-exhaustive list of factors to consider in that analysis. *Argos v. Orthotec LLC*, 304 F. Supp. 2d 591, 596 (D. Del. 2004). Indeed, it has long been understood that the "for profit" concept in the Lanham Act is to be given a wide interpretation. *See, e.g., Planetary Motion, Inc.*

*v. Techsplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001) ("[t]he term 'use in commerce' as used in the Lanham Act 'denotes Congress's authority under the Commerce Clause rather than an intent to limit the Lanham Act's application to profit making activity'") (quoting *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92-93 (2d Cir. 1997) (citation omitted), *cert. denied*, 523 U.S. 1076 (1998)); *see also Zipee Corp. v. United States Postal Service*, 140 F. Supp. 2d 1084, 1087 (D. Ore. 2000) ("although plaintiff does not directly profit from its use of the postal-service.com designation, it benefits by driving increased traffic to its websites.").

As then-Chief Judge Robinson recognized in *Argos*, the cybersquatting statute provides guidance for understanding the concept of a "bad faith intent to profit."  *See* 15 U.S.C. § 1125(d)(2) (listing factors for consideration).  Here, the statute's fifth factor describes Defendants' conduct: "the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or ***with the intent to tarnish or disparage the mark***, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site."   15 U.S.C. § 1125(d)(1)(B)(i)(V) (emphasis added); *see also Argos*, 304 F. Supp. 2d at 596–97 (denying motion to dismiss and stating "ARGOS's complaint alleges that Orthotec attempted to trade upon the goodwill that ARGOS established and to generate confusion among the relevant medical community as to the affiliation and sponsorship of Orthotec's activities").   The Amended Complaint alleges facts demonstrating that the statutory factors require an inference of "bad faith intent to profit":

| Factor | Statutory Text | Amended Complaint |
|---|---|---|
| I | The trademark or other intellectual property rights of the person, if any, in the domain name; | Defendants deliberately named their entity "NoLabels.com Inc." as part of their effort to infringe upon No Labels' trademark. |
| II | The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; | The domain name matches the name of Defendants' entity; Defendants chose the name of the entity to aid them in attacking and harming No Labels. |
| III | The person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; | None. Defendants created the entity and domain for the express purpose of harming Plaintiff. Plaintiff, however, had been using the name No Labels for more than a decade. |
| IV | The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name | Defendants did not have bona fide use of the mark, they created their entity and the domain name for the express purpose of harming Plaintiff and infringing its trademark. |
| V | The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site | This factor describes Defendants' purpose in creating the offending website. |

| Factor | Statutory Text | Amended Complaint |
|---|---|---|
| VI | The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; | Defendants did not create the offending website for any bona fide offering, rather it was created for the sole purpose of confusing the public and drawing consumers away from Plaintiffs' website. |
| VII | The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; | Not Applicable. |
| VIII | The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and | Not Applicable |
| IX | The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection I | "No Labels" which is incorporated in the domain name took a very specific meaning within the context of the election cycle |

Accordingly, Count I states a claim for cybersquatting and Siler's motion to dismiss that claim should be denied.  Moreover, the claim, being under a federal statute, forms the basis for subject matter jurisdiction in this court.

### D.    Siler's Motion to Dismiss Plaintiff's Trademark Claims Should Be Denied.

Counts II through VII of the Amended Complaint state various claims against all Defendants (Counts II, III, and IV) and against defendants APP, RT Group, Siler, Silver, and Caldwell (Counts V, VI, and VII) under the Lanham Act, 15 U.S.C. §§ 1114(1), 1116, 1117, and 1125(a), for trademark infringement and false designation of origination.  Siler argues that the claims should be dismissed because they fail to allege that the trademark was used "in commerce." D.I. 144 at 7.  Use "in commerce" means "the sale, offering for sale, distribution, or advertising of any goods or services…."  15 U.S.C. § 1114(1)(a).

However, nonprofit organizations like No Labels can, and do, engage "in commerce" for purposes of trademark claims.  "Courts have long construed the Lanham Act's requirement that a defendant use a trademark in connection with the advertisement of 'any goods or services' to encompass trademark infringement by political or nonprofit defendants."  *Libertarian Nat'l Comm., Inc. v. Saliba*, 116 F.4th 530, 537 (6th Cir. 2024); *see also Planetary Motion*, 261 F.3d at 1194 ("[t]he term 'use in commerce' as used in the Lanham Act 'denotes Congress's authority under the Commerce Clause rather than an intent to limit the Lanham Act's application to profit making activity'") (quoting *United We Stand*, 128 F.3d at 92-93) (citation omitted).

Whether prior use of a trademark in commerce is sufficient for a claim "does not turn on whether the use was for profit, but instead on whether the activities 'bear elements of competition, notwithstanding [a] lack of an immediate profit-motive.'"  *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1053 (10th Cir. 2021) (quoting *Planetary Motion*, 261 F.3d at 1200).  Nonprofit organizations like No Labels engage in activities that bear elements of competition with other political and nonprofit organizations in competing in the marketplace for ideas and policy direction.  *See id.* ("non-profit organizations… nonetheless engage in *competition* with other organizations") (emphasis in original).

Accordingly, the Court should deny Siler's request for dismissal of Counts II through VII and should find that those claims support subject matter jurisdiction in this court.

### E. Siler's Motion to Dismiss Count VIII for Violation of the Delaware Deceptive Trade Practices Act Should Be Denied.

Count VIII of the Amended Complaint alleges that all Defendants violated the Delaware Uniform Deceptive Trade Practices Act, 6 *Del. C.* § 2531, *et seq.* (the "DTPA"), by disparaging No Labels through the publication of false and misleading information on the Infringing Website. D.I. 126 ¶¶ 163-64. Siler argues that there is nothing in the DTPA "that gives any indication that it has extraterritorial application, and so the claim should be dismissed." D.I. 144 at 17. Siler relies on *JPMorgan Chase Bank, N.A. v. Argus Information & Advisory Services Inc.*, 765 F. Supp. 3d 367, 380 (D. Del. Feb. 2, 2025), as support for its argument that, because the alleged conduct took place outside Delaware, Delaware law does not apply.

However, trademark infringement that occurs nationwide as in this case is actionable in any U.S. jurisdiction. *Argus* addressed a claim that the defendants misappropriated trade secrets "somewhere else." *Id.* Contrary to Siler's argument, where a claim for trademark infringement arises under the Lanham Act, the same facts give rise to a claim in Delaware under the DTPA. *See Treasury Mgmt. Servs., Inc. v. Wall St. Sys. Delaware, Inc.*, 2017 WL 1821114, at *5 (D. Del. May 5, 2017) ("[c]ourts reviewing DDPTA violations apply the same standards as they apply to trademark infringement claims (*i.e.*, valid and protectable mark, plaintiff owns mark, and likelihood of confusion). Proof of a Lanham Act claim would necessarily meet the requirements for a claim under the DTPA."). Simply, because No Labels has properly pled claims "under the Lanham Act" it has pled facts "sufficient to support unfair competition under the DDTPA." *Id.*

This case also differs from *Argus* because it does not involve misappropriation of trade secrets but rather the nationwide publication of a false and misleading website. *See, e.g.*, *Puff*

31

*Corp. v. KandyPens, Inc.*, 2020 WL 6318708, at *3 (D. Del. Oct. 28, 2020) ("False advertising and deceptive trade practice claims, however, arise where a customer is misled by the challenged conduct. Because both KandyPens and Puffco sell and advertise on Instagram their competing products in all states, the alleged claims arise in both Delaware and California."). Thus, the disparagement took place everywhere, including in Delaware. *Pacira Biosciences, Inc. v. Ventis Pharma, Inc.*, 2024 WL 3925117, at *3 (D. Del. Aug. 23, 2024) ("[t]he purportedly false advertisements largely appear on Ventis's website. The advertising is thus accessible all over the United States."). The DTPA applies. The Court should deny Siler's motion to dismiss Count VIII.

### F.    Defendants' Motions to Dismiss Count IX for Violation of the D.C. Consumer Protection Procedures Act Should Be Denied.

#### 1.    No Labels Has Standing Under CPPA Subsection 28-3904(g).

Section 28-3904 of the District of Columbia Consumer Protection Procedures Act (the "CPPA") provides that:

> It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:

> ****

>> (g) disparage the goods, services, or business of another by false or misleading representations of material facts….

Count IX of the Amended Complaint seeks relief for all Defendants' violations of Section 28-3904(g) of the CPPA. Count IX alleges that "The Infringing Website likewise pushed out false and misleading information about No Labels and was, in fact, designed to frame the 'the entire NL project as a right-wing shadow effort by crafting language that looks like it's coming from NL as a right-wing shadow group.'" D.I. 126 ¶ 170 (quoting D.I. 126-1 at 5). It alleges that "Defendants used false and misleading information… to disparage No Labels." *Id.* ¶ 171.

Defendants RT Group (D.I. 135 at 2-4) and Siler (D.I. 144 at 17-18) move to dismiss Count IX. They argue first that Plaintiff lacks standing to bring a claim under the CPPA because the statute gives standing only to consumers, and No Labels is not a "consumer" as defined by the CPPA. *See* D.I. 135 at 2-3; D.I. 144 at 17-18. That argument is based not on the text of the CPPA, but rather on case law in the District of Columbia Court of Appeals and the United States Court of Appeals for the District of Columbia Circuit. *See, e.g.*, *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010) (cited at D.I. 135 at 3 and D.I. 144 at 17-18) (plaintiffs "did not engage in consumer transactions within the meaning of the Act and are not entitled to its protections"); *Ford v. ChartOne, Inc.*, 908 A.2d 72, 81 (D.C. Ct. App. 2006) (cited at D.I. 135 at 3) ("the CPPA 'was designed to police trade practices arising only out of consumer-merchant relationships,'… and does not apply to commercial dealings outside the consumer sphere") (quoting *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981)). That case law, however, stems from the understanding that at the administrative level, the Act was intended to govern claims by consumers against businesses. *See Howard v Riggs Natl. Bank*, 432 A2d 701, 709 (D.C. 1981) ("[w]e agree with Riggs that the CPPA, at least insofar as it is enforceable at the administrative level, was designed to police trade practices arising only out of consumer-merchant relationships."). Here, Plaintiffs are not seeking relief in an administrative forum, but rather are seeking relief in a judicial forum for exactly the injury that is described in Section 28-3904(g) of the CPPA: the disparagement of goods or services through false or misleading representations of fact. Further, the statute expressly contemplates that claim will arise even if no consumer is injured by the misconduct. *See* D.C. Code § 28-3904 ("It shall be a violation of this chapter for any person to

engage in an unfair or deceptive trade practice, *whether or not any consumer is in fact misled, deceived, or damaged thereby*" (emphasis added)).[2]

Moreover, none of the cases cited by Defendants involves an alleged violation of Subsection (g) of Section 28-3904. That subsection differs from others in the section because on its face it is not designed to protect consumers. It prohibits "any person" from "disparag[ing] the goods, services, or business of another by false or misleading representations of material facts." Because consumers as such do not by definition have goods, services, or business, a "person" could not disparage the "goods, services, or business" of a consumer and a consumer could not sue another person for disparagement of his or her goods, services, or business.

Defendants argue that the CPPA does not give a cause of action for violations of any provision of the CPPA to anyone but consumers. That interpretation, however, would render Subsection (g) a nullity. *Pennsylvania Med. Soc. v. Snider*, 29 F.3d 886, 895–96 (3d Cir. 1994) ("It is well settled that statutory construction is a holistic endeavor and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter. Put another way, in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy. *We are obligated to give effect, if possible, to every word Congress used*. That is, a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (cleaned-up, internal citations omitted). Because Subsection (g) refers to relations between businesses and not to relations between merchants and consumers, its application cannot be limited solely to dispute between merchants and consumers, as doing would effectively strike

---

[2] Implicitly, a business can bring a claim against another business because a consumer would lack standing to bring a claim where no consumer was "misled, deceived, or damaged."

Subsection 28-3904(g) from the statute.    Therefore, Plaintiff has a cause of action against Defendants under Subsection 28-3904(g).

The plaintiffs in *Shaw*, relied upon by both Siler and RT Group, were business travelers and their employers who claimed that the defendant, Marriott International, overcharged guests at its Russian hotels.  605 F.3d at 1041; *see* D.I. 135 at 3 and D.I. 144 at 17-18.  The opinion in *Shaw* does not specify the subsections of the CPPA under which the plaintiffs brought suit, but the case does not refer to disparagement and does not involve Subsection (g).  The plaintiffs sought relief under the CPPA's protections for consumers against unfair pricing practices, but they lacked standing because they were not "consumers" as defined by the CPPA.  The CPPA defines "consumer" as "a person who receives or demands goods or services that are primarily for personal, household, or family use."  *Shaw*, 605 F.3d at 1043.  The plaintiffs in *Shaw* received services for business use and not for personal, household, or family use, and therefore were not "consumers" under the CPPA and lacked standing to bring suit.  *Id.*

Similarly, the plaintiff in *Ford* sought relief under Subsection 28-3904(r), not under Subsection 28-3904(g).  Subsection 28-3904(r) makes it an unlawful trade practice under the CPPA to "make or enforce unconscionable terms or provisions of sales or leases."  *See* 908 A.2d at 78.  The plaintiff, Ford, alleged that the defendant, ChartOne, a medical records company, charged unconscionably high fees for providing copies of medical records to consumers.

In *Archie v. U.S. Bank, N.A.*, 255 A.3d 1005, 1019-20 (D.C. App. 2021), cited by RT Group (D.I. 135 at 3), the defendant, Archie, likewise asserted a defense and a counterclaim under CPPA Subsection 28-3904(r), arguing that the plaintiff was seeking to enforce an unconscionable loan. The court found that the parties were in a consumer-merchant relationship because the plaintiff sold Archie credit in the form of real estate refinancing.  *Id.* at 1020.

In *District Cablevision L.P. v. Bassin*, 828 A.2d 714, 722 n.7 (D.C. App. 2003), cited by RT Group (D.I. 135 at 3), the court cited CPPA Subsections 28-3904(e), which makes it an unlawful trade practice for any person to "misrepresent as to a material fact which has a tendency to mislead," and 28-3904(f), which makes it unlawful to "fail to state a material fact if such failure tends to mislead." The plaintiffs alleged that the defendant, District Cablevision, improperly imposed a $5.00 late fee on consumers. *Id.* at 722.

None of the cases cited by Defendants as support for their standing arguments refers to CPPA Subsection 28-3904(g). Standing in those cases was determined based on the parties' status as consumers. In this case, involving § 3904(g), No Labels has standing as a business that was injured by Defendants' acts of disparagement.

### 2.     Count IX States a Claim for Violation of CPPA Subsection 28-3904(g).

Defendants also argue that Count IX fails to state a claim for violation of the District of Columbia CPPA. D.I. 135 at 4; D.I. 144 at 18. Siler (but not RT Group) argues that Count IX "improperly lumps all Defendants together" and "does not identify the alleged false or misleading representation of material facts, as is required." D.I. 144 at 18. However, the Amended Complaint alleges that Siler stated in a PowerPoint presentation (D.I. 126-1 at 5), that Defendants' website would "mirror the NL.ORG language while also framing the entire NL project as a right-wing shadow effort by crafting language that looks like it's coming from NL as a right-wing shadow group." D.I. 126 ¶ 42; *see* D.I. 126-1 at 4 ("[t]he language will reflect NL.ORG while including overt [C]hristo-nationalist dog whistles").

The Amended Complaint alleges that Siler identified the <nolabels.com> domain name, contacted defendant Caldwell to discuss acquiring the domain and reached out to defendant Silver for funding to purchase the domain. D.I. 126 ¶¶ 51-52. It alleges that Siler "was designing the

36

'copycat' website that would mimic No Labels' actual website" and that he "prepared a pitch deck to outline the vision for the copycat website." *Id.* ¶ 54; *see also id.* (detailing false and misleading representations in the pitch deck).  It alleges that Siler set up the corporation NoLabels.com Inc. "expressly to support the website." *Id.* ¶ 58.  The Amended Complaint is replete with specific allegations about Siler's actions.

As to false and misleading representations of material facts, the Amended Complaint includes 11 paragraphs of specific allegations, including screen shots of the Infringing Website and quotations of its false statements, including that it "'is a hub for No Labels Party supporters to foster discussions and solutions,' thereby directly and misleadingly linking the Infringing Website with No Labels." *Id.* ¶¶ 62-72; *see also id.* ¶ 73 ("[t]hese photographs and captions are deceptive and false").  The Amended Complaint also alleges that Defendants funded a misleading Google Ads campaign "encouraging viewers to 'Join NoLabels.com Today.'" *Id.* ¶¶ 77-78.  In short, the Amended Complaint states a claim against Defendants for violation of CPPA Subsection 29-3904(g) for disparaging No Labels' business by false and misleading representations of material facts.

### G.    Siler's Motion to Dismiss Count X for Civil Conspiracy Should Be Denied.

"Under Delaware law, to state a claim for civil conspiracy, a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff." *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).  Count X of the Amended Complaint alleges each of those elements.  Specifically, the Amended Complaint alleges that "[t]here was a meeting of the minds between each of the defendants that false and misleading statements about No Labels should be disseminated" and that each of the Defendants "engaged in the dissemination of false and misleading information about

No Labels and violated U.S. trademark law and state/district unfair trade practice laws." D.I. 126 ¶¶ 174-75. Moreover, the Amended Complaint asserts that Defendants' conspiracy caused the loss of millions of dollars.

Although, as Siler argues, "civil conspiracy is not a separate cause of action and 'must arise from an underlying cause of action'" (D.I. 144 at 19 (quoting *Marino v. Cross Country Bank*, 2003 WL 503257, at *5 (D. Del. Feb. 14, 2003))), the Amended Complaint alleges the requisite underlying causes of action: violations of U.S. trademark law and state/district unfair trade practice laws. *See* D.I. 126 ¶ 175; *see also id.* at Counts II-IX. Because those causes of action are properly alleged (*see* Sections IV.B-F), Plaintiff's claim for civil conspiracy is properly alleged.

Accordingly, the Court must deny Siler's motion to dismiss Count X.

## V.    **CONCLUSION**

For each of the foregoing reasons, the Court should deny Defendants' motions to dismiss and should grant such other and further relief to Plaintiff as it deems appropriate under the circumstances.

Dated:  June 20, 2025

*Of Counsel:*

Mark D. Lytle (*pro hac vice*)
**NIXON PEABODY LLP**
799 9ᵗʰ Street NW, Suite 500
Washington, DC 20001
Tel: (202) 585-8435
Email: mlytle@nixonpeabody.com

Jason C. Kravitz (*pro hac vice*)
Leslie E. Hartford (*pro hac vice*)
**NIXON PEABODY LLP**
Exchange Place, 53 State Street
Boston, Massachusetts 02109
Tel: (617) 345-1318
Email:  jkravitz@nixonpeabody.com /
lhartford@nixonpeabody.com

**HALLORAN FARKAS + KITTILA LLP**

*/s/ Theodore A. Kittila*
Theodore A. Kittila (Bar No. 3963)
James G. McMillan, III (Bar No. 3979)
William E. Green, Jr. (Bar No. 4864)
5722 Kennett Pike
Wilmington, Delaware 19807
Tel:  (302) 257-2103
Fax:  (302) 257-2019
Email:  tk@hfk.law / jm@hfk.law /
wg@hfk.law

*Counsel for Plaintiff No Labels*

39